1   BELINDA ESCOBOSA HELZER (SB# 214178)
    bescobosahelzer@aclusocal.org
2   ACLU FOUNDATION OF SOUTHERN CALIFORNIA
    Orange County Office
3   1851 E. First Street, Suite 450
    Santa Ana, CA 92705
4   Telephone:  (714) 450-3962
    Facsimile:  (714) 543-5240
5
6   *Attorneys for Plaintiffs*
    [Additional counsel listed on next page]
7
8               UNITED STATES DISTRICT COURT
9              CENTRAL DISTRICT OF CALIFORNIA
10                  SOUTHERN DIVISION

11  Kenneth Glover; David Sestini;          CASE NO. 8:15-CV-01332-AG-DFM
12  Douglas Frederes Jr.; Jeffrey Aiken;
    Katrina Aune; John Miller; and Lisa     **CLASS ACTION**
13  Holbrook, individually, and on behalf
    of all others similarly situated        **PLAINTIFFS' REPLY IN SUPPORT**
14                                          **OF MOTION FOR PRELIMINARY**
                   Plaintiffs,              **INJUNCTION**
15
          vs.
16
    CITY OF LAGUNA BEACH; THE               Date:        January 25, 2016
17  LAGUNA BEACH POLICE                     Time:        10:00 a.m.
    DEPARTMENT, a California charter        Courtroom:   10D
18  city
                                            Hon. Andrew J. Guilford
19                 Defendants.
20                                          [Reply In Support of Motion for
                                            Provisional Class Certification;
21                                          Declarations of Belinda Escobosa Helzer,
                                            John Culbertson, Benjamin F. Henwood,
22                                          Pam Bowers, Lisa Holbrook, Leonard
                                            John Porto III, James Scott Rudolph, and
23                                          David Sestini in Support of Replies;
                                            Objections to Defendants' Evidence; and
24                                          Responses to Defendants' Evidentiary
                                            Objections filed and served concurrently
25                                          herewith]
26
27
28

1   DAVID M. HERNAND (SB #162733)
    davidhernand@paulhastings.com
2   ANDREW B. GROSSMAN (SB# 211546)
    andrewgrossman@paulhastings.com
3   KATHERINE F. MURRAY (SB# 211987)
    katherinemurray@paulhastings.com
4   PAUL HASTINGS LLP
    515 South Flower Street
5   Twenty-Fifth Floor
    Los Angeles, CA 90071
6   Telephone:  (213) 683-6000
    Facsimile:  (213) 996-3273
7

8   DANIEL LIM (SB# 292406)
    daniellim@paulhastings.com
9   PAUL HASTINGS LLP
    695 Town Center Drive
10  Seventeenth Floor
    Costa Mesa, CA  92626-1924
11  Telephone:  (714) 668-6200
    Facsimile:  (714) 979-1921
12
    *Attorneys for Plaintiffs*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................... 1

II.   ARGUMENT ........................................................................................... 2

III.  DEFENDANTS' CHARACTERIZATION OF THE PRELIMINARY
      INJUNCTION STANDARD IS INSUFFICIENT. ........................................... 2

IV.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR EIGHTH
      AMENDMENT CLAIM. ............................................................................ 4

      A.    Defendants Criminalize Plaintiffs' Status Despite the Fact that
            Plaintiffs' Have No Safe, Legal Place to Sleep. ............................ 4

      B.    Plaintiffs' Contention that Defendants' Actions Are
            Unconstitutional is Supported by Law. ......................................... 8

V.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR ADA AND
      REHABILITATION ACT CLAIMS. ............................................................ 11

      A.    Plaintiffs Are Likely to Establish the Prima Facie Elements of
            their ADA Claim. ..................................................................... 12

      B.    Defendants Have Not Met Their Burden To Demonstrate That
            The Reasonable Accommodations Identified By Plaintiffs Would
            Fundamentally Alter Defendants' Homelessness Program. ............. 16

VI.   PLAINTIFFS WILL LIKELY BE IRREPARABLY HARMED IF
      DEFENDANTS ARE NOT PRELIMINARILY ENJOINED FROM
      PROHIBITING DISABLED, HOMELESS INDIVIDUALS FROM
      SLEEPING, RESTING, OR LAYING IN PUBLIC. ....................................... 18

VII.  THE BALANCE OF EQUITIES TIPS IN PLAINTIFFS' FAVOR AND
      A PRELIMINARY INJUNCTION IS IN THE PUBLIC'S INTEREST. ............... 21

VIII. A PRELIMINARY INJUNCTION THAT PROHIBITS
      DEFENDANTS FROM CRIMINALIZING SLEEPING BECAUSE
      PLAINTIFFS HAVE NO SAFE, LEGAL PLACE TO ENGAGE IN
      SUCH INVOLUNTARY AND NECESSARY ACTS IS PROPER. ..................... 23

IX.   CONCLUSION ..................................................................................... 24

REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Alexander v. Choate,*

5
  469 U.S. 287, 105 S. Ct. 712, 83 L. Ed. 2d 661 (1985) ........................................ 13

6

*Allen v. City of Sacramento,*

7
  234 Cal. App. 4th 41 (2015) ................................................................................... 10

8

*Alliance for the Wild Rockies v. Cottrell,*

9
  632 F.3d 1127 (9th Cir. 2001) .................................................................................. 3

10

*Chalk v. U.S. Dist. Court,*
  840 F.2d 701 (9th Cir. 1988) .................................................................................. 20

11

12

*County of Los Angeles v. Davis,*
  440 U.S. 625, 99 S. Ct. 1379, 59 L. Ed. 2d 642 (1979) ......................................... 8

13

14

*Crowder v. Kitagawa,*
  81 F.3d 1480 (9th Cir. 1996) ...............................................................12, 13, 15, 16

15

16

*DHX, Inc. v. Allianz AGF MAT, Ltd.,*
  425 F.3d 1169 (9th Cir. 2005) .................................................................................. 8

17

18

*Flint Distrib. Co., Inc. v. Harvey,*
  734 F.2d 1389 (9th Cir. 1984) ............................................................................ 3, 13

19

20

*Ingraham v. Wright,*
  430 U.S. 651, 97 S. Ct. 1401, 51 L. Ed. 2d 711 (1977) ....................................... 19

21

22

*Jones v. Los Angeles,*
  444 F.3d 1118 (9th Cir. 2006) ....................................................................... 8, 9, 19

23

24

*Joyce v. City & County of San Francisco,*
  846 F. Supp. 843 (N.D. Cal. 1994) ........................................................................ 10

25

*Lehr v. City of Sacramento,*
  624 F. Supp. 2d 1218 (E.D. Cal. 2009) ........................................................... 11, 19

26

27

*Los Angeles Memorial Coliseum Com. v. Nat'l Football League,*
  634 F.2d 1197 (9th Cir. 1980) .................................................................................. 2

28

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*McGary v. City of Portland,*
386 F.3d 1259 (9th Cir. 2004) ............................................................. 12

*Perfect 10, Inc. v. Amazon.com, Inc.,*
508 F.3d 1146 (9th Cir. 2007) ............................................................. 16

*Pottinger v. City of Miami,*
810 F. Supp. 1551 (S.D. Fla. 1992) ................................................. 9, 10

*Powell v. Texas,*
392 U.S. 514, 88 S. Ct. 2145, 20 L. Ed. 2d 1254 (1968) ............ 9, 10, 11

*Regents of Univ. of Cal. v. Am. Broadcasting Cos.,*
747 F.2d 511 (9th Cir. 1984) ................................................................. 2

*Republic of Philippines v. Marcos,*
862 F.2d 1355 (9th Cir. 1988) ......................................................... 3, 13

*Rizzo v. Goode,*
423 U.S. 362, 96 S. Ct. 598, 46 L. Ed. 2d 561 (1976) ...................... 3, 4

*Robinson v. State of California,*
370 U.S. 660, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1962) ..................... 9, 11

*Rodriguez by Rodriguez v. City of New York,*
197 F.3d 611 (2d Cir. 1999) ............................................................... 18

*Rose v. Rhorer,*
No. 13-cv-3502-WHO, 2014 Dist. LEXIS 64550 (N.D. Cal. May 9,
2014) .................................................................................................... 17

*Sierra On-Line, Inc. v. Phoenix Software, Inc.,*
739 F.2d 1415 (9th Cir. 1984) ............................................................... 2

*Tobe v. City of Santa Ana,*
9 Cal. 4th 1069 (1995) ........................................................................ 10

*United States v. Joelson,*
7 F.3d 174 (9th Cir. 1993) .................................................................... 8

-iii-

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Univ. of Tex. v. Camenisch,*
 451 U.S. 390, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981) ................................... 3, 13

*Vasquez v. Rackauckas,*
 734 F.3d 1025 (9th Cir. 2013) ................................................................................. 4

*Winter v. Natural Res. Def. Council, Inc.,*
 555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008) ............................................ 3

**Statutes**

29 U.S.C. § 701 ("Rehabilitation Act") ............................................................. 2, 11, 12

42 U.S.C.
 § 12101(a)(2), (5) ................................................................................................ 16
 § 12101(a)(5) ................................................................................................ 14, 15
 § 12101(b)(1) ...................................................................................................... 13
 § 12131 ("ADA") ......................................................................................... *passim*

Cal. Penal Code § 647(e) ........................................................................... 2, 21, 23

Laguna Beach Municipal Code §§ 8.30.030 & 18.05.020 ................................... 21, 23

**Other Authorities**

28 C.F.R. § 35.130(b)(7) .................................................................................. 15, 16

Fed. R. Evid.
 602 ...................................................................................................................... 13
 701 ...................................................................................................................... 13

U.S. Const. amend. VIII ..................................................................................... *passim*

REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

Plaintiffs David Sestini and Jeffrey Aiken, individually and on behalf of those similarly situated (collectively "Plaintiffs"),[1] submit this memorandum of points and authorities in reply to Defendants' opposition to Plaintiffs' motion for preliminary injunction.

## I.   INTRODUCTION

Thousands of men, women and children (many of whom are disabled) live, eat and sleep on streets with limited or no access to shelter.  The most vulnerable individuals who experience homelessness are the chronically homeless – those with mental or physical disabilities who experience long-term or repeated homelessness.  As local, state and federal governments grapple with finding solutions, there is a growing recognition that homelessness is a real human tragedy and not just what some see as a visual blight on otherwise pristine communities.  In response, many cities have taken steps to reduce or eliminate enforcement of laws that criminalize the status of being homeless or conduct that is involuntary and inseparable from such status, such as sleeping, for so long as adequate shelter is unavailable.  The City of Laguna Beach and its police department have taken the opposite approach – choosing to increase enforcement of laws that criminalize being homeless in the City at a time where there remains a severe shortage of adequate shelter.

The City's establishment in 2009 of a permanent emergency shelter for up to 45 homeless persons (the so-named "Alternative Sleeping Location" or "ASL") – though a positive step for a portion of the City's homeless population – does not legalize police strong-arm tactics to threaten, cite, harass, intimidate and discriminate against other portions of the homeless population – particularly those with mental and physical disabilities – to try and force them out of the City.  The City's

---

[1] Plaintiffs Katina Aune, Lisa Holbrook, and John Miller no longer seek interim relief.  Since the filing of Plaintiffs' motion on November 23, 2015, all three named Plaintiffs have received housing.  Nevertheless, their declarations and supporting documents filed in support of Plaintiffs' instant motion are relevant to illustrating the plight of disabled, homeless persons in Laguna Beach.

ineffective policy and practice is based on a false diagnosis – that homelessness is a choice and that it can be deterred.

## II.    ARGUMENT

This Court should grant Plaintiffs' motion for a preliminary injunction enjoining Defendants from applying California Penal Code section 647(e) and its anti-sleeping ordinances in a manner that criminalizes disabled, homeless individuals (or persons the police reasonably believe are disabled) who have no safe (adequate), legal place to sleep from sleeping, resting, or lying in public places, because: (1) Plaintiffs are likely to succeed on the merits of at least one of their Eighth Amendment, ADA, and Rehabilitation Act claims; (2) they are likely to suffer irreparable harm to their constitutional rights, as well as to their mental and/or physical health, in the absence of an injunction preventing continued police enforcement activities; (3) the balance of equities tips in favor of the Plaintiffs as individuals whose rights are being trampled and who will suffer adverse health consequences; and, (4) an injunction is in the public interest of protecting its most vulnerable citizens.

## III.    DEFENDANTS' CHARACTERIZATION OF THE PRELIMINARY INJUNCTION STANDARD IS INSUFFICIENT.

This Court is vested with equitable discretion to decide whether a preliminary injunction is necessary in this case.  *See Regents of Univ. of Cal. v. Am. Broadcasting Cos.*, 747 F.2d 511, 515 (9th Cir. 1984).  Despite Defendants' assertions and implications to the contrary, a preliminary injunction "is not a preliminary adjudication on the merits but rather a device for preserving the status quo and preventing the irreparable loss of rights before judgment." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984).  Of course, in the early stages of this litigation, Plaintiffs are not asking for a final decision on the merits, *see Los Angeles Memorial Coliseum Com. v. Nat'l Football League,* 634 F.2d 1197, 1200 (9th Cir. 1980), and are not required to present evidence that meets the preponderance of the evidence standard required for Plaintiffs to obtain a permanent

REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

injunction, which Defendants suggest is required by its overreliance on hearsay and improper expert opinion objections to Plaintiffs' declarations submitted in support of its motion. *See Republic of Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) ("It was within the discretion of the district court to accept this hearsay for purposes of deciding whether to issue the preliminary injunction."); *Flint Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial.  The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial."); *see also Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981) ("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.")

Instead, Plaintiffs need only show that they meet the preliminary injunction requirements, which Plaintiffs have done. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008).  Although each of the four elements of the preliminary injunction standard is important, the test is balanced by a sliding scale.  In other words, the strengths in one element may offset a weaker showing of another. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2001).  "For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits." *Id.*  While the test "requires the plaintiff to make a showing on all four prongs[,]" the showing need not be equally strong. *Id.* at 1135.  Defendants, however, focus only on the "likelihood of success on the merits" prong, implying that this element is weighted more than the others, which it is not.

Last, Defendants, relying on *Rizzo v. Goode*, 423 U.S. 362, 379-380, 96 S. Ct. 598, 46 L. Ed. 2d 561 (1976), erroneously claim that this Court does not have the authority to grant a preliminary injunction enjoining Defendants' activity.

REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

1    Defendants' reliance is misplaced.  The *Rizzo* court held that the district court

2    exceeded its authority by issuing a broad mandatory injunction requiring that

3    government defendants, against whom little evidence of misconduct was presented,

4    create and implement a "comprehensive program for improving the handling of

5    citizen complaints alleging police misconduct[,] . . ." a remedy that was not aligned

6    with the nature of the violation.  *See generally,* 423 U.S. 362.

7         In contrast, here, Plaintiffs seek a narrow injunction enjoining Defendants from

8    enforcing specific laws in a manner that criminalizes people who are disabled and

9    homeless who have no safe, legal place to sleep.  Such injunctions prohibiting state

10   officials from violating individuals' rights are well within the Court's authority to

11   grant.  *See generally, Vasquez v. Rackauckas*, 734 F.3d 1025 (9th Cir. 2013).

12        Because Defendants ignore the true preliminary injunction standard, its analysis

13   of Plaintiffs' motion is flawed.

14   **IV.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR EIGHTH**

15   **       AMENDMENT CLAIM.**

16        Plaintiffs' Eighth Amendment claim is straightforward:  (1) the number of

17   disabled, homeless individuals in Laguna Beach exceeds the availability of adequate

18   shelter for them; (2) Defendants vigorously and consistently enforce anti-sleeping

19   laws against homeless people they know or should know to be mentally and/or

20   physically disabled and have nowhere to go; and (3) such actions criminalize the

21   status of being disabled and homeless in Laguna Beach, as well as conduct

22   inseparable from this status, which constitutes cruel and unusual punishment.

23        **A.    Defendants Criminalize Plaintiffs' Status Despite the Fact that**

24        **       Plaintiffs' Have No Safe, Legal Place to Sleep.**

25        Defendants imply that there are sufficient resources in Laguna Beach,

26   specifically, or Orange County, generally, providing Plaintiffs a legal place to sleep

27   every night.  Defendants' implication is completely unsupported.  First, according to

28   the City's own documents, the homeless population in Laguna Beach is significantly

-4-

REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

larger than Defendants' estimate of 44.  (*See* Opp. to Provisional Class Cert Mot. (Dkt. 47) at pp. 10-11.)  In the City's report to HUD, it documented that the ASL, which was proposed to assist only 50 people, actually "assisted" 214 homeless people in the 2013-2014 program year, meeting its "goal of 45 individuals each night at the alternative sleeping location and transporting the *general* homeless to and from the shelter each day."  (Johnson Decl. (Dkt. 31) at 127-28 (emphasis added).)  Defendants' estimates are skewed lower than reality because Defendants define the number of homeless individuals in Laguna Beach as the "local" homeless population, (consisting of only those individuals that meet Defendants' self-serving residency criteria), rather than the actual homeless population.  (Pietig Decl., Ex. 7 (Dkt. 57) at 139 ("[T]he Laguna Beach Homeless Task Force estimates there are 45-55 individuals comprising the historical *local* homeless population." (emphasis added)).  That the ASL is full every night and people are turned away (Supp. Decl. David Sestini, dated Jan. 14, 2016 ("Sestini Supp. Decl.") ¶ 3; Decl. of Leonard Porto, dated Jan. 13, 2016 ("Porto Decl.") ¶ 14), coupled with Defendants' admission that the LBPD is constantly warning and citing homeless individuals for sleeping in public, is further evidence that Laguna Beach's homelessness population far exceeds 44 people.

Moreover, other than the ASL, there are no permanent year-round emergency shelters for homeless individuals in Orange County.  (Defs.' Opp. to Prelim. Inj. (Dkt. 46) at p. 3; Pietig Decl. (Dkt. 50) ¶ 24; Haynes Decl. (Dkt. 76) ¶ 6).  "On a single night in January 2015, nearly 4,500 people experienced homelessness in Orange County," a five percent increase as compared to the 2013 count.  (Decl. of Belinda Escobosa Helzer, dated Jan. 14, 2016 ("Helzer Decl.") ¶ 3, Ex. A at 5, 14.)  Forty-nine percent, or 2,201, homeless individuals are unsheltered.  (*Id*. at 6-7, 15.)

Despite the existence of the ASL, many disabled, homeless individuals in Laguna Beach have no safe, legal place to sleep.  Plaintiffs frequently cannot access the ASL for various reasons, including: (1) they are not considered "local" residents

REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

1    and have to participate in the lottery, which they do not win, (Sestini Decl. (Dkt. 34)

2    ¶ 4); (2) whether they are "local" or not, they have been banned from the ASL for a

3    period of time, or indefinitely, (*Id.* ¶ 6; Miller Decl. (Dkt. 36) ¶ 9); (3) they obtain a

4    spot at the ASL, but get expelled for not adhering to the ASL's rules, (Aune Decl.

5    (Dkt. 35) ¶ 7); or (4) they do not seek shelter at the ASL because they cannot tolerate

6    the shelter environment and/or the lottery system for that night, (Aiken Decl. (Dkt.

7    35) ¶ 8; Oldham Decl. (Dkt. 40) ¶ 5).  Regardless of the reason, the disabled,

8    homeless individual who is unable to access the ASL finds himself or herself without

9    a safe, legal place to sleep in Laguna Beach.  Worse yet, a disabled and homeless

10   individual who takes the City's van service to the ASL but is denied entry, or is

11   admitted but later expelled, finds himself or herself outside the ASL at night in a

12   dangerous canyon two and one-half miles away from the downtown area of Laguna

13   Beach with no available transportation to any location.  (Porto Decl. ¶ 18.)  They

14   have no choice but to sleep in the ASL parking lot or in the canyon surrounding the

15   shelter.  (*Id.*; Glover Decl. (Dkt. 38) ¶ 9.)

16        Defendants fault Plaintiffs for their predicament of failing to find shelter

17   although the evidence to date suggests that Plaintiffs' inability to seek shelter is

18   beyond their control.  Despite Defendants' assertions, not even those disabled and

19   homeless individuals who are considered by Defendants to be "local" are guaranteed

20   a spot at the ASL. (Opp. (Dkt. 46) at p. 19.)  For example, Plaintiff John Miller, who

21   is considered by Defendants to be a "local" homeless person, was banned from the

22   ASL for two weeks for helping himself to coffee five minutes early.  (Miller Decl.

23   (Dkt. 36) ¶ 9.)  This is undisputed.  (*See* Ferreira Decl. (Dkt. 75) ¶¶ 36, 49.)

24        Unfortunately, being expelled from the ASL for minor reasons is not unusual.

25   (Sestini Decl. (Dkt. 34) ¶ 6; Aune Decl. (Dkt. 33) ¶ 7.)  The rules are unreasonably

26   broad, strict and applied in an arbitrary manner, which adversely affects disabled

27   homeless individuals.  (*Id.*; Ferriera Decl. (Dkt. 75), Ex. A; Henwood Decl. (Dkt. 32)

28   ¶ 11.)  For instance, if a disabled, homeless individual is having a difficult time

-6-

REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

tolerating the stressful shelter environment or needs some space from another resident or from ASL staff or volunteers so as to decrease the stress they feel, they cannot leave the shelter for any length of time after they have signed in or they forfeit their space.  (Ferreira Decl., (Dkt. 75) Ex. 1 at p. 14; Sestini Decl. (Dkt. 34) ¶ 8.)  They can also be suspended from using the shelter if they merely disagree with staff or ASL volunteers or are perceived as being "disrespectful."  (*Id.* at pp. 14-15.) These rules and the enforcement of them often leave Plaintiffs, who already have difficulty tolerating the shelter environment because of their disabilities, without a legal place to sleep.  (Sestini Decl. (Dkt. 34) ¶ 6.)

Defendants also claim that they are justified in punishing Plaintiffs for engaging in the human, involuntary, and necessary act of sleeping because Plaintiffs can seek shelter at the Armories, which opened on November 30, 2015 and which will close after the cold weather passes, usually in March.  (Haynes Decl.(Dkt. 76) ¶ 7.)  But the Armories are not as accessible as Defendants claim them to be.  Despite the purported agreement between the ASL and Mercy House (the nonprofit organization that runs the seasonal Armory shelters) to accommodate people who are denied a space at the ASL (Ferreira Decl. (Dkt. 75) ¶ 14; Haynes Decl. (Dkt. 76) ¶ 7)), homeless individuals turned away from the ASL only are offered a one-way bus pass (if they are available) and a piece of paper with directions to the Armory shelters. (See Supp. Decl. of Lisa Holbrook, dated Jan. 14, 2016 ("Holbrook Supp. Decl.") ¶¶ 6, 8; Decl. of John Culbertson, dated Jan. 14, 2016 ("Culbertson Decl.") ¶¶ 8-9; Porto Decl. ¶ 17.)  Plaintiff Lisa Holbrook was recently turned away from the ASL and tried to obtain shelter at the Armory.  (Holbrook Supp. Decl. ¶ 8.)  She never received a "pink slip" that would inform the Armory shelters that she was guaranteed a spot.  (*Id.* ¶ 6.)  Mr. Holbrook took the bus after she discovered that she did not get a space at the ASL and arrived at the Armory at about 11:30 p.m.  (*Id.* ¶ 8.)  By the time she got there, the Armory was full.  (*Id.*)

Also, similar to the ASL, some Plaintiffs cannot access the Armory shelters

1   because the shelter environment exacerbates their disabilities, such as bipolar

2   disorder, depression, schizophrenia, and post-traumatic stress disorder. (Henwood

3   Decl. (Dkt. 32) ¶ 11; Aiken Decl. (Dkt. 35) ¶ 7.)  Moreover, due to their disabilities,

4   it is unlikely that Plaintiffs would even be able to tolerate the long bus ride.  (See,

5   e.g., Suppl. Decl. of Ben Henwood, dated Jan. 14, 2016 ("Henwood Suppl. Decl.")

6   ¶¶ 3, 12, 13; Decl. of Pam Bowers, dated Jan. 14, 2016 ("Bowers Decl.") ¶ 6.)  And,

7   even if they attempted the ride, it would not be realistic to expect that they would be

8   successful since disabled, homeless individuals are often unable to navigate public

9   transportation, especially at night when they are traveling to an unfamiliar place.  (*Id.*

10  ¶¶ 3, 11.)  Defendants' claims that, at least during the winter months, Plaintiffs have

11  a safe, legal place to sleep is feeble at best.

**B.    Plaintiffs' Contention that Defendants' Actions Are**
**Unconstitutional is Supported by Law.**

14      Defendants contend that "Plaintiffs' papers are devoid of authority holding that

15  homelessness is a constitutionally recognized status."  (Opp. (Dkt. 46) at p. 7.)  This

16  statement is simply not true.  Although district courts may disagree on this issue, the

17  Ninth Circuit clearly held in *Jones v. Los Angeles*, 444 F.3d 1118, 1138 (9th Cir.

18  2006), *vacated,* 505 F.3d 1006 (9th Cir. 2007) that "the Eighth Amendment prohibits

19  the City from punishing involuntary sitting, lying, or sleeping [in public spaces] that

20  is an unavoidable consequence of being human and homeless without shelter in the

21  City . . . ."  Moreover, although *Jones* was later vacated by settlement of the parties

22  to that action, it still carries significant weight in determining whether Plaintiffs are

23  likely to succeed on the merits of their Eighth Amendment claim.  *See DHX, Inc. v.*

24  *Allianz AGF MAT, Ltd.,* 425 F.3d 1169, 1175-76 (9th Cir. 2005) (Beezer, J.,

25  concurring ("[A]t minimum, a vacated opinion still carries informational and perhaps

26  even persuasive or precedential value.") (citing *United States v. Joelson*, 7 F.3d 174,

27  178 n.1 (9th Cir. 1993); *see also County of Los Angeles v. Davis*, 440 U.S. 625, 646

28  n.10, 99 S. Ct. 1379, 59 L. Ed. 2d 642 (1979) (Powell, J., dissenting) (stating that

REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

1   although the decision is vacated "the expressions of the court . . . , *if not reversed*,

2   will continue to have precedential weight and, until contrary authority is decided, are

3   likely to be viewed as persuasive authority if not the governing law of the Ninth

4   Circuit.) (emphasis added)).  *Jones'* sound reasoning, which was recently recognized

5   by the Department of Justice in its Statement of Interest Brief in *Bell v. City of Boise*,

6   No. 1:09-cv-540 (D. Idaho Aug. 6, 21015), is also support by an analysis of two U.S.

7   Supreme Court cases, *Robinson v. State of California*, 370 U.S. 660, 82 S. Ct. 1417,

8   8 L. Ed. 2d 758 (1962) and *Powell v. Texas*, 392 U.S. 514, 88 S. Ct. 2145, 20 L. Ed.

9   2d 1254 (1968).  *See Jones*, 444 F.3d at 1135 ("[F]ive Justices in *Powell* understood

10  *Robinson* to stand for the proposition that the Eighth Amendment prohibits the state

11  from punishing an involuntary act or condition if it is the unavoidable consequence

12  of one's status or being.")  Defendants' dismissal of the existence or significance of

13  this authority renders their argument that Plaintiffs are not likely to succeed on the

14  merits of their Eighth Amendment claim unpersuasive.

15      Defendants also exaggerate when they state that "courts routinely conclude that

16  homelessness is not a status for purposes of the Eighth Amendment," and regardless,

17  the cases relied on by Defendants are distinguishable.  (Opp. at p.7.)  Significantly,

18  Defendants ignore *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1554 (S.D. Fla.

19  1992), a case similar to this case, where a class of homeless individuals challenged

20  the city's "custom, practice and policy of arresting, harassing and otherwise

21  interfering with homeless people for engaging in basic activities of daily life –

22  including sleeping and eating – in the public places where they are forced to live."

23  In holding that the Eighth Amendment prohibits the city from punishing homeless

24  plaintiffs who do not have a place where they can lawfully be, *id.* at 1565, the

25  *Pottinger* court recognized that, based on *Robinson*, many courts from across the

26  country overturned vagrancy laws because they punish status or condition.

27  *Pottinger*, 810 F. Supp. at 1562 ("Therefore, just as application of the vagrancy

28  ordinances to the displaced poor constitutes cruel and unusual punishment arresting

REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

the homeless for harmless, involuntary, life-sustaining acts such as sleeping, sitting or eating in public is cruel and unusual [punishment].") (citations omitted). *Pottinger* also recognized that the *Powell* plurality was not confronted with the unique plight of homeless individuals who have no realistic choice but to live in public places. *Id.* at 1563 (stating the Justice White identified this distinction in his concurring opinion in *Powell*).

The court in *Joyce v. City & County of San Francisco*, 846 F. Supp. 843 (N.D. Cal. 1994) similarly did not confront this issue of whether the Eighth Amendment prohibits punishment of homeless persons when they have no legal place to sleep. Plaintiffs in *Joyce* unsuccessfully challenged the selective enforcement of so-called "quality of life" laws against homeless persons. The court in *Joyce* held that "homelessness" was not a cognizable "status" under the Constitution, and rejected plaintiffs' claims. *Joyce*, 846 F. Supp. at 857. However, here Plaintiffs' claims are not predicated on the recognition of homelessness as a protected status alone. Rather, Plaintiffs advance the far more modest proposition that where, as here, the evidence demonstrates that the number of homeless persons substantially exceeds the number of adequate shelter space, leaving people literally unable to comply with the law, the government may not lawfully punish such persons for conduct that is involuntary and unavoidable. Here, the distinction between "status" and "behavior" is meaningless and irrelevant: eating and breathing are undoubtedly "behaviors," but it does not follow that the City could lawfully proscribe them.[2]

Defendants also ignore the significance that Plaintiffs are not only homeless, but

---

[2] Defendants also cite *Tobe v. City of Santa Ana*, 9 Cal. 4th 1069, 1082-83 (1995) and *Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 46 (2015) as support for their argument that Plaintiffs are not likely to succeed on the merits of their Eighth Amendment claim. Both cases involved facial challenges to anti-camping ordinances, not as-applied challenges, and are therefore inapposite. *See Tobe*, 9 Cal. 4th at 1094 (holding that there is no basis to believe that ordinance only targets the homeless or that the city intended that the ordinance be enforced only against homeless persons); *Allen*, 234 Cal. App. 4th at 46, 60 (same).

REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

they are also mentally and/or physically disabled.[3]  Plaintiffs' disabilities contribute to, if not caused, Plaintiffs' homelessness, as well as reduce the availability of adequate shelter.  (Sestini Decl. (Dkt. 34) ¶¶ 2-3; Aiken Decl. ¶¶ 2-5.)  Similar to this Court's task, the *Robinson* court, in prohibiting punishment of persons who are addicted to narcotics, "the Court was dealing with a condition brought about by acts remote in time from the application of the criminal sanctions contemplated, a condition which was relatively permanent in duration, and a condition of great magnitude and significance in terms of human behavior and values."  *Powell*, 392 U.S. at 550 n.2 (distinguishing a narcotics addict or chronic alcoholic from the "mere transitory state of "being drunk in public"); *see also Robinson*, 370 U.S. at 666 (finding that a law which made a criminal offense for a person to be mentally ill would doubtless be universally thought to be an infliction of cruel and unusual punishment).

Therefore, despite Defendants' arguments to the contrary, Plaintiffs are likely to prevail on their Eighth Amendment claim because Defendants' homelessness program, which criminalizes the status of being disabled and homeless in Laguna Beach when adequate alternative shelter is lacking, and also criminalizes conduct inseparable from this status, constitutes cruel and unusual punishment.

## V.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR ADA AND REHABILITATION ACT CLAIMS.

Plaintiffs are also likely to succeed on their claims that Defendants' homelessness program violates Defendants' obligations under Title II of the ADA

---

[3] Defendants extensively rely on *Lehr v. City of Sacramento*, 624 F. Supp. 2d 1218 (E.D. Cal. 2009).  *Lehr* not only suffers from a faulty analysis of *Robinson* and *Powell*, but it also did not confront homeless individuals who are also disabled.  Had the facts in that case been similar to those presented in this case, it is likely that *Lehr* would have turned out differently.  624 F. Supp. 2d at 1231 n.3 ("Indeed, perhaps the most fundamental difference between those 'rare' cases where the Cruel and Unusual Punishment Clause may come into play and the instant case is the lack of any allegation that Plaintiffs' condition or status is a 'disease' or the product of a 'disease.'").

and Section 504 of the Rehabilitation Act.[4]  Defendants' disagree, asserting that "Plaintiffs are unlikely to establish the prima facie elements of their ADA and Rehabilitation Act claims," and because "the relief that [Plaintiffs] seek would fundamentally alter the nature of the service provided by the City and force the City to create an entirely new service." (Opp. at p. 11.)  Defendants completely misunderstand Plaintiffs' ADA arguments supporting their motion for preliminary injunction, as well as the law.

### A.   Plaintiffs Are Likely to Establish the Prima Facie Elements of their ADA Claim.

Plaintiffs argue that the City's overall homelessness program, and not the physical attributes of the ASL,[5] discriminates against disabled, homeless persons in violation of the ADA.  The City created its current homelessness program in 2009 to include: (1) operation of a facility that provides a safe, legal place for homeless individuals to sleep; and (2) renewed enforcement of anti-sleeping laws in public places.  (*See* Pietig Decl. ¶¶ 8-10, Exs. 2, 3, 6.)  The City believed and expected that "by providing an alternative location for homeless persons to sleep at night, the City can enforce laws against lodging and camping on public properties." (Pietig Decl. (Dkt. 50), Ex. 3 at 37.)  Unfortunately, such program has been implemented in a manner that violates the ADA because Plaintiffs, as disabled homeless persons, are denied the benefit of <u>meaningful access to a safe, legal place to sleep so that they can avoid police enforcement, harassment, and scrutiny.</u>  *See Crowder v. Kitagawa*, 81

---

[4] The analysis of the ADA and Rehabilitation Act are identical. *McGary v. City of Portland*, 386 F.3d 1259, 1269 n.7 (9th Cir. 2004).  Accordingly, when referring to the ADA, Plaintiffs are also referencing the Rehabilitation Act.

[5] Defendants submitted the Declaration of Wade Brown in support of their Opposition to Plaintiffs' motion. (Dkt. 74.)  Mr. Brown, who is responsible for the design standards of the ASL building, testifies that the ASL building comports with ADA standards regarding ramps, restrooms, door widths and clearances.  Plaintiffs have never claimed that the physical building where the ASL is located violates the ADA's structural requirements.

REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

F.3d 1480, 1484 (9th Cir. 1996) (stating that the test for determining violation of the ADA is "whether disabled persons were denied 'meaningful access' to state-provided services").  Said differently, Defendants have unlawfully denied disabled, homeless individuals the benefit of being free from threats, harassment, intimidation, and/or civil and criminal punishment for sleeping or resting in public outdoor spaces by reason of their disability.  Therefore, Defendants' overall homelessness program burdens disabled, homeless individuals in a manner that is different and greater than the burdens suffered by non-disabled homeless individuals.  *See id.*  As such, Plaintiffs are likely to succeed on the merits of their ADA claims.[6]

Defendants' assertions that Plaintiffs are not likely to succeed on their claims because Plaintiffs have slept at the ASL various times in the past misses the point.  (Opp. at p. 12).  Plaintiffs have never denied that they have stayed at the ASL.  Rather, Defendants' homelessness program places Plaintiffs in an untenable position, which, under the ADA, amounts to discrimination.  The ADA was enacted by Congress "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities . . . ."  42 U.S.C. § 12101(b)(1).  The Act "intended to protect disabled persons from discrimination arising out of both discriminatory animus and thoughtlessness, indifference, or benign neglect.  *Crowder,* 81 F.3d at 1484 (quoting *Alexander v. Choate*, 469 U.S. 287, 295, 105 S. Ct. 712, 83 L. Ed. 2d 661 (1985) (internal quotation marks

---

[6] Defendants argue that Plaintiffs have not submitted competent evidence as to their alleged disabilities or the effects that Defendants' homelessness program has on their disabilities.  Defendants' objections, which are primarily hearsay and improper opinion, lack merit.  As stated previously, because of the urgency of the proceedings, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. at 395; *see Republic of Philippines*, 862 F.2d at 1365; *Flint Distrib. Co., Inc.*, 734 F.2d at 1394.  Moreover, lay witnesses can testify regarding their personal conditions if they have personal knowledge (Fed. R. Evid. 602), and can provide opinion testimony if it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge . . . [,]" which is true here.  Fed. R. Evid. 701.

REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

omitted)).  Congress found that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of . . . overprotective rules and policies, [and] failure to make modifications to existing [ ] practices . . . ."  42 U.S.C. § 12101(a)(5).

Such discrimination is exactly what Plaintiffs are experiencing.  Defendants' program requires homeless individuals to obtain shelter at the ASL or sleep outdoors illegally, which subjects them to all manner of police harassment, intimidation and enforcement of anti-sleeping laws.  Assuming that they are not turned away because the ASL is full, Plaintiffs who obtain shelter at the ASL do so to the detriment of their mental and/or physical health, as this environment does not accommodate their disabilities.[7]  (Henwood Decl. (Dkt. 32) ¶ 11; Sestini Decl. (Dkt. 34) ¶ 6; Aiken Decl. (Dkt. 35) ¶ 7.)  Still others do not even seek shelter at the ASL because they either cannot tolerate the conditions by reason of their disability (Oldham Decl. (Dkt. 40) ¶ 5) or because they are banned from the ASL because their disabilities manifest in behavior that City staff determines to be in violation of ASL's strict and overprotective rules and policies.  (Sestini Decl. (Dkt. 34) ¶ 6; Aune Decl. (Dkt. 33) ¶ 7.)  Whatever the circumstance, Plaintiffs are denied the benefit of a safe, legal place to sleep and are therefore subject to negative police contact and enforcement, which further exacerbates Plaintiffs' disabilities.  (Sestini Decl. (Dkt. 34) ¶ 9)

Defendants also argue that the ADA expressly "permits the City to exclude from the ASL anyone – whether disabled or otherwise – who does not comply with the rules and regulations adopted to ensure the safe operation of the ASL."  (Opp. at p. 13.)  Again, Defendants' argument is misguided because it focuses solely on the ASL, which is only part of the problem.   Defendants cannot deny Plaintiffs the benefit of a safe, legal place to sleep on the basis that Plaintiffs allegedly broke ASL

---

[7] The ASL is a 60 feet by 60 feet commercial modular unit, (Brown Decl. (Dkt. 74), Ex. 1 at 3), which has a common area that allows up to 45 people to sleep on mats on the floor just inches away from one another, (Culbertson Decl. ¶ 14.)

rules and therefore lost their right to the benefit, when those ASL rules are unreasonable and applied in a manner that disparately impacts disabled individuals. In fact, protection from the discriminatory effects of overprotective rules and procedures is exactly what the ADA provides.  42 U.S.C. § 12101(a)(5).

Further, there is no evidence that any of the Plaintiffs posed a direct threat to the health or safety of others at the ASL.  (Opp. at p. 13.)  But even if Defendants' public safety concerns were reasonable, such concerns would not relieve Defendants from their obligations to comply with the ADA.  In *Crowder*, the Ninth Circuit considered whether a 120-day quarantine requirement on carnivorous animals entering the state violated the ADA.  The State argued that "the quarantine requirement is a public health measure, and not a 'service' or benefit furnished by the state to eligible participants."  81 F.3d at 1483 (internal quotation marks omitted).  The court disagreed and held that the requirement "discriminate[d] against visually-impaired individuals by denying them meaningful access to state services, programs and activities by reason of their disability in violation of the ADA."  *Id.* at 1485.  Similarly, here, Defendants cannot avoid compliance with the ADA by merely claiming that its actions against disabled, homeless individuals are justified by public safety concerns.

Plaintiffs are also likely to succeed on their ADA claim because, despite the fact that Defendants know that the homeless population in the City is comprised of persons who are almost exclusively disabled, (Johnson Decl. (Dkt. 31), Ex. A at 402-03; *id.*, Ex. B at 2931 & Ex. C at 2818), Defendants have failed to make any modifications to their existing policies and practices.  42 U.S.C. § 12101(a)(5).  A public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability . . . ."  28 C.F.R. § 35.130(b)(7).  Here, Defendants have failed to provide disabled, homeless individuals with either a safe, legal place to sleep, such as permanent supportive housing, or ceased enforcement of their anti-sleeping laws.

1   Their failure to do either amounts to intentional discrimination to exclude disabled,

2   homeless individuals from their program, or thoughtlessness, indifference, or benign

3   neglect of Plaintiffs, their needs, and Defendants' obligations.  *Crowder,* 81 F.3d at

4   1484.  Indeed, Defendants' continued policies and practices in implementing its

5   homeless program isolates and segregates individuals with disabilities in violation of

6   the ADA.[8]  *See* 42 U.S.C. § 12101(a)(2), (5).

7   **B.     Defendants Have Not Met Their Burden To Demonstrate That**

8   **The Reasonable Accommodations Identified By Plaintiffs Would**

9   **Fundamentally Alter Defendants' Homelessness Program.**

10   Whether an accommodation is a "fundamental alteration" is a defense to

11   Plaintiffs' ADA claims, but it is Defendants' burden to show that ceasing

12   enforcement of anti-sleeping laws or ultimately providing permanent supportive

13   housing would fundamentally alter the nature of their homelessness program.[9]

14   *Crowder*, 81 F.3d at 1485 (quoting 28 C.F.R. § 35.130(b)(7))).  Defendants have not

15   met their burden.

16   Defendants argue only that Plaintiffs' ultimate proposed accommodation –

17   permanent supportive housing – fundamentally alters Defendants' homelessness

18   program.  (Opp. at pp.  15-18.)  They do not dispute Plaintiffs' argument that a

19   cessation in enforcement against those who sleep in public out of necessity could be

20   a reasonable accommodation.  (Opp. at p.  21; First Am. Compl. (Dkt. 18) at 26.)

21   Nevertheless, Defendants have not demonstrated that they are likely to succeed

22   on a claim that permanent supportive housing fundamentally alters Defendants'

23

24   ---

[8] Defendants' other policies and practices, both old and new, further disparately

25   impact disabled, homeless.  (Culbertson Decl. ¶ 13; Bowers Decl. ¶¶ 8-12; Porto Decl. ¶¶ 5-12, 19.)

26   [9] Since "the burdens at the preliminary injunction stage track the burdens at trial,

27   once the moving party has carried its burden of showing a likelihood of success on the merits, the burden shifts to the nonmoving party to show a likelihood that its affirmative defense will succeed." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d

28   1146, 1158 (9th Cir. 2007) (internal quotation marks omitted).

REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

homelessness program.[10]  As discussed, Defendants' homelessness program was designed to provide homeless individuals in the City with a safe, legal place to sleep as justification for the City criminalizing sleeping outdoors in public spaces. Permanent supportive housing merely provides disabled, homeless individuals a safe, legal place to sleep because they cannot access the ASL by reason of their disabilities.  For this reason *Rose v. Rhorer*, No. 13-cv-3502-WHO, 2014 Dist. LEXIS 64550 (N.D. Cal. May 9, 2014), which Defendants cite to support their position, is distinguishable.  In *Rose,* the city of San Francisco operated emergency shelters "intended to provide short-term support for homeless adults so that they can obtain a permanent housing placement . . . ." *Id.* at *5.  Unlike Defendants here, San Francisco's shelter was limited, temporary, and not intended to provide a safe, legal place to sleep so that the city could criminalize sleeping in public.  Also, the court's grant of summary judgment in favor of the city was based on various reasons, including the fact that the city altered its shelter system to provide better services to disabled, homeless individuals, as well as that plaintiffs' claims were barred by an earlier settlement.  *Id.* at *4.  Also, unlike plaintiffs in *Rose*, Plaintiffs here are not requesting that Defendants alter the ASL, or that they transform it from short term to long term housing.  Indeed, the ASL already provides long term, permanent housing to homeless people.  Plaintiffs merely assert that to conform its homelessness program to the mandates of the ADA, Defendants must extend the benefit of a safe, legal place to sleep to disabled, homeless individuals who cannot use the ASL because of their disabilities.

Permanent supportive housing is also not a provision of new benefits under

---

[10] As noted in Plaintiffs' moving papers, Plaintiffs' proposed accommodations of permanent supportive housing and a cessation in enforcement against those who sleep in public out of necessity have been identified by the City and federal agencies as being appropriate options.  (*See* Johnson Decl., Ex. A at 407 (identifying permanent supportive housing as the most successful model for housing people who are chronically homeless, such as those individuals who are homeless in Laguna Beach).)

REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

Defendants' homelessness program.  In *Rodriguez by Rodriguez v. City of New York*, the court rejected plaintiffs' claim that New York must include safety monitoring — a care giver to be present in the patient's home to ensure that the person did not injure himself/herself in some manner — for people who suffer from mental disabilities, to comply with the ADA.  197 F.3d 611, 614 (2d Cir. 1999).  Finding that the ADA did not require the city to provide such monitoring, the court reasoned that "New York cannot have unlawfully discriminated against appellees by denying a benefit that it provides to no one." *Id.* at 618.  In contrast here, Defendants provide the benefit of a safe, legal place to sleep to some homeless individuals, but not to Plaintiffs, who are disabled, homeless individuals.

## VI.   PLAINTIFFS WILL LIKELY BE IRREPARABLY HARMED IF DEFENDANTS ARE NOT PRELIMINARILY ENJOINED FROM PROHIBITING DISABLED, HOMELESS INDIVIDUALS FROM SLEEPING, RESTING, OR LAYING IN PUBLIC.

The evidence submitted in support of Plaintiffs' Motion and Officer Farris' Declaration submitted in support of Defendants' Opposition confirm that Defendants' pattern and practice of criminalizing sleeping in public is continuous and pervasive.  (Johnson Decl. ¶¶ 16-17, Ex. N; Farris Decl. (Dkt. 73) ¶¶ 10-11.)  It is undisputed that this pattern and practice involves constant police scrutiny of those who are forced to sleep outdoors, including warnings of Plaintiffs' purported illegal behavior, threats of citation, and citations.  (Farris Decl. ¶¶ 10-11.)  It is also undisputed that this pattern and practice will not stop.  In fact, the evidence so far demonstrates that the police tactics used to criminalize and dissuade disabled, homeless individuals from sleeping, resting, or lying in public, specifically, and just being in the City, generally, have recently become harsher.  (Aune Decl. (Dkt. 33) ¶ 13; Porto Decl. ¶ 19.) Defendants' actions detrimentally affect Plaintiffs and are likely to cause continued irreparable harm. (Henwood Decl. (Dkt. 32) ¶¶ 12-13; Sestini Decl. (Dkt. 34) ¶ 9.) This harm can be avoided by enjoining Defendants from

enforcing certain laws that criminalize disabled homeless persons who lack an adequate and legal place to sleep.

Defendants also argue that Plaintiffs have not demonstrated that they are likely to suffer irreparable harm because Plaintiffs are not taken into custody when they are cited for sleeping in public and that Plaintiffs' evidence demonstrating harm to their physical and mental health is inadmissible.  Defendants' arguments are unsupported and unpersuasive.[11]

Physical custody is not a prerequisite to a constitutional violation and Defendants have presented no authority or facts supporting their contention that Plaintiffs suffer no harm because "those who do sleep outside have no legitimate fear that a citation for violating the State or local anti-lodging laws will result in physical custody." (Opp. at p. 20.)  The Eighth Amendment's protections govern the criminal law process, including the issuance of citations.  *See Ingraham v. Wright*, 430 U.S. 651, 667, 97 S. Ct. 1401, 51 L. Ed. 2d 711 (1977); *Jones,* 444 F.3d at1128-29; *see also Lehr*, 624 F. Supp. 2d at 1226.  Defendants do not dispute that a violation of a constitutional right constitutes irreparable harm.  (*See* Opp. at p.  22 n.12.) Moreover, Plaintiffs have a legitimate fear that a citation will be issued, which mandates that they appear in court and address the charges.  (*See* Sestini Decl., (Dkt. 34), Ex. A at p. 4; Aiken Decl. (Dkt. 34), Ex. A at p. 3.)  In fact, it is likely that the citation will lead to custody.  (Farris Decl. (Dkt.  73) ¶ 10 ("Usually one or two citations are sufficient and the officer lets it go to warrant."); *see also* Porto Decl. ¶ 20) (indicating that police stop homeless people, ask for the identification, and run a warrant check).

Also, Defendants do not contest the genuineness of Plaintiffs' claims of

---

[11] Defendants also argue that Plaintiffs have not demonstrated irreparable harm because they "none of them must resort to sleeping in public in violation of the City's laws." (Opp. at pp. 19-20.)  As this is essentially the same argument Defendants make in challenging the likelihood of success on Plaintiffs' Eighth Amendment claim, Plaintiffs have addressed Defendants' arguments in that section of this Reply.

REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

1   irreparable harm to their mental and physical health, but instead argue that the

2   declarations Plaintiffs submitted in support of their motion are unsupported and

3   inadmissible.  As previously discussed, this challenge rings hollow.  Here, Plaintiffs

4   and witnesses have provided declarations to demonstrate the likelihood of irreparable

5   harm if the requested preliminary injunction is not issued.  For example, Plaintiff

6   David Sestini testified that when he is forced to sleep outside, which is often, he is

7   under constant stress from trying to avoid detection from the police.  (Sestini Decl.

8   (Dkt. 34) ¶ 9.)  The stress caused by constant police harassment and scrutiny worsens

9   his breathing and heart problems, exacerbates his anxiety, and his often feels suicidal

10  as a result.  (*Id.*)  The deterioration of Plaintiffs mental health amounts to irreparable

11  harm.

12       This Court can also appropriately consider Dr. Benjamin Henwood's declaration

13  when evaluating Plaintiff's Motion, especially as it assists the Court in recognizing

14  the significance of the harm suffered by disabled, homeless individuals, as well as

15  the harm they will continue to suffer absent the requested relief.  Dr. Henwood, who

16  is a nationally recognized expert on the mental health impacts of homelessness

17  policies on people experiencing serious mental illness, concludes that based on his

18  review of the Plaintiffs' and witness' declarations, "treatment by law enforcement

19  has contributed to a deterioration in mental health for all of these individuals."

20  (Henwood Decl. (Dkt. 32) ¶ 12.)  Dr. Henwood goes on to opine that "without

21  intervention, there could be lifelong consequences in the experience of post-

22  traumatic stress disorder."  (*Id.*)  In other words, if police continue to criminalize

23  disabled homeless individuals in Laguna Beach, there is a likelihood that those

24  individuals will suffer irreparable harm.  *See Chalk v. U.S. Dist. Court*, 840 F.2d

25  701, 709-10 (9th Cir. 1988) (holding that a plaintiff who showed that he was likely to

26  suffer "emotional or psychological" injury demonstrated irreparable harm).

27  Defendants do not provide any contrary evidence.

28

REPLY IN SUPPORT OF MOTION
                                                            FOR PRELIMINARY INJUNCTION

## VII.   THE BALANCE OF EQUITIES TIPS IN PLAINTIFFS' FAVOR AND A PRELIMINARY INJUNCTION IS IN THE PUBLIC'S INTEREST.

Defendants' treatment of disabled, homeless persons takes a heavy toll on them. Heightened law enforcement scrutiny, harassment, and citations poses a likely grave and irreparable harm to Plaintiffs.  These hardships are significant and outweigh any hardship to Defendants that might result from this Court's issuance of a preliminary injunction.  A preliminary injunction would also be in the public interest.

Defendants predict that, without the authority to enforce Penal Code section 647(e) and Laguna Beach Municipal Code sections 8.30.030 and 18.05.020 against disabled, homeless individuals in a manner that criminalizes sleeping outdoors in public places, the City of Laguna will become a maelstrom.  (Opp. at p. 21.) Defendants base this prediction on a period in 2009 when the City repealed its anti-sleeping ordinances as part of a settlement agreement.  The alleged problems that resulted from the City's prior cessation of its anti-sleeping ordinance, however, are unspecific and therefore the City's argument is weak and illusory.

For instance, Mr. Pietig vaguely states that there was an "onset and intensification of several consequences" after the City suspended enforcement in 2009, but his testimony and supporting exhibits lack any facts connecting the situations described and the City's cessation of enforcement of its anti-sleeping ordinances.  Mr. Pietig also fails to specify to what degree or significance these alleged consequences had on the City as compared to the period when the City was enforcing the ordinance.  (*See* Pietig Decl. (Dkt. 50) ¶ 7.)  While Mr. Pietig refers to a staff report where "these concerns were described" and presented to the City, (*id.* ¶ 8), this report merely states that citizens and visitors "feel" that their use and enjoyment of property has been diminished, and that people "believe" that the number of homeless individuals in town have increased during the last year.  (*Id.*, Ex. 2 at p. 22.)

Although, Mr. Pietig provides summaries of alleged police calls, these

-21-

LEGAL_US_W # 84741131.3

summaries do not relate specifically to homeless individuals.  Moreover, most of the behaviors described in these summaries are punishable by laws irrespective of the City's suspension of its anti-sleeping ordinances, and in fact, many of the incidents resulted in arrest.  The ominous prediction of what may happen if  Defendants are enjoined from criminalizing sleeping against disabled, homeless individuals is nothing more than an illustration of the fear that the City had then, and still has today, that Laguna Beach will become "a magnet for homeless people," which is mere speculation.  (*Id.*; Opp. at p.  3.)  This "sky is falling" fear does not justify violating Plaintiffs' constitutional and statutory rights.

Further, many of the situations described by Mr. Pietig are happening under Defendants' current heavy enforcement regime, and more public safety concerns have resulted from Defendants' current policy and practice.  (*See* Farris Decl. (Dkt. 73) ¶ 21.)  For example, there are still homeless encampments on the beach, and now in the brush, as homeless people try to hide from police who search them out to cite and harass them.  These hidden encampments heighten the potential for fire.  (Farris Decl. (Dkt. 73) ¶ 21.)  Nor has the existence of unhygienic conditions decreased as a result of Defendants' criminalization activities.  (Farris Decl. (Dkt. 73) ¶ 21.  In fact, Defendants' harsh treatment of disabled, homeless individuals, which includes among other things, failing to provide portable toilets outside the ASL, refusing to make safe drinking water available, and most recently forcing homeless individuals to leave the ASL parking lot during the day and prohibiting many homeless people from storing their property, only serves to increase "blight" and unsanitary conditions.  (Porto Decl. ¶¶ 4-12.)  Simply put, Defendants' current tactics and approaches to homelessness are not working.  Defendants can take more effective actions for the benefit of the public without violating disabled, homeless individuals' rights.

REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

## VIII. A PRELIMINARY INJUNCTION THAT PROHIBITS DEFENDANTS FROM CRIMINALIZING SLEEPING BECAUSE PLAINTIFFS HAVE NO SAFE, LEGAL PLACE TO ENGAGE IN SUCH INVOLUNTARY AND NECESSARY ACTS IS PROPER.

A preliminary injunction will not completely stop the harm that Plaintiffs are experiencing daily.  But a preliminary injunction prohibiting Defendants from criminalizing sleeping outdoors will eliminate the continuous violation of their constitutional rights, and will at least lessen the harm to their mental and physical health.  That said, if necessary, Plaintiffs are willing to revise the terms of the injunction so that it can be stated with sufficient clarity to permit the injunction to be fairly enforced.  Plaintiffs suggest the following:

> The City of Laguna Beach and the Laguna Beach Police Department, and their agents, servants, employees, and those in active concert or participation with them (collectively "Defendants"), are restrained and enjoined pending trial of this action from enforcing or threatening to enforce – either through written citation and/or written or verbal warnings, and/or threats – California Penal Code section 647(e) and Laguna Beach Municipal Code ("LBMC") sections 8.30.030 and 18.05.020 for merely sleeping, resting, or lying down with their belongings, against disabled, homeless individuals in public outdoor places, where their disability and homelessness is either:  (1) known to Defendants; or (2) reasonably apparent to Defendants. Defendants are restrained and enjoined from enforcing these laws in the manner described in the City of Laguna Beach between the hours of 8:00 p.m. and 7:00 a.m., except at the Alternative Sleeping Location ("ASL") where Defendants are restrained and enjoined from enforcing these laws in the manner described at any time of day.

Although Plaintiffs dispute Defendants' arguments regarding the scope and enforceability of Plaintiffs' initial proposed preliminary injunction, these modifications leave no doubt that the Court can issue a narrowly tailored, reasonable, and enforceable injunction.

REPLY IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION

IX.   CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for a Preliminary Injunction.

.

DATED:  January 15, 2016          ACLU FOUNDATION OF SOUTHERN
                                  CALIFORNIA and PAUL HASTINGS LLP


                                  By:     /s/
                                  Belinda Escobosa Helzer
                                  Counsel for Plaintiffs

-24-