**<u>EXHIBIT 11</u>**

1  PETER J. ELIASBERG (SB# 189110)
   peliasberg@aclusocal.org
2  BELINDA ESCOBOSA HELZER (SB# 214178)
   bescobosahelzer@aclusocal.org
3  ACLU FOUNDATION OF SOUTHERN CALIFORNIA
   Orange County Office
4  1851 E. First Street, Suite 450
   Santa Ana, CA 92705
5  Telephone: (714) 450-3962
   Facsimile: (714) 543-5240
6
   DAVID M. HERNAND (SB #162733)
7  davidhernand@paulhastings.com
   ANDREW B. GROSSMAN (SB# 211546)
8  andrewgrossman@paulhastings.com
   KATHERINE F. MURRAY (SB# 211987)
9  katherinemurray@paulhastings.com
   PAUL HASTINGS LLP
10 515 South Flower Street, Twenty-Fifth Floor
   Los Angeles, CA 90071
11 Telephone: (213) 683-6000
   Facsimile: (213) 627-0705
12
   *Attorneys for Plaintiffs*
13
14              UNITED STATES DISTRICT COURT

15             CENTRAL DISTRICT OF CALIFORNIA

16                  SOUTHERN DIVISION

17 | Kenneth Glover, et al., individually, and on behalf of all others similarly situated | CASE NO. 8:15-CV-01332-AG-DFM |
18 | | **CLASS ACTION** |
19 | Plaintiffs, | **PLAINTIFF RICHARD OWENS' OBJECTIONS AND RESPONSES TO DEFENDANT CITY OF LAGUNA BEACH'S REQUESTS FOR ADMISSIONS, SET TWO** |
20 | vs. | |
21 | CITY OF LAGUNA BEACH; THE LAGUNA BEACH POLICE DEPARTMENT, a California charter city | |
22 | | Courtroom: 10D |
23 | | Hon. Andrew J. Guilford |
24 | Defendants. | |

25 PROPOUNDING PARTY:  DEFENDANT CITY OF LAGUNA BEACH

26 RESPONDING PARTY:    PLAINTIFF RICHARD OWENS

27

28

**Exhibit 11**
**Page 129**
PLTF. OWENS' OBJS. & RESPS. TO DEF'S
REQUESTS FOR ADMISSIONS, SET TWO

LEGAL_US_W # 87042746.1

1  TO DEFENDANT CITY OF LAGUNA BEACH AND TO ITS ATTORNEYS OF

2  RECORD, PHILIP D. KOHN, ESQ., AJIT SINGH THIND, ESQ., RUTAN &

3  TUCKER, LLP, MICHAEL G. YODER, ESQ., CHRISTOPHER S.

4  WHITTAKER, ESQ., AND O'MELVENY & MYERS LLP:

5      Plaintiff Richard Owens ("Plaintiff" or "Owens") hereby answers, objects,

6  and otherwise responds to Defendant's Second Requests for Admissions as follows:

7              **PLAINTIFF'S PRELIMINARY STATEMENT**

8

9      Plaintiff has not completed its investigation relating to this action, has not

10  completed discovery in this action, and has not completed preparation for trial.  As

11  discovery proceeds, facts, information, evidence, documents and things may be

12  discovered that are not set forth in these responses, but which may have been

13  responsive to these Requests for Admissions.  The following responses are based

14  on Plaintiff's knowledge, information and belief at this time and are complete as to

15  Plaintiff's best knowledge at this time.  Furthermore, these responses were prepared

16  based on Plaintiff's good faith interpretation and understanding of the Requests and

17  are subject to correction for inadvertent errors or omissions, if any.

18      Plaintiff reserves the right to refer to, conduct discovery with reference to, or

19  to offer into evidence at the time of trial, any and all facts, evidence, documents and

20  things developed during the course of discovery and trial preparation,

21  notwithstanding the reference to facts, evidence, documents and things in these

22  responses.  These responses are given without prejudice to subsequent revision or

23  supplementation, including objections, based upon any information, evidence and

24  documentation, which hereinafter may be discovered.

25

26

27

28

**Exhibit 11**
**Page 130**

-1-

PLTF. OWENS' OBJS. & RESPS. TO DEF'S
REQUESTS FOR ADMISSIONS, SET TWO

## PLAINTIFF'S GENERAL OBJECTIONS TO DEFENDANT'S
## REQUESTS FOR ADMISSIONS

1.     Plaintiff makes the following general responses and objections ("General Objections") to Defendant's Second Set of Requests for Admissions. These General Objections are hereby incorporated into each specific response.  The assertion of the same, similar or additional objections or partial responses to the individual requests does not waive or prejudice any of Plaintiff's General Objections.

2.     Plaintiff objects to each Request and Definition propounded to the extent they are broader than, or purport to impose obligations upon Plaintiff beyond those required by the Federal Rules of Civil Procedure and/or the Local Civil Rules of this Court.

3.     Plaintiff objects to Defendant's Requests in their entirety to the extent that they seek information that is not relevant to the subject matter of this litigation, including any claim or defenses asserted herein, and are not proportional to the needs of this case.

4.     Plaintiff objects to Defendant's Requests for Admissions as a whole, and to each Request contained therein, to the extent that they seek information protected from disclosure by the attorney-client privilege, the attorney work product doctrine, and/or any other applicable privilege or immunity.

5.     Plaintiff objects to each Request to the extent that it seeks information not in Plaintiff's knowledge, possession, custody, or control, or refers to persons, entities, or events not known to Plaintiff, on the grounds that such Definitions and Requests seek to require more of Plaintiff than any obligation imposed by law, and would subject Plaintiff to unreasonable and undue annoyance, oppression, burden, and expense, and would seek to impose upon Plaintiff an obligation to investigate

**Exhibit 11**
**Page 131**

-2-

1   or discover information or materials from third parties or services equally

2   accessible to Defendant.

3       6.      Plaintiff objects to each Request to the extent it is not appropriately

4   limited in time or scope.  Such Requests are overbroad, unduly burdensome, and

5   seek information not relevant and proportional to the needs of this case.

6       7.      Plaintiff objects to each and every Request to the extent that it is

7   vague, ambiguous, overbroad, and/or would require Plaintiff to speculate as to the

8   information sought.

## PLAINTIFF'S OBJECTIONS AND RESPONSES TO
## DEFENDANT'S REQUESTS FOR ADMISSIONS

12  REQUEST FOR ADMISSION NO. 34:

13      Admit that the Alternative Sleeping Location is an emergency shelter for

14  homeless individuals.

15  OBJECTIONS AND RESPONSE TO REQUEST FOR ADMISSION NO. 34:

16      Plaintiff objects to this Request on the grounds that it is vague and

17  ambiguous as to "emergency shelter."  Plaintiff further objects to this Request on

18  the grounds that it is overly broad as to time and scope.  Plaintiff further objects to

19  this Request to the extent that it seeks information protected by the attorney-client

20  privilege and/or attorney work product doctrine.

21      Subject to and without in any way waiving the foregoing objections, and to

22  the extent he understands this Request, Plaintiff responds as follows:  Admit that

23  the Alternative Sleeping Location ("ASL") is described as an emergency shelter.

25  REQUEST FOR ADMISSION NO. 35:

26      Admit that the Alternative Sleeping Location is a group shelter for homeless

27  individuals.

**Exhibit 11**
**Page 132**

28

PLTF. OWENS' OBJS. & RESPS. TO DEF'S
REQUESTS FOR ADMISSIONS, SET TWO

LEGAL_US_W # 87042746.1

OBJECTIONS AND RESPONSE TO REQUEST FOR ADMISSION NO. 35:

Plaintiff objects to this Request on the grounds that it is vague and ambiguous as to "group shelter."  Plaintiff further objects to this Request on the grounds that it is overly broad as to time and scope.  Plaintiff further objects to this Request to the extent that it seeks information protected by the attorney-client privilege and/or attorney work product doctrine.

Subject to and without in any way waiving the foregoing objections, and to the extent it understands this Request, Plaintiff responds as follows:  Admit.

REQUEST FOR ADMISSION NO. 36:

Admit that the Alternative Sleeping Location is a temporary shelter for homeless individuals.

OBJECTIONS AND RESPONSE TO REQUEST FOR ADMISSION NO. 36:

Plaintiff objects to this Request on the grounds that it is vague and ambiguous as to "temporary shelter."  Plaintiff further objects to this Request on the grounds that it is overly broad as to time and scope.  Plaintiff further objects to this Request to the extent that it seeks information protected by the attorney-client privilege and/or attorney work product doctrine.

Subject to and without in any way waiving the foregoing objections, and to the extent it understands this Request, Plaintiff responds as follows:  Admit.

REQUEST FOR ADMISSION NO. 37:

Admit that the Alternative Sleeping Location does not provide homeless individuals with individual apartments.

OBJECTIONS AND RESPONSE TO REQUEST FOR ADMISSION NO. 37:

Plaintiff objects to this Request on the grounds that it is vague and ambiguous as to "individual apartments."  Plaintiff further objects to this Request on the grounds that it is overly broad as to time and scope.  Plaintiff further objects

**Exhibit 11**
**Page 133**

-4-

PLTF. OWENS' OBJS. & RESPS. TO DEF'S
REQUESTS FOR ADMISSIONS, SET TWO

LEGAL_US_W # 87042746.1

1  to this Request on the grounds that it seeks information that is not relevant to the

2  subject matter of this litigation and is not reasonably calculated to lead to the

3  discovery of admissible evidence.

4      Subject to and without in any way waiving the foregoing objections, and to

5  the extent it understands this Request, Plaintiff responds as follows:  Admit.

6

7  REQUEST FOR ADMISSION NO. 38:

8      Admit that the Alternative Sleeping Location does not offer leases or

9  subleases to homeless individuals.

10  OBJECTIONS AND RESPONSE TO REQUEST FOR ADMISSION NO. 38:

11     Plaintiff objects to this Request on the grounds that it is vague and

12  ambiguous as to "leases" and "subleases."  Plaintiff further objects to this Request

13  on the grounds that it is overly broad as to time and scope.  Plaintiff further objects

14  to this Request on the grounds that it seeks information that is not relevant to the

15  subject matter of this litigation and is not reasonably calculated to lead to the

16  discovery of admissible evidence.

17     Subject to and without in any way waiving the foregoing objections, and to

18  the extent it understands this Request, Plaintiff responds as follows:  Admit.

19

20  DATED:  September 6, 2016          ACLU FOUNDATION OF SOUTHERN
                                      CALIFORNIA and PAUL HASTINGS LLP
21

22                                    By:  _____
                                               Katherine F. Murray
23

24                                    Counsel for Plaintiffs

25

26

27                                                    **Exhibit 11**
                                                      **Page 134**
28
                                      -5-    PLTF. OWENS' OBJS. & RESPS. TO DEF'S
                                             REQUESTS FOR ADMISSIONS, SET TWO

LEGAL_US_W # 87042746.1

**EXHIBIT 12**

1   PETER J. ELIASBERG (SB# 189110)
    peliasberg@aclusocal.org
2   BELINDA ESCOBOSA HELZER (SB# 214178)
    bescobosahelzer@aclusocal.org
3   ACLU FOUNDATION OF SOUTHERN CALIFORNIA
    Orange County Office
4   1851 E. First Street, Suite 450
    Santa Ana, CA 92705
5   Telephone: (714) 450-3962
    Facsimile: (714) 543-5240
6
    DAVID M. HERNAND (SB #162733)
7   davidhernand@paulhastings.com
    ANDREW B. GROSSMAN (SB# 211546)
8   andrewgrossman@paulhastings.com
    KATHERINE F. MURRAY (SB# 211987)
9   katherinemurray@paulhastings.com
    PAUL HASTINGS LLP
10  515 South Flower Street, Twenty-Fifth Floor
    Los Angeles, CA 90071
11  Telephone: (213) 683-6000
    Facsimile: (213) 627-0705
12
    *Attorneys for Plaintiffs*
13
14              UNITED STATES DISTRICT COURT
15              CENTRAL DISTRICT OF CALIFORNIA
16                   SOUTHERN DIVISION

17  | Kenneth Glover, et al., individually, | CASE NO. 8:15-CV-01332-AG-DFM |
18  | and on behalf of all others similarly situated | **CLASS ACTION** |
19  |                Plaintiffs, | **PLAINTIFF DAVID SESTINI'S OBJECTIONS AND RESPONSES TO DEFENDANT CITY OF LAGUNA** |
20  |         vs. | **BEACH'S REQUESTS FOR** |
21  | CITY OF LAGUNA BEACH; THE | **ADMISSIONS, SET TWO** |
22  | LAGUNA BEACH POLICE DEPARTMENT, a California charter | Courtroom: 10D |
23  | city | Hon. Andrew J. Guilford |
24  |               Defendants. | |

25  PROPOUNDING PARTY:  DEFENDANT CITY OF LAGUNA BEACH

26  RESPONDING PARTY:    PLAINTIFF DAVID SESTINI

27

28

Exhibit 12
Page 135
PLTF. SESTINI'S OBJS. & RESPS. TO DEF'S
REQUESTS FOR ADMISSIONS, SET TWO

1  TO DEFENDANT CITY OF LAGUNA BEACH AND TO ITS ATTORNEYS OF

2  RECORD, PHILIP D. KOHN, ESQ., AJIT SINGH THIND, ESQ., RUTAN &

3  TUCKER, LLP, MICHAEL G. YODER, ESQ., CHRISTOPHER S.

4  WHITTAKER, ESQ., AND O'MELVENY & MYERS LLP:

5      Plaintiff David Sestini ("Plaintiff" or "Sestini") hereby answers, objects, and

6  otherwise responds to Defendant's Second Requests for Admissions as follows:

7                    **PLAINTIFF'S PRELIMINARY STATEMENT**

8

9      Plaintiff has not completed its investigation relating to this action, has not

10  completed discovery in this action, and has not completed preparation for trial.  As

11  discovery proceeds, facts, information, evidence, documents and things may be

12  discovered that are not set forth in these responses, but which may have been

13  responsive to these Requests for Admissions.  The following responses are based

14  on Plaintiff's knowledge, information and belief at this time and are complete as to

15  Plaintiff's best knowledge at this time.  Furthermore, these responses were prepared

16  based on Plaintiff's good faith interpretation and understanding of the Requests and

17  are subject to correction for inadvertent errors or omissions, if any.

18      Plaintiff reserves the right to refer to, conduct discovery with reference to, or

19  to offer into evidence at the time of trial, any and all facts, evidence, documents and

20  things developed during the course of discovery and trial preparation,

21  notwithstanding the reference to facts, evidence, documents and things in these

22  responses.  These responses are given without prejudice to subsequent revision or

23  supplementation, including objections, based upon any information, evidence and

24  documentation, which hereinafter may be discovered.

25

26

27

28

**Exhibit 12**
**Page 136**
-1-

PLTF. SESTINI'S OBJS. & RESPS. TO DEF'S
REQUESTS FOR ADMISSIONS, SET TWO

LEGAL_US_W # 87074609.1

## PLAINTIFF'S GENERAL OBJECTIONS TO DEFENDANT'S REQUESTS FOR ADMISSIONS

1.     Plaintiff makes the following general responses and objections ("General Objections") to Defendant's Second Set of Requests for Admissions. These General Objections are hereby incorporated into each specific response.  The assertion of the same, similar or additional objections or partial responses to the individual requests does not waive or prejudice any of Plaintiff's General Objections.

2.     Plaintiff objects to each Request and Definition propounded to the extent they are broader than, or purport to impose obligations upon Plaintiff beyond those required by the Federal Rules of Civil Procedure and/or the Local Civil Rules of this Court.

3.     Plaintiff objects to Defendant's Requests in their entirety to the extent that they seek information that is not relevant to the subject matter of this litigation, including any claim or defenses asserted herein, and are not proportional to the needs of this case.

4.     Plaintiff objects to Defendant's Requests for Admissions as a whole, and to each Request contained therein, to the extent that they seek information protected from disclosure by the attorney-client privilege, the attorney work product doctrine, and/or any other applicable privilege or immunity.

5.     Plaintiff objects to each Request to the extent that it seeks information not in Plaintiff's knowledge, possession, custody, or control, or refers to persons, entities, or events not known to Plaintiff, on the grounds that such Definitions and Requests seek to require more of Plaintiff than any obligation imposed by law, and would subject Plaintiff to unreasonable and undue annoyance, oppression, burden, and expense, and would seek to impose upon Plaintiff an obligation to investigate

**Exhibit 12**
**Page 137**
PLTF. SESTINI'S OBJS. & RESPS. TO DEF'S
REQUESTS FOR ADMISSIONS, SET TWO

1    or discover information or materials from third parties or services equally

2    accessible to Defendant.

3        6.    Plaintiff objects to each Request to the extent it is not appropriately

4    limited in time or scope.  Such Requests are overbroad, unduly burdensome, and

5    seek information not relevant and proportional to the needs of this case.

6        7.    Plaintiff objects to each and every Request to the extent that it is

7    vague, ambiguous, overbroad, and/or would require Plaintiff to speculate as to the

8    information sought.

9    **PLAINTIFF'S OBJECTIONS AND RESPONSES TO**

10   **DEFENDANT'S REQUESTS FOR ADMISSIONS**

11

12   REQUEST FOR ADMISSION NO. 34:

13       Admit that the Alternative Sleeping Location is an emergency shelter for

14   homeless individuals.

15   OBJECTIONS AND RESPONSE TO REQUEST FOR ADMISSION NO. 34:

16       Plaintiff objects to this Request on the grounds that it is vague and

17   ambiguous as to "emergency shelter."  Plaintiff further objects to this Request on

18   the grounds that it is overly broad as to time and scope.  Plaintiff further objects to

19   this Request to the extent that it seeks information protected by the attorney-client

20   privilege and/or attorney work product doctrine.

21       Subject to and without in any way waiving the foregoing objections, and to

22   the extent he understands this Request, Plaintiff responds as follows:  Admit that

23   the Alternative Sleeping Location ("ASL") is described as an emergency shelter.

24

25   REQUEST FOR ADMISSION NO. 35:

26       Admit that the Alternative Sleeping Location is a group shelter for homeless

27   individuals.

28
**Exhibit 12**
**Page 138**
-3-

PLTF. SESTINI'S OBJS. & RESPS. TO DEF'S
REQUESTS FOR ADMISSIONS, SET TWO

LEGAL_US_W # 87074609.1

1  <u>OBJECTIONS AND RESPONSE TO REQUEST FOR ADMISSION NO. 35:</u>

2       Plaintiff objects to this Request on the grounds that it is vague and

3  ambiguous as to "group shelter."  Plaintiff further objects to this Request on the

4  grounds that it is overly broad as to time and scope.  Plaintiff further objects to this

5  Request to the extent that it seeks information protected by the attorney-client

6  privilege and/or attorney work product doctrine.

7       Subject to and without in any way waiving the foregoing objections, and to

8  the extent it understands this Request, Plaintiff responds as follows:  Admit.

9

10  <u>REQUEST FOR ADMISSION NO. 36:</u>

11       Admit that the Alternative Sleeping Location is a temporary shelter for

12  homeless individuals.

13  <u>OBJECTIONS AND RESPONSE TO REQUEST FOR ADMISSION NO. 36:</u>

14       Plaintiff objects to this Request on the grounds that it is vague and

15  ambiguous as to "temporary shelter."  Plaintiff further objects to this Request on the

16  grounds that it is overly broad as to time and scope.  Plaintiff further objects to this

17  Request to the extent that it seeks information protected by the attorney-client

18  privilege and/or attorney work product doctrine.

19       Subject to and without in any way waiving the foregoing objections, and to

20  the extent it understands this Request, Plaintiff responds as follows:  Admit.

21

22  <u>REQUEST FOR ADMISSION NO. 37:</u>

23       Admit that the Alternative Sleeping Location does not provide homeless

24  individuals with individual apartments.

25  <u>OBJECTIONS AND RESPONSE TO REQUEST FOR ADMISSION NO. 37:</u>

26       Plaintiff objects to this Request on the grounds that it is vague and

27  ambiguous as to "individual apartments."  Plaintiff further objects to this Request

28  on the grounds that it is overly broad as to time and scope.  Plaintiff further objects

**Exhibit 12**
**Page 139**

-4-

PLTF. SESTINI'S OBJS. & RESPS. TO DEF'S
REQUESTS FOR ADMISSIONS, SET TWO

1   to this Request on the grounds that it seeks information that is not relevant to the

2   subject matter of this litigation and is not reasonably calculated to lead to the

3   discovery of admissible evidence.

4       Subject to and without in any way waiving the foregoing objections, and to

5   the extent it understands this Request, Plaintiff responds as follows:  Admit.

6

7   REQUEST FOR ADMISSION NO. 38:

8       Admit that the Alternative Sleeping Location does not offer leases or

9   subleases to homeless individuals.

10  OBJECTIONS AND RESPONSE TO REQUEST FOR ADMISSION NO. 38:

11      Plaintiff objects to this Request on the grounds that it is vague and

12  ambiguous as to "individual apartments."  Plaintiff further objects to this Request

13  on the grounds that it is overly broad as to time and scope.  Plaintiff further objects

14  to this Request on the grounds that it seeks information that is not relevant to the

15  subject matter of this litigation and is not reasonably calculated to lead to the

16  discovery of admissible evidence.

17      Subject to and without in any way waiving the foregoing objections, and to

18  the extent it understands this Request, Plaintiff responds as follows:  Admit.

19

20  DATED:  September 6, 2016        ACLU FOUNDATION OF SOUTHERN
                            CALIFORNIA and PAUL HASTINGS LLP

21

22                             By:

23                                  Katherine F. Murray

24                             Counsel for Plaintiffs

25

26

27

28

**Exhibit 12**
**Page 140**

PLTF. SESTINI'S OBJS. & RESPS. TO DEF'S
REQUESTS FOR ADMISSIONS, SET TWO

LEGAL_US_W # 87074609.1

**<u>EXHIBIT 13</u>**

1  PETER J. ELIASBERG (SB# 189110)
   peliasberg@aclusocal.org
2  BELINDA ESCOBOSA HELZER (SB# 214178)
   bescobosahelzer@aclusocal.org
3  ACLU FOUNDATION OF SOUTHERN CALIFORNIA
   Orange County Office
4  1851 E. First Street, Suite 450
   Santa Ana, CA 92705
5  Telephone: (714) 450-3962
   Facsimile: (714) 543-5240
6
   DAVID M. HERNAND (SB #162733)
7  davidhernand@paulhastings.com
   ANDREW B. GROSSMAN (SB# 211546)
8  andrewgrossman@paulhastings.com
   KATHERINE F. MURRAY (SB# 211987)
9  katherinemurray@paulhastings.com
   PAUL HASTINGS LLP
10 515 South Flower Street, Twenty-Fifth Floor
   Los Angeles, CA 90071
11 Telephone: (213) 683-6000
   Facsimile: (213) 627-0705
12
   *Attorneys for Plaintiffs*
13
14            UNITED STATES DISTRICT COURT
15            CENTRAL DISTRICT OF CALIFORNIA
16                  SOUTHERN DIVISION
17
   Kenneth Glover, et al., individually,   CASE NO. 8:15-CV-01332-AG-DFM
18 and on behalf of all others similarly
   situated                               **CLASS ACTION**
19
                  Plaintiffs,             **PLAINTIFF MICHAEL
20                                        NEWMAN'S SUPPLEMENTAL
        vs.                               OBJECTIONS AND RESPONSES
21                                        TO DEFENDANT LAGUNA BEACH
   CITY OF LAGUNA BEACH; THE              POLICE DEPARTMENT'S
22 LAGUNA BEACH POLICE                    INTERROGATORIES, SET ONE**
   DEPARTMENT, a California charter
23 city                                   Courtroom: 10D
24                Defendants.             Hon. Andrew J. Guilford
25 PROPOUNDING PARTY:  DEFENDANT LAGUNA BEACH POLICE
26                     DEPARTMENT
27 RESPONDING PARTY:   PLAINTIFF MICHAEL NEWMAN
28 SET NO.:            ONE

Exhibit 13
Page 141

PLTF. NEWMAN'S SUPP. OBJS. & RESPS. TO
LBPD'S INTERROGATORIES, SET ONE

1   TO DEFENDANT LAGUNA BEACH POLICE DEPARTMENT AND TO ITS

2   ATTORNEYS OF RECORD, PHILIP D. KOHN, ESQ., AJIT SINGH THIND,

3   ESQ., RUTAN & TUCKER, LLP, MICHAEL G. YODER, ESQ., CHRISTOPHER

4   S. WHITTAKER, ESQ., AND O'MELVENY & MYERS LLP:

5        Plaintiff Michael Newman ("Plaintiff" or "Newman") hereby answers,

6   objects, and otherwise responds to Defendant's First Set of Interrogatories as

7   follows:

8   ## PLAINTIFF'S PRELIMINARY STATEMENT

9

10        Plaintiff has not completed its investigation relating to this action, has not

11   completed discovery in this action, and has not completed preparation for trial.  As

12   discovery proceeds, facts, information, evidence, documents and things may be

13   discovered, which are not set forth in these responses, but which may have been

14   responsive to these Interrogatories.  The following responses are based on

15   Plaintiff's knowledge, information and belief at this time, and are complete as to

16   Plaintiff's best knowledge at this time.  Furthermore, these responses were prepared

17   based on Plaintiff's good faith interpretation and understanding of the

18   Interrogatories, and are subject to correction for inadvertent errors or omissions, if

19   any.

20        Plaintiff reserves the right to refer to, conduct discovery with reference to, or

21   to offer into evidence at the time of trial, any and all facts, evidence, documents and

22   things developed during the course of discovery and trial preparation,

23   notwithstanding the reference to facts, evidence, documents and things in these

24   responses.  In addition, Plaintiff assumes no obligation to voluntarily supplement or

25   amend these responses to reflect information, evidence, documents or things

26   discovered following service of these responses.  Nevertheless, these responses are

27   given without prejudice to subsequent revision or supplementation, including

28

**Exhibit 13**
**Page 142**

-1-

PLTF. NEWMAN'S SUPP. OBJS. & RESPS. TO
LBPD'S INTERROGATORIES, SET ONE

objections, based upon any information, evidence and documentation, which hereinafter may be discovered.

### PLAINTIFF'S GENERAL OBJECTIONS TO
### DEFENDANT'S INTERROGATORIES

1.    Plaintiff objects to Defendant's Interrogatories as a whole, and to each Interrogatory contained therein, to the extent they seek information protected from disclosure by the attorney-client privilege, the attorney work product doctrine, and/or any other applicable privilege or immunity.

2.    Plaintiff objects to Defendant's Interrogatories as a whole, and to each Interrogatory contained therein, to the extent that they seek to require Plaintiff to provide information other than that which may be obtained through a reasonably diligent search of its records.

3.    Plaintiff objects to Defendant's Interrogatories as a whole, and to each Interrogatory contained therein, to the extent that they violate the requirements of Federal Rule of Civil Procedure 33 by containing improper subparts or otherwise compound requests.

4.    Plaintiff objects to Defendant's Interrogatories as a whole, and to each Interrogatory contained therein, to the extent they seek (a) information, the disclosure of which would constitute an unwarranted invasion of the affected persons' rights of privacy and/or confidentiality.

All General Objections are incorporated by reference into each Response as though set forth in full therein.

**Exhibit 13**
**Page 143**
PLTF. NEWMAN'S SUPP. OBJS. & RESPS. TO
LBPD'S INTERROGATORIES, SET ONE

-2-

## PLAINTIFF'S OBJECTIONS AND RESPONSES TO
## DEFENDANT'S INTERROGATORIES

INTERROGATORY NO. 3:

Do you contend that the City is obligated to provide, create, or fund an additional unit of permanent supportive housing or other similar housing for any disabled, homeless individual who relocates to Laguna Beach in the future?

OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 3:

Plaintiff objects to this Interrogatory on the grounds that it is vague and ambiguous as to the undefined term "additional unit." Plaintiff further objects to this Interrogatory on the grounds that it calls for a legal conclusion as to the City's obligations. Plaintiff further objects to this Interrogatory on the grounds that it is overly broad as to time and scope. Plaintiff further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or attorney work product doctrine.

Subject to and without in any way waiving the foregoing objections, and to the extent he understands this Interrogatory, Plaintiff responds as follows: Yes, provided that the Court finds Permanent Supportive Housing to be the necessary remedy for the violations alleged in the Second Amended Complaint. If the Court does not find that Permanent Supportive Housing is necessary, those who relocate would be entitled to a non-discriminatory homelessness program that could include: Defendants' ceasing enforcement, either through written citation and/or written or verbal warnings and/or threats, of the penal and municipal code provisions challenged in these proceedings for merely sleeping, resting, or lying down with personal property at any time of day (and in particular ceasing enforcement of criminal or civil code provisions which penalize the status of being homeless in public areas, including parking lots, adjacent to City housing shelters and any sleeping locations for homeless individuals); Defendants' ceasing

Exhibit 13
Page 144

-3-

1   enforcement, either through written citation and/or written or verbal warnings

2   and/or threats, of the penal and municipal code provisions challenged in these

3   proceedings for merely sleeping, resting, or lying down with personal property for

4   those individuals who have attempted to obtain a place in the ASL but have not

5   obtained one through the lottery; police and City employees or contractors at any

6   City housing shelters and sleeping locations for homeless individuals receiving

7   adequate training in any and all modifications made as well as in evidence-based

8   best practices for interacting with individuals with disabilities; rules, regulations,

9   policies and procedures reflecting the rights of homeless individuals to receive non-

10  discriminatory, safe, humane, and respectful services, to ensure due process and

11  otherwise accommodate the needs of individuals with disabilities; adding private,

12  non-congregant sleeping units at any City housing shelters and sleeping locations

13  for homeless individuals whose disabilities are exacerbated by living in large

14  congregate space adding beds or cots at any City housing shelters and sleeping

15  locations for homeless individuals, particularly for those with physical disabilities

16  impair their ability to sleep on the floor ; increasing accessibility of bathrooms

17  (both physical accessibility and accessibility of bathroom access and use policies) at

18  any City housing shelters and sleeping locations for homeless individuals;

19  permitting physical presence in public areas, including parking lots, adjacent to any

20  City housing shelters and sleeping locations for homeless individuals 24 hours per

21  day (and in particular during non-sleeping hours); eliminating any and all residency

22  requirements for sleeping at any City housing shelters and sleeping locations for

23  homeless individuals; eliminating any and all residency requirements for using any

24  storage provided by or at any City housing shelters and sleeping locations for

25  homeless individuals with disabilities; making potable water and accessible

26  toileting facilities available both inside and outside in public areas, including

27  parking lots, adjacent to any City housing shelters and sleeping locations for

28  homeless individuals with disabilities; providing transportation to and from

**Exhibit 13**
**Page 145**

-4-

LEGAL_US_W # 87382738.1

downtown Laguna Beach and any City housing shelters and sleeping locations for
homeless individuals (and in particular any individuals who are unable to be
accommodated overnight and/or at any times at which shelters or sleeping locations
are closed); permitting use of interior spaces of any City housing shelters and
sleeping locations for homeless individuals during non-sleeping periods; providing
integrated indoor shelter, housing, apartment, or any other residential living options
and/or other alternative, legal places to sleep; implementing any and all changes to
the Defendants' housing policy and practices to ensure a housing first model, such
that any such housing provides crisis intervention, rapid access to housing, follow-
up case management, and support services; and other similar modifications, having
an ADA coordinator on-site at the ASL to entertain and implement requests for
modifications necessary to eliminate barriers to access for people with disabilities.
These additional forms of relief could, either individually, in some grouping, or all
together provide relief on Plaintiffs' ADA and Rehabilitation Act claims in the
event the Court were not to require the provision of permanent supportive housing.


DATED:  October 1, 2016          ACLU FOUNDATION OF SOUTHERN
                                 CALIFORNIA and PAUL HASTINGS
                                 LLP

                                 By: _____
                                        Peter J. Eliasberg

                                 Counsel for Plaintiffs

**Exhibit 13**
**Page 146**

PLTF. NEWMAN'S SUPP. OBJS. & RESPS. TO
LBPD'S INTERROGATORIES, SET ONE

LEGAL_US_W # 87382738.1

## **VERIFICATION**

I, MICHAEL NEWMAN, declare and state:

1.     I have read the foregoing SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DEFENDANT LAGUNA BEACH POLICE DEPARTMENT'S SPECIAL INTERROGATORIES, SET ONE, INTERROGATORY NUMBER 3, and know the contents thereof.

2.     The factual statements in the SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DEFENDANT LAGUNA BEACH POLICE DEPARTMENT'S SPECIAL INTERROGATORIES, SET ONE, INTERROGATORY NUMBER 3 are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ___ day of October 2016, at _Laguna Beach_, California.

_[signature]_

MICHAEL NEWMAN

**Exhibit 13**
**Page 147**

1

## PROOF OF SERVICE

2

STATE OF CALIFORNIA              )
                                 ) ss:
3

CITY OF LOS ANGELES AND COUNTY OF   )
LOS ANGELES                      )

4

5

6        I am employed in the City of Los Angeles and County of Los Angeles, State
of California. I am over the age of 18, and not a party to the within action. My business
7   address is 515 South Flower Street, Twenty-Fifth Floor, Los Angeles, California 90071-
2228.

8        On October 5, 2016, I served the foregoing document(s) described as:

9   **PLAINTIFF MICHAEL NEWMAN'S SUPPLEMENTAL OBJECTIONS AND**
**RESPONSES TO DEFENDANT LAGUNA BEACH POLICE DEPARTMENT'S**
10                        **INTERROGATORIES, SET ONE**

11   on the interested parties by placing thereof in a sealed envelope(s) addressed as follows:

12

13   Philip D. Kohn (pkohn@rutan.com)       Michael G. Yoder (myoder@omm.com)
     Ajit Singh Thind (athind@rutan.com)    Christopher S. Whittaker
14   Rutan & Tucker, LLP                    (cwhittaker@omm.com)
     611 Anton Boulevard, Suite 1400        O'Melveny & Myers LLP
15   Costa Mesa, CA 92626-1931              610 Newport Center Drive, Suite 1700
     Phone: (714) 641-5100                  Newport Beach, CA 92660-6429
16   Fax: (714) 546-9035                    Phone: (949) 823-6900
                                            Fax: (949) 823-6994
17

18

19   ☐       **VIA OVERNIGHT MAIL:**
             VIA UPS: By delivering such document(s) to an overnight mail service or
20           an authorized courier in a sealed envelope or package designated by the
             express service courier addressed to the person(s) on whom it is to be
21           served.

22   ☒       **VIA U.S. MAIL:**
             I am readily familiar with the firm's practice of collection and processing of
23           correspondence for mailing. Under that practice such sealed envelope(s)
             would be deposited with the U.S. postal service on October 5, 2016 with
24           postage thereon fully prepaid, at Los Angeles, California.

25   ☐       **VIA PERSONAL DELIVERY:**
             I personally delivered such sealed envelope(s) by hand to the offices of the
26           addressee(s) pursuant to CCP § 1011.

27

28                                              **Exhibit 13**
                                                **Page 148**
                                             PROOF OF SERVICE

1

☐     **VIA FACSIMILE:**

2       The facsimile transmission report indicated that the transmission was
        complete and without error.  The facsimile was transmitted to Facsimile

3       #_____ on October 5, 2016 at _____.  A copy of that report, which
        was properly issued by the transmitting machine, is attached hereto.

4       **[Permitted by written agreement of the parties.]**

5           I declare under penalty of perjury under the laws of the United States that
    the above is true and correct.

6

7           Executed on October 5, 2016, at Los Angeles, California.

8

9                                                    _____
                                                            Maggie Icart

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                                              **Exhibit 13**
                                                              **Page 149**
                          - 2 -                               PROOF OF SERVICE

**EXHIBIT 14**

PETER J. ELIASBERG (SB# 189110)
peliasberg@aclusocal.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 W 8th St, Suite 200
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 417-2228

DAVID M. HERNAND (SB #162733)
davidhernand@paulhastings.com
ANDREW B. GROSSMAN (SB# 211546)
andrewgrossman@paulhastings.com
KATHERINE F. MURRAY (SB# 211987)
katherinemurray@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, Twenty-Fifth Floor
Los Angeles, CA 90071
Telephone: (213) 683-6000
Facsimile: (213) 627-0705

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| Kenneth Glover, et al., individually, and on behalf of all others similarly situated<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF LAGUNA BEACH; THE LAGUNA BEACH POLICE DEPARTMENT, a California charter city<br><br>Defendants. | CASE NO. 8:15-CV-01332-AG-DFM<br><br>**CLASS ACTION**<br><br>**PLAINTIFF DAVID SESTINI'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DEFENDANT LAGUNA BEACH POLICE DEPARTMENT'S INTERROGATORIES, SET ONE**<br><br>Courtroom: 10D<br><br>Hon. Andrew J. Guilford |

PROPOUNDING PARTY:   DEFENDANT LAGUNA BEACH POLICE DEPARTMENT

RESPONDING PARTY:   PLAINTIFF DAVID SESTINI

SET NO.:   ONE

**Exhibit 14**
**Page 150**

1   TO DEFENDANT LAGUNA BEACH POLICE DEPARTMENT AND TO ITS

2   ATTORNEYS OF RECORD, PHILIP D. KOHN, ESQ., AJIT SINGH THIND,

3   ESQ., RUTAN & TUCKER, LLP, MICHAEL G. YODER, ESQ., CHRISTOPHER

4   S. WHITTAKER, ESQ., AND O'MELVENY & MYERS LLP:

5        Plaintiff David Sestini ("Plaintiff" or "Sestini") hereby answers, objects, and

6   otherwise responds to Defendant's First Set of Interrogatories as follows:

7                    **PLAINTIFF'S PRELIMINARY STATEMENT**

8

9        Plaintiff has not completed its investigation relating to this action, has not

10  completed discovery in this action, and has not completed preparation for trial.  As

11  discovery proceeds, facts, information, evidence, documents and things may be

12  discovered, which are not set forth in these responses, but which may have been

13  responsive to these Interrogatories.  The following responses are based on

14  Plaintiff's knowledge, information and belief at this time, and are complete as to

15  Plaintiff's best knowledge at this time.  Furthermore, these responses were prepared

16  based on Plaintiff's good faith interpretation and understanding of the

17  Interrogatories, and are subject to correction for inadvertent errors or omissions, if

18  any.

19       Plaintiff reserves the right to refer to, conduct discovery with reference to, or

20  to offer into evidence at the time of trial, any and all facts, evidence, documents and

21  things developed during the course of discovery and trial preparation,

22  notwithstanding the reference to facts, evidence, documents and things in these

23  responses.  In addition, Plaintiff assumes no obligation to voluntarily supplement or

24  amend these responses to reflect information, evidence, documents or things

25  discovered following service of these responses.  Nevertheless, these responses are

26  given without prejudice to subsequent revision or supplementation, including

27  objections, based upon any information, evidence and documentation, which

28  hereinafter may be discovered.

**Exhibit 14**
**Page 151**

-1-

PLTF. SESTINI'S SUPP. OBJS. & RESPS. TO
LBPD'S INTERROGATORIES, SET ONE

1    <u>**PLAINTIFF'S GENERAL OBJECTIONS TO**</u>

2    <u>**DEFENDANT'S INTERROGATORIES**</u>

3

4       1.      Plaintiff objects to Defendant's Interrogatories as a whole, and to each

5    Interrogatory contained therein, to the extent they seek information protected from

6    disclosure by the attorney-client privilege, the attorney work product doctrine,

7    and/or any other applicable privilege or immunity.

8

9       2.      Plaintiff objects to Defendant's Interrogatories as a whole, and to each

10   Interrogatory contained therein, to the extent that they seek to require Plaintiff to

11   provide information other than that which may be obtained through a reasonably

12   diligent search of its records.

13

14      3.      Plaintiff objects to Defendant's Interrogatories as a whole, and to each

15   Interrogatory contained therein, to the extent that they violate the requirements of

16   Federal Rule of Civil Procedure 33 by containing improper subparts or otherwise

17   compound requests.

18

19      4.      Plaintiff objects to Defendant's Interrogatories as a whole, and to each

20   Interrogatory contained therein, to the extent they seek (a) information, the

21   disclosure of which would constitute an unwarranted invasion of the affected

22   persons' rights of privacy and/or confidentiality.

23

24      All General Objections are incorporated by reference into each Response as

25   though set forth in full therein.

26

27

28

**Exhibit 14**
**Page 152**
PLTF. SESTINI'S SUPP. OBJS. & RESPS. TO
LBPD'S INTERROGATORIES, SET ONE

-2-

**PLAINTIFF'S OBJECTIONS AND RESPONSES TO**

**DEFENDANT'S INTERROGATORIES**

INTERROGATORY NO. 3:

        Do you contend that the City is obligated to provide, create, or fund an additional unit of permanent supportive housing or other similar housing for any disabled, homeless individual who relocates to Laguna Beach in the future?

OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 3:

        Plaintiff objects to this Interrogatory on the grounds that it is vague and ambiguous as to the undefined term "additional unit." Plaintiff further objects to this Interrogatory on the grounds that it calls for a legal conclusion as to the City's obligations. Plaintiff further objects to this Interrogatory on the grounds that it is overly broad as to time and scope. Plaintiff further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or attorney work product doctrine.

        Subject to and without in any way waiving the foregoing objections, and to the extent he understands this Interrogatory, Plaintiff responds as follows: Yes, provided that the Court finds Permanent Supportive Housing to be the necessary remedy for the violations alleged in the Second Amended Complaint. If the Court does not find that Permanent Supportive Housing is necessary, those who relocate would be entitled to a non-discriminatory homelessness program that could include: Defendants' ceasing enforcement, either through written citation and/or written or verbal warnings and/or threats, of the penal and municipal code provisions challenged in these proceedings for merely sleeping, resting, or lying down with personal property at any time of day (and in particular ceasing enforcement of criminal or civil code provisions which penalize the status of being homeless in public areas, including parking lots, adjacent to City housing shelters and any sleeping locations for homeless individuals); Defendants' ceasing

**Exhibit 14**
**Page 153**

-3-

PLTF. SESTINI'S SUPP. OBJS. & RESPS. TO
LBPD'S INTERROGATORIES, SET ONE

1    enforcement, either through written citation and/or written or verbal warnings

2    and/or threats, of the penal and municipal code provisions challenged in these

3    proceedings for merely sleeping, resting, or lying down with personal property for

4    those individuals who have attempted to obtain a place in the ASL but have not

5    obtained one through the lottery; police and City employees or contractors at any

6    City housing shelters and sleeping locations for homeless individuals receiving

7    adequate training in any and all modifications made as well as in evidence-based

8    best practices for interacting with individuals with disabilities; rules, regulations,

9    policies and procedures reflecting the rights of homeless individuals to receive non-

10   discriminatory, safe, humane, and respectful services, to ensure due process and

11   otherwise accommodate the needs of individuals with disabilities; adding private,

12   non-congregant sleeping units at any City housing shelters and sleeping locations

13   for homeless individuals whose disabilities are exacerbated by living in large

14   congregate space adding beds or cots at any City housing shelters and sleeping

15   locations for homeless individuals, particularly for those with physical disabilities

16   impair their ability to sleep on the floor ; increasing accessibility of bathrooms

17   (both physical accessibility and accessibility of bathroom access and use policies) at

18   any City housing shelters and sleeping locations for homeless individuals;

19   permitting physical presence in public areas, including parking lots, adjacent to any

20   City housing shelters and sleeping locations for homeless individuals 24 hours per

21   day (and in particular during non-sleeping hours); eliminating any and all residency

22   requirements for sleeping at any City housing shelters and sleeping locations for

23   homeless individuals; eliminating any and all residency requirements for using any

24   storage provided by or at any City housing shelters and sleeping locations for

25   homeless individuals with disabilities; making potable water and accessible

26   toileting facilities available both inside and outside in public areas, including

27   parking lots, adjacent to any City housing shelters and sleeping locations for

28   homeless individuals with disabilities; providing transportation to and from

**Exhibit 14**
**Page 154**

PLTF. SESTINI'S SUPP. OBJS. & RESPS. TO
LBPD'S INTERROGATORIES, SET ONE

1   downtown Laguna Beach and any City housing shelters and sleeping locations for

2   homeless individuals (and in particular any individuals who are unable to be

3   accommodated overnight and/or at any times at which shelters or sleeping locations

4   are closed); permitting use of interior spaces of any City housing shelters and

5   sleeping locations for homeless individuals during non-sleeping periods; providing

6   integrated indoor shelter, housing, apartment, or any other residential living options

7   and/or other alternative, legal places to sleep; implementing any and all changes to

8   the Defendants' housing policy and practices to ensure a housing first model, such

9   that any such housing provides crisis intervention, rapid access to housing, follow-

10  up case management, and support services; and other similar modifications, having

11  an ADA coordinator on-site at the ASL to entertain and implement requests for

12  modifications necessary to eliminate barriers to access for people with disabilities.

13  These additional forms of relief could, either individually, in some grouping, or all

14  together provide relief on Plaintiffs' ADA and Rehabilitation Act claims in the

15  event the Court were not to require the provision of permanent supportive housing.

16

17

18  DATED:  October 1, 2016          ACLU FOUNDATION OF SOUTHERN
                                     CALIFORNIA and PAUL HASTINGS
19                                   LLP

20
                                     By:   _____
21                                              Peter J. Eliasberg

22
                                     Counsel for Plaintiffs
23

24

25

26

27

28

**Exhibit 14**
**Page 155**
PLTF. SESTINI'S SUPP. OBJS. & RESPS. TO
LBPD'S INTERROGATORIES, SET ONE

-5-

1      <u>**VERIFICATION**</u>

2      I, DAVID SESTINI, declare and state:

3      1.      I have read the foregoing SUPPLEMENTAL OBJECTIONS AND

4  RESPONSES TO DEFENDANT LAGUNA BEACH POLICE DEPARTMENT'S

5  SPECIAL INTERROGATORIES, SET ONE, INTERROGATORY NUMBER 3,

6  and know the contents thereof.

7      2.      The factual statements in the SUPPLEMENTAL OBJECTIONS

8  AND RESPONSES TO DEFENDANT LAGUNA BEACH POLICE

9  DEPARTMENT'S SPECIAL INTERROGATORIES, SET ONE,

10  INTERROGATORY NUMBER 3 are true and correct to the best of my knowledge,

11  information, and belief.

12      I declare under penalty of perjury under the laws of the United States of

13  America that the foregoing is true and correct.

14      Executed this _10th_ day of October 2016, at _Santa Ana_,

15  California.

16

17

18

19

20

21

22              DAVID SESTINI

23

24

25

26

27

28                                              **Exhibit 14**
                                                **Page 156**

1

## PROOF OF SERVICE

2

STATE OF CALIFORNIA                          )
3                                            ) ss:
CITY OF LOS ANGELES AND COUNTY OF           )
4  LOS ANGELES                               )

5

6        I am employed in the City of Los Angeles and County of Los Angeles, State of California.  I am over the age of 18, and not a party to the within action.  My business
7  address is 515 South Flower Street, Twenty-Fifth Floor, Los Angeles, California  90071-2228.

8        On October 12, 2016, I served the foregoing document(s) describ**ed as:**

9  **PLAINTIFF DAVID SESTINI'S SUPPLEMENTAL OBJECTIONS AND
   RESPONSES TO DEFENDANT LAGUNA BEACH POLICE DEPARTMENT'S
10                INTERROGATORIES, SET ONE**

11  on the interested parties by placing thereof in a sealed envelope(s) addressed as follows:

12

13  Philip D. Kohn (pkohn@rutan.com)          Michael G. Yoder (myoder@omm.com)
    Ajit Singh Thind (athind@rutan.com)       Christopher S. Whittaker
14  Rutan & Tucker, LLP                       (cwhittaker@omm.com)
    611 Anton Boulevard, Suite 1400           O'Melveny & Myers LLP
15  Costa Mesa, CA  92626-1931                610 Newport Center Drive, Suite 1700
    Phone:  (714) 641-5100                    Newport Beach, CA  92660-6429
16  Fax:  (714) 546-9035                      Phone:  (949) 823-6900
                                              Fax:  (949) 823-6994
17

18

19  ☐        **VIA OVERNIGHT MAIL:**
20           VIA UPS:  By delivering such document(s) to an overnight mail service or
             an authorized courier in a sealed envelope or package designated by the
21           express service courier addressed to the person(s) on whom it is to be
             served.

22  ☒        **VIA U.S. MAIL:**
23           I am readily familiar with the firm's practice of collection and processing of
             correspondence for mailing.  Under that practice such sealed envelope(s)
             would be deposited with the U.S. postal service on October 12, 2016 with
24           postage thereon fully prepaid, at Los Angeles, California.

25  ☐        **VIA PERSONAL DELIVERY:**
26           I personally delivered such sealed envelope(s) by hand to the offices of the
             addressee(s) pursuant to CCP § 1011.

27

28                                            **Exhibit 14**
                                              **Page 157**
                                              PROOF OF SERVICE

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

☐     **VIA FACSIMILE:**

The facsimile transmission report indicated that the transmission was complete and without error.  The facsimile was transmitted to Facsimile #_____ on October 12, 2016 at _____.  A copy of that report, which was properly issued by the transmitting machine, is attached hereto. **[Permitted by written agreement of the parties.]**

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on October 12, 2016, at Los Angeles, California.

_____
Maggie Icart

**Exhibit 14**
**Page 158**
PROOF OF SERVICE

- 2 -

**<u>EXHIBIT 15</u>**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION


KENNETH GLOVER, et al.,
individually, and on behalf of all
others similarly situated,

         Plaintiffs,

     vs.                No. 8:15-CV-01332-AG-DFM

CITY OF LAGUNA BEACH;
THE LAGUNA BEACH POLICE
DEPARTMENT, a California
charter city,

         Defendants.
_____

DEPOSITION OF MICHAEL NEWMAN

Costa Mesa, California

Thursday, September 8, 2016
Volume I


Reported by:
ANGELA METZ
CSR No. 12454

JOB No. 22144


PAGES 1 - 250

1

Exhibit 15
Page 159

Michael Newman, 9/8/2016
Glover v. City of Laguna Beach

```
 1            MR. KYSEL:  Ian Kysel ACLU for plaintiff.
 2            MS. GARROW:  Eve Garrett, ACLU for the
 3     plaintiff.
 4            MR. YODER:  Michael Yoder.  I represent the
 5     defendants.                                          10:00
 6            MR. WHITTAKER:  Chris Winker.  I also
 7     represent the defendant.
 8            THE VIDEOGRAPHER:  Madam Court Reporter,
 9     would you please swear in the witness?
10
11                    MICHAEL NEWMAN,
12     having been first duly sworn, was examined and
13     testified as follows:
14
15                    EXAMINATION
16     BY MR. YODER:
17        Q   Would you please state and spell your name.
18        A   Michael Eric Newman, M-i-c-h-a-e-l,
19     E-r-i-c, N-e-w-m-a-n.
20        Q   How old are you, Mr. Newman?                  10:01
21        A   Fifty-three.
22        Q   Do you have a permanent address currently?
23        A   Yes.
24        Q   And what is that?
25        A   20652 Laguna Canyon Road, Laguna Beach        10:01
```

7

Michael Newman, 9/8/2016
Glover v. City of Laguna Beach

1      Q   So for how long a period of time, then, did
2   you, on a regular basis, stay overnight at the ASL?
3      A   I'm sorry.  Question again?
4      Q   Sure.  At some point shortly after you
5   returned from Dallas, you are given the designation        10:47
6   of a Laguna Beach local?
7      A   Yeah.
8      Q   Correct?
9      A   Yeah.  Yes.
10     Q   At that point, you started staying at the        10:47
11  ASL on a regular basis?
12     A   Yes.
13     Q   And my question is, for how long did you
14  continue to stay at the ASL on a regular basis?
15     A   Until I was accepted into the Friendship        10:48
16  Shelter.
17     Q   When were you accepted in the Friendship
18  Shelter?
19     A   More dates, maybe 2014 or '15.
20     Q   Let me ask it this way, Mr. Newman:  Can        10:48
21  you give me your best estimate as to how long a
22  period of time was where you were staying on a
23  regular basis at the ASL before you were accepted
24  into the Friendship Shelter?
25     A   I do remember that, actually.  It was eight      10:48

48

ADVANCED DEPOSITIONS
www.advanceddepositions.com | 855.811.3376

**Exhibit 15**
**Page 161**

Michael Newman, 9/8/2016
Glover v. City of Laguna Beach

1    or nine months.
2        Q    What is the Friendship Shelter?
3        A    Best described as a sober living
4    environment to help homeless people to get back on
5    their feet.                                          10:49
6        Q    Did the Friendship Shelter actually offer
7    you and provide to you a place to live?
8        A    Yes.
9        Q    Where was that?
10       A    At the Friendship Shelter's building.      10:49
11       Q    Where is that?
12       A    I don't remember the address, on PCH.
13       Q    In Laguna Beach?
14       A    Yes.
15       Q    And what type of accommodation were you    10:49
16   given at the Friendship Shelter?
17       A    To describe the build -- or the situation,
18   there's 15 or 16 men and 15 or 16 women.  There's
19   typically two to four in each room.  There are
20   resources of clothing and counseling and very good  10:49
21   food and structure.
22       Q    What do you mean by "structure"?
23       A    Within the realms of rules that actually
24   get enforced, for the most part, especially as it
25   pertains to drinking and drugs and just overall     10:50

49

**Exhibit 15
Page 162**

Michael Newman, 9/8/2016
Glover v. City of Laguna Beach

```
 1   mentioned.
 2        Q    Any others?
 3        A    That is it.
 4        Q    Have you ever been cited or ticketed for
 5   camping or sleeping overnight in a public area?          11:59
 6        A    No.
 7        Q    Have you ever been cited or ticketed for
 8   sleeping overnight in a public area?
 9        A    Appreciate I haven't been ticketed, but I
10   have been harassed on multiple occasions.               12:00
11        Q    We'll get to those.  Have you ever been
12   cited or ticketed for sleeping overnight in a public
13   area?
14        A    No.
15        Q    Have you ever been cited or ticketed for    12:00
16   drug use?
17        A    No.
18        Q    Have you ever been cited or ticketed for
19   drunkenness?
20        A    No.                                          12:00
21        Q    You said at some point you had had a
22   scooter?
23        A    Yes.
24        Q    What type of scooter?
25        A    Honda.                                       12:00
```

95

ADVANCED DEPOSITIONS
www.advanceddepositions.com | 855.811.3376

**Exhibit 15**
**Page 163**

Michael Newman, 9/8/2016
Glover v. City of Laguna Beach

```
 1        A    I think it was the first time that -- well,
 2   first they're -- these were huge, large-scale
 3   operations.  That was overwhelming to me to be
 4   involved in that at the time.  It was -- I don't
 5   even know how to really express what I was going            12:18
 6   through, but I just felt at the time there's no way
 7   I can be in this environment.
 8        Q    And you felt that the Laguna shelter would
 9   be a better environment for you?
10        A    Five hundred, six hundred strangers versus      12:18
11   thirty or forty.
12        Q    And can you describe for me what the
13   differences were between the Dallas shelters and the
14   Laguna ASL?
15        A    Yeah.  Well, initially, the first Dallas       12:18
16   shelter was a Christian-based shelter, which goes
17   against everything I'm about.  Secondly, the -- the
18   -- the other shelter was the inner-city Dallas
19   shelter which is also kind of, you know, a shock to
20   anybody that had my background.  And at the time, I      12:18
21   just felt the -- oh, there was no smoking, which was
22   a big deal to me at that point, you know,
23   cigarettes.  And once you go in there, you can't
24   come out.  So whatever the reasons were, I was just
25   in a place with my depression where I found that        12:19
```

110

```
 1    impossible to deal with.  And so I was in the
 2    streets for a handful of days preparing to get back
 3    to Laguna Beach.
 4         Q   And in what way did you believe that the
 5    Laguna Beach shelter would be better for you?          12:19
 6         A   As I had said before, you know, as I first
 7    became homeless in 2009, I had checked out the
 8    shelter, and I had a taste of what it was like
 9    there.
10         Q   And so in what ways did you think it would   12:19
11    be better for you?
12         A   It was less people, and it was Laguna
13    Beach.
14         Q   Nicer area?
15         A   Yes.                                          12:19
16         Q   And a nicer grouping of homeless who are
17    staying there than what you were experience in
18    Dallas?
19             MR. ROTSTEIN:  Objection.  Vague.
20             THE WITNESS:  That is true.                   12:20
21    BY MR. YODER:
22         Q   More flexibility?
23         A   Yes.
24         Q   Among other things, there's a place where
25    you can actually smoke at the ASL, correct?           12:20
```

                                                        111

Michael Newman, 9/8/2016
Glover v. City of Laguna Beach

1          A    Correct.

2          Q    So you came back, and that's when you

3    started to stay regularly overnight at the ASL?

4          A    Correct.

5          Q    And you continued to do that until you                 12:20

6    moved into the Friendship Shelter?

7          A    Correct.

8          Q    And then from the Friendship Shelter, you

9    went to the room in Aliso Viejo?

10         A    Correct.                                                12:20

11         Q    And once you then left the room in Aliso

12   Viejo, where have you been sleeping?

13         A    ASL.

14         Q    Are there nights where you don't stay at

15   the ASL?                                                          12:21

16         A    Yes.

17         Q    And why are there occasions where you don't

18   stay overnight at the ASL?

19         A    Because I have been exited is the word by

20   staff.                                                            12:21

21         Q    So you have been asked to leave on

22   occasion?

23         A    Yes.

24         Q    And told not to come back for some period

25   of time?                                                         12:21

                                                              112

**Exhibit 15
Page 166**

1        A    Correct.

2        Q    When you -- when you are exited -- strike

3   that.  On how many occasions have you been exited?

4   And I know you're not going to have a specific

5   number but your best estimate.  What kind of range        12:21

6   are we talking about?

7        A    On three occasions, I was exited -- I'm

8   sorry.  Two occasions I was exited for two weeks,

9   and maybe ten-ish occasions I've been exited for one

10  or two days.                                               12:21

11       Q    And when you are exit -- exited, is that by

12  an employee at the Friendship Shelter?

13       A    Yes.

14       Q    Not by Laguna Beach police, right?

15       A    Correct.                                         12:22

16       Q    On those occasions where you've been exited

17  and, therefore, you are not allowed to stay

18  overnight at the ASL, where have you slept?

19       A    Either the parking lot or the beach.

20       Q    And I think we covered this more generally,      12:22

21  but on those occasions where you've been exited from

22  the ASL and slept in the ASL parking lot, have you

23  ever received any citation or ticket?

24       A    No.

25       Q    On those occasions where you've been exited      12:23

                                                        113

1    from the ASL and slept on the beach, did you ever

2    receive any citation or ticket?

3         A    No.

4         Q    Is there any particular reason why, on

5    those occasions where you slept at the beach, you          12:23

6    did not sleep overnight in the ASL parking lot?

7         A    Question again?

8         Q    Sure.  Fair to say that most of the time

9    where you've been exited from the ASL, you end up

10   sleeping in the ASL parking lot?                            12:23

11        A    Yes.

12        Q    There have been at least some occasions,

13   though, where you've actually gone to the beach to

14   sleep?

15        A    Right.                                            12:23

16        Q    So I'm asking why go to the beach to sleep

17   on those occasions rather than just stay in the ASL

18   parking lot.

19        A    The answer really has to do with the

20   depressional issue of feeling the victimization of         12:24

21   the staff at -- and biases towards the staff and why

22   I was wrongly exited in the first place, and all --

23   and also having problems or issues with the meth --

24   methamphetamine use in -- rampant methamphetamine

25   use the parking lot and having to deal with that           12:24

114

**Exhibit 15
Page 168**

Michael Newman, 9/8/2016
Glover v. City of Laguna Beach

```
 1    BY MR. YODER:
 2         Q    Where are you sleeping currently?
 3         A    Both the parking lot and inside the ASL.
 4         Q    Are you currently exited from the ASL?
 5         A    No.                                           12:25
 6         Q    When were you last exited from the ASL?
 7         A    Week and a half to two weeks ago.
 8         Q    For what?
 9         A    Actually, a misunderstanding I had with
10    another gentleman.  He pushed me.  I pushed him     12:26
11    back.  He was a little older, and Mary just thought
12    we should separate, and I had already been sleeping
13    in the parking lot in the summertime.  It -- it
14    smells horribly in there because they don't force
15    people to bathe or whatever, so for the most part,   12:26
16    when I can, I like to sleep outside, especially in
17    the summer when I am -- when all -- when all things
18    are working, you know, and I -- when I have the
19    opportunity to tent myself or separate myself from
20    everybody.                                           12:26
21         Q    And that's a choice that you make?
22         A    Correct.
23         Q    And you're allowed to make that choice?
24         A    Seems like I am these days.
25              MR. YODER:  Okay.  Why don't we take a      12:26
```

                                                              116

Michael Newman, 9/8/2016
Glover v. City of Laguna Beach

```
 1    time that you actually slept at the beach, correct?
 2         A    And on one occasion, I slept down the way a
 3    bit in the canyon to get away from things.  Yeah.
 4         Q    Okay.  But during this period of time
 5    between you first returning to Laguna and being        01:33
 6    placed in the Friendship Shelter, is it fair to say
 7    when you were exited, you almost always then slept
 8    in the ASL parking lot?
 9         A    Fair to say.
10         Q    And there may have been one occasion where  01:34
11    you slept somewhere else in the canyon?
12         A    Yes.
13         Q    Okay.  Best estimate of how many nights you
14    actually slept in the ASL parking lot during that
15    period of time?                                        01:34
16         A    That's an impossibility.  I just don't have
17    an idea.  I mean, how many nights I slept?
18         Q    In the parking lot during that period of
19    time, the December 2013 through August 2014.
20         A    Yeah.  There had been many times when the   01:34
21    circumstances of the box became untenable --
22    untenable to me, so I stayed in the parking lot for
23    those reasons just to get away from, again, the
24    smells, the noises, the insanity of the box or
25    because some staff member or another got it wrong,     01:34
```

                                                            122

Michael Newman, 9/8/2016
Glover v. City of Laguna Beach

```
 1   so to speak, and -- and mischaracterized me or did
 2   something to upset me, and I felt it better to be
 3   outside, for example.  Or my depression became such
 4   that I just needed to be alone and isolate because
 5   it was too much.  So there's a lot of reasons for me    01:35
 6   to be in the parking lot, that --
 7        Q   Wasn't my question, though.
 8        A   I don't know.  And the answer to your
 9   question is, I don't know how many of those times or
10   I don't even know if I could possibly characterize,     01:35
11   within reasonableness, the amount of times I stayed
12   out there.  I just don't know, a lot, a lot for a
13   lot of reasons.
14        Q   Sometimes you stayed in the parking lot
15   because you had been exited by the ASL, correct?        01:35
16        A   Correct.
17        Q   Other times you chose to stay in the
18   parking lot by your choice.  You hadn't been exited,
19   but for various reasons, you decided you'd rather be
20   in the parking lot?                                     01:36
21        A   That's correct.
22        Q   And can you tell me percentage-wise -- I
23   know you can't give me the overall number of how
24   often you slept in the parking lot during that
25   December 2013 to August 2014 period of time, but can    01:36
```

123

**Exhibit 15**
**Page 171**

Michael Newman, 9/8/2016
Glover v. City of Laguna Beach

```
 1    you give me an estimate of the percentage of time
 2    you're staying in the parking lot because you were
 3    exited versus the percentage of time you were
 4    staying in the parking lot because you chose to stay
 5    in the parking lot?                                    01:36
 6         A    Yes.  I think it's very fair to say
 7    something in the neighborhood of 75 percent of the
 8    time was my choice.  The -- the vast majority, maybe
 9    80, maybe 85 percent.  The vast majority of the
10    times that I slept in the parking lot or elsewhere     01:36
11    was because of my choice.
12         Q    Okay.  Let me show you a document that we
13    had marked as Exhibit 17.
14              (Exhibit 17 was marked for
15              identification.)                             01:37
16    BY MR. YODER:
17         Q    And you'll see this is a document, the
18    first page is entitled ASL Report.  And if you look
19    down at the bottom of the first page, you'll see
20    there's a reference to Mike Newman exited, and it      01:37
21    says, "CIR," and then if you go in four or five
22    pages on the sign-in sheet, and in the lower
23    right-hand corner there's a reference to city and
24    then a number.  And the page I'm on at the very
25    bottom right-hand corner it says, "City 047223."       01:37
```

124

**Exhibit 15**
**Page 172**

Michael Newman, 9/8/2016
Glover v. City of Laguna Beach

```
 1    while in -- in the ASL properly, which is Mia, the
 2    director, and now Raul in the morning.  But -- but
 3    that's not even consistent.  So the problem is,
 4    nobody -- none of the staff members -- what is the
 5    word -- actually throws people out for using or          01:53
 6    drinking.
 7          They throw people out for behavior.  So
 8    although there are, for example, rules that say
 9    you're not to bring in marijuana or alcohol inside
10    the ASL, it is not observed, and it is not enforced     01:53
11    is the word I was looking for.  So what is enforced
12    and what we self enforce is behavior, and that is
13    when you get kicked out for drinking or for pot use,
14    unless you are scrutinized by the director, Mia.
15       Q    And how -- so with most the staff, at least      01:54
16    as you observe it, exits are based on behavior?
17       A    Correct, with all of the staff except for a
18    few.
19       Q    And the few being Mia, who is the director?
20       A    Right.                                           01:54
21       Q    And then Raul?
22       A    Raul in the morning.  He's the overnight
23    guy, and he's in the mornings.  He has exited me,
24    for example, for literally not smoking marijuana,
25    but I fell asleep on a table.  Had some insomnia,       01:54
```

137

**Exhibit 15**
**Page 173**

Michael Newman, 9/8/2016
Glover v. City of Laguna Beach

1    of environment, A, and B, because the staff allows
2    us to smoke, within reason.  Again, it's behavior
3    that's decided, and we consider those rules moot,
4    "we" being the majority of everybody that partakes
5    of either or.                                                02:08
6         Q   Has it been your experience, then, that the
7    staff tends to be flexible with the rules?
8         A   Absolutely.
9         Q   Doesn't rigidly enforce the rules?
10        A   Especially when it comes to marijuana, not          02:08
11   as much as when it comes to drinking because,
12   frankly, there are more incidents with people not
13   being able to control themselves with drink.  There
14   are no incidents with people being able to control
15   themselves with marijuana.                                   02:08
16        Q   So it's been your experience that staff is
17   -- is pretty flexible when it comes to drug use,
18   somewhat flexible but not as flexible when it comes
19   to drinking?
20        A   No.  It's -- they're somewhat flexible when         02:09
21   it comes to marijuana use.  It's to be -- to -- you
22   need to make a -- you need to distinguish that from
23   other drugs.
24        Q   But other drugs not so flexible?
25        A   One would hope not.  They're harder to know         02:09

144

**Exhibit 15**
**Page 174**

Michael Newman, 9/8/2016
Glover v. City of Laguna Beach

1        A    Again, it's vague, but I kind of remember

2    something like this.   Yeah.

3        Q    Being exited for drinking and then trying

4    to hide the bottle?

5        A    That doesn't -- I -- I don't remember          02:10

6    specifically, but that doesn't sound so -- that

7    doesn't sound like something that didn't happen.

8    Yeah.   If it's written, let's just assume it

9    happened.

10       Q    Did -- having reviewed these incident         02:10

11   reports, do you have a memory of any other

12   particular incidents in this first period of time

13   that you were staying regularly at the ASL,

14   December 2013 to June 2014, besides the ones we've

15   now gone over?                                          02:11

16       A    No.

17       Q    Let me ask you, then, in August 2014 or

18   thereabouts, you're admitted to the Friendship

19   Shelter.   You stay there for some period of time,

20   correct?                                                02:11

21       A    Correct.

22       Q    You then obtain employment and you rent the

23   room in Aliso Viejo for some period of time,

24   correct?

25       A    Correct.                                       02:11

                                                        146

1      Q   And as best we can tell, it looks like it

2   was around the summer of 2015 when you left the room

3   in Aliso Viejo and started staying at the ASL again.

4   Is that consistent with your memory?

5      A   Again, it's inconsistent with my memory,        02:11

6   which is so weak, but if you have the records, then

7   that would be the case.

8      Q   Yeah.  Take look back at Exhibit 16, which

9   are the Interrogatory Responses.  And page 14, that

10  same response to Special Interrogatory Number 13,       02:12

11  and you'll see down at the very -- very bottom of

12  the page, starting line 25, "However, in June 2015,

13  I lost my job and became homeless again.  I also

14  stayed at Phoenix House and Unidos, but do not

15  recall the dates of my residence."  So do you have     02:12

16  any reason to question that it was around June of

17  2015 when you left the room in Aliso Viejo?

18     A   Nope, that is correct.

19     Q   And at that point, you began to stay again

20  overnight at the ASL?                                   02:12

21     A   That's correct.

22     Q   Were you considered, at that point, to

23  still be a Laguna Beach local?

24     A   Yes.

25     Q   So you were eligible to stay at the ASL         02:12

                                                      147

Michael Newman, 9/8/2016
Glover v. City of Laguna Beach

1   every night if you chose to do so unless you had

2   been exited?

3          A    Correct.

4          Q    And you did stay at the ASL from that point

5   forward on a regular basis?                                02:13

6          A    Yes.

7          Q    You say, in your Interrogatory Response,

8   you also stayed for a period of time at the Phoenix

9   House?

10         A    Okay.  So what happened was, the first       02:13

11  time, right before I went to Friendship, I stayed at

12  the Unidos for -- for 12 days, and then I got

13  another 15 days of sobriety when I went back to the

14  box, to the shelter, and it was those 30 days that

15  allowed me to gain access to the Friendship the       02:13

16  first time.

17         The second time, they needed 90 days of

18  sobriety, so I acquiesced and said I would go to the

19  Phoenix House and the same type of scenario existed

20  where the programs are called AB, I believe, 109      02:13

21  where they're getting people that have done time in

22  prison as a felon, and I believe, let's say, they

23  broke parole.  Before they go back to jail, the

24  judge sends them into these -- into these -- the

25  Phoenix House or Unidos, which Unidos, by the way,    02:14

148

Michael Newman, 9/8/2016
Glover v. City of Laguna Beach

```
 1          A    And the answer is yes.
 2          Q    On how many occasions?
 3          A    Again, I -- I don't know.  I know maybe
 4     three, maybe more, maybe four.
 5          Q    Handful?                                    02:17
 6          A    Handful.  I don't know.
 7          Q    Do you recall any of the reasons?
 8          A    Here's the problem I don't remember:  I
 9     don't take most of those exits very seriously.
10          Q    Because --                                 02:17
11          A    They're bogus.  They're biased.  They exit
12     some.  For example, I see Raul exiting me for pot
13     when he doesn't see me physically smoke pot, but
14     with a -- with a gal that's Mexican that stays in a
15     wheelchair and another group of people that smoke    02:18
16     pot on his table every morning, he just -- he -- he
17     comes out the door.  He sees them smoking pot, and
18     he goes back in so he doesn't have to see it.  So
19     he's got his friends, and he's got his people that
20     he doesn't really -- turns the other way.  He's the  02:18
21     worst I've ever seen it holding a bias and letting
22     some people get away with stuff and letting others
23     that he doesn't like not get away with stuff.
24          Q    Do you feel that some of the staff has a
25     bias against you?                                     02:18
```

                                                        151

**Exhibit 15**
**Page 178**

| | |
|---|---|
| 1 | A    Yeah.  Well, yes, I feel that. |
| 2 | Q    And discriminate against you? |
| 3 | A    If -- if a bias -- if having a bias and |
| 4 | making -- yes.  Discrimination is when you use a |
| 5 | bias for the wrong purpose.  Whatever.  Yes. |
| 6 | Q    Do you think they're doing that because you |
| 7 | use drugs? |
| 8 | A    No. |
| 9 | Q    Do you think they're doing that because you |
| 10 | drink? |
| 11 | A    No. |
| 12 | Q    Do you think they're doing that because you |
| 13 | suffer from depression? |
| 14 | A    No. |
| 15 | Q    Do you think they're doing that because you |
| 16 | -- |
| 17 | A    I'll tell you why they're doing that. |
| 18 | Q    Well, do you think -- let me ask my |
| 19 | questions first. |
| 20 | A    Okay. |
| 21 | Q    You answer.  I get to ask questions. |
| 22 | A    Okay. |
| 23 | Q    Although, you know, maybe we can turn it |
| 24 | over at some point in time.  Do you think they're |
| 25 | discriminating against you because you have a |

02:18

02:18

02:18

02:19

02:19

152

**Exhibit 15
Page 179**

Michael Newman, 9/8/2016
Glover v. City of Laguna Beach

```
 1   bipolar condition?
 2        A    No.
 3        Q    Why do you think they're discriminating
 4   against you?
 5        A    Thank you.  As is issued by certain          02:19
 6   statements they've all have made to me, they feel
 7   like I am too smart and too articulate and too
 8   different in the circles of homeless people to be
 9   there, and therefore, I should be doing my own
10   thing, and therefore, I am weak or I am -- I don't     02:19
11   know what they think exactly but something to the --
12   the nature of I am -- I am not the typical homeless
13   person there, and -- and the fact that I called them
14   on their idiocy sometimes, on their misjudgments, on
15   their injustice, and the fact that I don't care if     02:19
16   they put me out and they know that, or the fact that
17   I sleep better outside than I do inside, for the
18   most part, and they know that, and the fact that,
19   again, I really call them out on their mistakes,
20   which I can go -- which I -- I'm able to speak on       02:20
21   for a long time, they have a bias against me.  And
22   some of them -- and sometimes antisemitism slips
23   into that category as well, unfortunately.
24        Q    If, during the second period of time we're
25   talking about, June 2015 through the present, you      02:20
```

153

**Exhibit 15
Page 180**

Michael Newman, 9/8/2016
Glover v. City of Laguna Beach

1   said you've been exited a handful of times, are

2   there also occasions -- well -- strike that.  During

3   this period of time, June 2015 through the present,

4   you testified that you've been exited a handful of

5   times, on those occasions, where have you slept?          02:20

6        A    Again, in the parking lot, or there was

7   period where I was exited for two weeks, and I was

8   downtown for the majority of that time.

9        Q    Sleeping at the beach?

10       A    Correct.                                          02:21

11       Q    Has there also been occasions where you've

12  chosen not to stay at the ASL?  You haven't been

13  exited, but your own choice was not to stay there in

14  the second period of time?

15       A    As I've said, I've been in the parking lot       02:21

16  a lot lately.  This -- this second period of time --

17       Q    Yes.

18       A    -- I've been in the parking lot this summer

19  a lot more than I've been on the inside.

20       Q    And that was by choice?                          02:21

21       A    Yes.

22       Q    And you've also slept on the beach by

23  choice rather than going to the ASL?

24       A    The times that I spent in -- on the beach

25  was because I was exited for two weeks.                    02:21

                                                          154

ADVANCED DEPOSITIONS
www.advanceddepositions.com | 855.811.3376

**Exhibit 15**
**Page 181**

1      Q    Trying to, you know, just ask about the

2    time you were staying at the beach.

3      A    In that case, yes.

4      Q    Where you were asked to move?

5      A    Yes.                                              02:25

6      Q    And you moved?

7      A    Yes.

8      Q    And they left?

9      A    Yes.

10     Q    If you -- can you tell me, best estimate,          02:25

11   the number of nights in June 2015 to the present

12   where you have not slept at the ASL?

13     A    My best guess is that couple of weeks that

14   I was downtown, which was -- yeah.  That was it.

15     Q    Can you tell me the number of times since          02:25

16   June 2015 where you've slept in the parking lot of

17   the ASL as opposed to in the ASL itself?

18     A    No, but like we used percentages last time,

19   this time the percentage through the summer is

20   closer to 90 percent sleeping outside.                    02:26

21     Q    Ninety percent in the parking lot?

22     A    Yeah.

23     Q    And 10 percent in the ASL?

24     A    Correct.

25     Q    And have you ever been ticketed or cited           02:26

                                                    159

**Exhibit 15**
**Page 182**

Michael Newman, 9/8/2016
Glover v. City of Laguna Beach

```
 1        Q   And do you think you're capable, able to
 2   engage in the cultivation and sale of marijuana as a
 3   business?
 4        A   I am completely capable.
 5        Q   You've done it before.  You know what that    02:58
 6   would entail?
 7        A   Yes.
 8        Q   And you think that you would be able to do
 9   that again?
10        A   Yes.                                          02:58
11        Q   If you were in the right place and you had
12   some capital to get you going?
13        A   Correct.
14        Q   Does your depression prevent you from
15   obtaining admission to the ASL?                        02:58
16        A   No.
17        Q   Does your depression prevent you from
18   staying overnight at the ASL?
19        A   No.
20        Q   Does your depression prevent you from         02:58
21   obtaining any of the programs or services that are
22   offered at the ASL?
23        A   The larger picture is my depression may
24   sometimes set me up to be reactive or to not -- I --
25   I have often thought without any, you know, real       02:59
```

179

**Exhibit 15**
**Page 183**

1      Q    If we look back at your Declaration, you

2    listed bipolar disorder, which we've talked about,

3    severe major depressive disorder.

4      A    Uh-huh.

5      Q    And then you talk about alcoholism --                    03:09

6      A    Uh-huh.

7      Q    -- and Cannibis dependance?

8      A    Right.

9      Q    And has any issue you have with alcoholism

10   or Cannibis dependance prevented you from obtaining         03:09

11   access to the ASL?

12     A    Well, asides the time I get kicked out for

13   using them, no.

14     Q    For using alcohol?

15     A    Yeah.  Except for the time -- times that I        03:09

16   have been caught using those things and have been

17   kicked out as a result, they have not -- which was

18   the word you just used, discriminated?

19     Q    Prevented --

20     A    Yeah.                                              03:09

21     Q    -- you from obtaining access?

22     A    Meaning access to the facility?

23     Q    Right.

24     A    No.

25     Q    Has anyone ever told you you can't stay at        03:09

188

Michael Newman, 9/8/2016
Glover v. City of Laguna Beach

1    the ASL because you're an alcoholic?

2        A    It's a wet shelter as it's been deemed, so

3    the answer is no.

4        Q    Has anyone ever told you that you cannot

5    stay at the ASL because of drug dependance?                    03:10

6        A    No.

7        Q    And the times that you've been exited where

8    either alcohol or drugs were involved, it's where

9    you were actually using drugs or drinking alcohol at

10   the facility, correct?                                         03:10

11       A    Yep.

12       Q    Look at paragraph 4 of your declaration.

13   You also talk there about some physical health

14   conditions.

15       A    Right.                                                03:10

16       Q    Including sleep apnea, hernia,

17   hypertension, and lower back conditions and that

18   you're partially blind in your left eye.  Do any of

19   those -- and then some dental issues, correct?

20       A    Uh-huh.                                               03:11

21       Q    You need to say "Yes" or "No"?

22       A    Yes.

23       Q    Do any of those physical health conditions

24   prevent you from obtaining access to the ASL?

25       A    No.                                                   03:11

                                                          189

1       Q    Do any of those physical conditions prevent
2   you from staying at the ASL?
3       A    No.
4       Q    Take a look at paragraph 5 of your
5   Declarations.  It refers to a medication there,      03:11
6   trazodone?
7       A    Correct.
8       Q    Is that prescribed, as you understand it,
9   for depression?
10      A    Both -- it's a antidepressant that's been    03:11
11  used for sleep, and so I use that for sleep, and --
12  and another antidepressant -- for antidepression
13  which isn't listed here.
14      Q    What's that?
15      A    I can't remember.  It starts with an L.      03:11
16      Q    Lexapro?
17      A    Yes.
18      Q    If you look at paragraph 7 of your
19  Declarations, it discusses government benefits.  Do
20  you see that?                                         03:12
21      A    Yep.
22      Q    And you've told me about the County general
23  relief benefits, correct?
24      A    Yes.
25      Q    You have a current application in for State  03:12

                                                  190

**Exhibit 15**
**Page 186**

Michael Newman, 9/8/2016
Glover v. City of Laguna Beach

1

2

3

4

5

6

7

8          I, MICHAEL NEWMAN, do hereby declare under

9    penalty of perjury that I have read the foregoing

10   transcript; that I have made any corrections as appear

11   noted, in ink, initialed by me, or attached hereto; that

12   my testimony as contained herein, as corrected, is true

13   and correct.

14          EXECUTED this _14_ day of _October_,

15   20_16_, at _LAGUNA Bch._, _CA._.
                    (City)                    (State)

16

17

18

19   _____
          MICHAEL NEWMAN

20

21

22

23

24

25

249

Exhibit 15
Page 187

Michael Newman, 9/8/2016
Glover v. City of Laguna Beach

```
 1          I, the undersigned, a Certified Shorthand

 2   Reporter of the State of California, do hereby certify:

 3          That the foregoing proceedings were taken before

 4   me at the time and place herein set forth; that any

 5   witnesses in the foregoing proceedings, prior to

 6   testifying, were duly sworn; that a record of the

 7   proceedings was made by me using machine shorthand which

 8   was thereafter transcribed under my direction; further,

 9   that the foregoing transcript is a true record of the

10   testimony given.

11          Further, that if the foregoing pertains to the

12   original transcript of a deposition in a Federal Case,

13   before completion of the proceedings, review of the

14   transcript [  ] was [  ] was not requested.

15          I further certify I am neither financially

16   interested in the action nor a relative or employee of any

17   attorney of any of this action.

18          IN WITNESS WHEREOF, I have this date subscribed

19   my name.

20

21   Dated: _____

22

23

24          _____
            ANGELA METZ
25          CSR No. 12454
```

250

**<u>EXHIBIT 16</u>**

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION


Kenneth Glover, et al.,
individually, and on behalf of all
others similarly situated,

            Plaintiffs,

      vs.                          No. 8:15-CV-01332-AG-DFM

CITY OF LAGUNA BEACH;
THE LAGUNA BEACH POLICE
DEPARTMENT, a California
charter city,

            Defendants.
_____


DEPOSITION OF DAVID SESTINI

Costa Mesa, California

Tuesday, September 13, 2016
            Volume I


Reported by:
ANGELA METZ
CSR No. 12454

JOB No. 22146


PAGES 1 - 202

                                              1

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

1          MR. YODER:  Michael Yoder.  I represent the

2     defendants.

3          THE VIDEOGRAPHER:  Would the court reporter

4     please now administer the oath?

5

6                    DAVID SESTINI,

7     having been first duly sworn, was examined and

8     testified as follows:

9

10                    EXAMINATION

11    BY MR. YODER:

12         Q   Would you please state and spell your name?

13         A   David Farrell Sestini, David, D-a-v-i-d,

14    Farrell, F-a-r-r-e-l-l, Sestini, S-e-s-t-i-n-i.

15         Q   How old are you, Mr. Sestini?                    09:58

16         A   I am 54 years old.

17         Q   Do you have a permanent address currently?

18         A   I have my mail to the ASL.  That's the only

19    address I have.  I have no permanent address.

20         Q   What's that address so we have it for the       09:58

21    record?

22         A   It's the Alternative Sleeping Location.

23    That's where my mail goes, otherwise, I am not

24    allowed there.

25         Q   Do you know the address of that location?        09:58

                                                      6

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

```
 1          Q    Near the ASL facility?
 2          A    Yes.
 3          Q    And how many times would you say you've
 4     slept --
 5          A    Maybe five.                                    10:21
 6          Q    You got to let me finish.  I'm going to
 7     remind you again.
 8          A    Okay.
 9          Q    You're doing great, but you're getting a
10     little too quick with your answer, and it's going to   10:21
11     make it hard for the reporter.  So let me finish my
12     question.  Best estimate, about how many times since
13     March of 2015 you've slept overnight at the creek in
14     the canyon?
15          A    Five.                                          10:21
16          Q    And were those all around the same time
17     period or spread out?
18          A    They're spread out.
19          Q    Any particular reason why, on those five
20     times or so, you chose to sleep overnight at the        10:21
21     creek rather than in the ASL parking lot?
22          A    No, just to get a break from all of the
23     people and the lights.
24          Q    So that was your choice?
25          A    Yes.                                           10:22
```

                                                          28

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

1    more than any other City or the County should be

2    required to provide you permanent housing?

3          MS. WANNER:  Objection.  Compound.

4          THE WITNESS:  Yeah.  I can't answer that.

5    BY MR. YODER:                                          10:57

6       Q    Why can't you answer that?

7       A    I don't have all of the information.

8       Q    You may not have a complete answer but is

9    there some reason why you feel you, David Sestini,

10   personally feel the City of Laguna Beach should be    10:57

11   the one providing you permanent housing?

12      A    I can't answer that.

13      Q    Why can't you answer that?

14      A    I just can't.  You want me to be perfectly

15   honest with you?                                       10:57

16      Q    Absolutely.

17      A    Well, then I guess every city that I've

18   lived in -- oh, me.  Permanent.  I don't know.  I

19   can't tell you.  Can I go back to Whittier and say,

20   "Hey, can I get" -- you know.                          10:57

21      Q    Well, let me ask you this:  How did you get

22   to the city of Laguna Beach in the first place?

23      A    How?  Somebody, it was a resident, he's got

24   a place now, told me about it.

25      Q    The shelter?                                   10:58

                                                    54

ADVANCED DEPOSITIONS
www.advanceddepositions.com | 855.811.3376

**Exhibit 16**
**Page 192**

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

```
 1        A    Yes.  And he --
 2        Q    So you came to the city because of the
 3   shelter?
 4        A    Yes.  It was the only -- as you know, the
 5   only year-round shelter, which, in my belief, when      10:58
 6   you have homeless populations, each city should take
 7   care of them.  I truly believe that, and I know
 8   there is more than enough money.  It's not because
 9   you guys -- the City actually has done something
10   that other cities don't.                                10:58
11        Q    Right.
12        A    And, you know, it's sad.  They're trying to
13   make one in Anaheim.  It's going slow, and it's only
14   going to hold 200 people, but, you know, I'm kind of
15   like right in the trenches, as they say.  You know,    10:58
16   I think when you get people some housing and their
17   disability support, most of the people are disabled.
18   I can't give you an exact figure, but most people on
19   the streets that I know in the little encampments
20   around Orange County are disabled people, and it's     10:58
21   very sad because over half of them, if they had just
22   gotten their disability, like a church lady told me,
23   they wouldn't have all these people on the street.
24        Q    So when -- strike that.  Have you ever
25   applied for any form of disability income benefit?     10:59
```

55

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

```
 1   eat, take a shower, and a lot of people don't have a
 2   problem sleeping outside.  It's the winter months
 3   that are very aggravating for a lot of people
 4   because the Santa Ana Armory is a two-hour bus ride.
 5   By the time they have the lottery at 7:45, 8          11:11
 6   o'clock, if you don't get on that 8 o'clock bus -- I
 7   don't know many women -- Lynn was one that she --
 8   she wasn't afraid, but I don't know many women who
 9   will be walking down that area of Santa Ana at 10:30
10   at night, and, you know, I don't know why they have  11:11
11   it -- in the winter, it would seem to have the
12   lottery, it might make more sense, earlier in the
13   evening because they do post, you know, where it is
14   and what buses to take.
15        Q   Okay.  Let me just stop you for a second,   11:11
16   though.
17        A   Uh-huh.
18        Q   Let me just try and develop a little bit of
19   a chronology --
20        A   Okay.                                       11:11
21        Q   -- in terms of your history with the ASL.
22   I think that will be helpful in terms of trying to
23   frame my questions.
24        A   Uh-huh.
25        Q   So July 2012 when you first started staying 11:11
```

66

**Exhibit 16**
**Page 194**

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

1    at the ASL, right?

2        A    Right.

3        Q    In a -- in a given week, on average, how

4    often were you able to win the lottery and stay in

5    the ASL versus not?                                          11:12

6        A    I would say 50 percent, about half and

7    half.  Sometimes I would stay -- I would get lucky

8    maybe eight times in a row, and sometimes I may lose

9    four night in a row.  In the warmer months, it just

10   became easier to get a shower, eat and lay my          11:12

11   sleeping bag out and get to sleep, to get enough

12   sleep.

13       Q    So in the -- in the summer and early months

14   when you first started attempting to stay at the

15   ASL --                                                       11:12

16       A    Right.

17       Q    -- were there occasions where you didn't

18   enter the lottery and you just chose to stay in the

19   parking lot?

20       A    Yes.                                                11:12

21       Q    And there were other occasions where you

22   entered the lottery, weren't successful and stayed

23   in the parking lot?

24       A    That's correct.

25       Q    And there were also occasions where you        11:12

                                                         67

ADVANCED DEPOSITIONS
www.advanceddepositions.com | 855.811.3376

**Exhibit 16**
**Page 195**

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

1    were successful and you stayed at the ASL?

2         A    Right.  That's right.  Yes.

3         Q    And you did that for some period of time?

4         A    On and off for years.  Yeah.  And I'll --

5    I'm going to be, frankly, honest.  In the                    11:13

6    wintertime, it's so cold up there that most people

7    won't -- for me, I would spend the winter at the

8    armories, but I -- you know, I was -- the first year

9    there, that fall, I got a job.  And unfortunately, I

10   caught pneumonia and I had to go back to work in           11:13

11   town.  I can't --  you know.

12        Q    What did you --

13        A    I was working for Warrior Golf.

14        Q    When did you work for Warrior Golf?

15        A    It was 2012 in the fall, September and          11:13

16   October, I believe.

17        Q    What did you do for Warrior Golf?

18        A    I was sales, calling their customers up and

19   selling golf clubs and bags and hats and everything

20   that they sell.                                             11:13

21        Q    Paying you by the hour or by commission?

22        A    By the hour.

23        Q    How much were you making?

24        A    I only got paid $9 an hour.

25        Q    Were you still staying at the ASL or at the     11:13

                                                          68

ADVANCED DEPOSITIONS
www.advanceddepositions.com | 855.811.3376

**Exhibit 16**
**Page 196**

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

1    parking lot during that time?

2        A    Yeah.   Because I would get back at about

3    9:00, 9:30 past the lottery.   Sometimes they would

4    -- sometimes they would have an empty mat, and

5    Catherine would say, "Get your stuff, Dave.   Come on          11:14

6    in.   There's somebody" -- like -- like a -- a

7    permanent resident or somebody in the lottery would

8    win and then take off.   So they would have -- you

9    know, and then she would say, "Come on in for the

10   night because this person left."   And they're                11:14

11   supposed to tell the staff.   You know, "Hey, I'm --

12   I don't want to be in the lottery."   Because, you

13   know -- and there are a lot of nights I don't -- I

14   can't give you an exact number, but I gave up my

15   spot for a woman to get inside.                                11:14

16       Q    And then you would stay in the parking lot?

17       A    Yes.

18       Q    In this period of time in the summer and

19   fall of 2012, were you allowed to sleep overnight at

20   the parking lot?                                               11:14

21       A    Yes.

22       Q    Did you ever receive any tickets or

23   citations --

24       A    Not--

25       Q    -- for staying overnight in the parking lot          11:14

                                                          69

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

```
 1    in that time period?
 2         A    In the whole time, I have one.
 3         Q    Okay.  We'll get to that.
 4         A    Okay.
 5         Q    Let's just focus on this summer --        11:14
 6         A    No.
 7         Q    -- to early fall 2012.
 8         A    No.  2012, no.  I never really had any
 9    problems.
10         Q    Were you ever given any warnings that you   11:14
11    couldn't stay in the ASL parking lot in that time
12    period?
13         A    No.
14         Q    In that time period, were you ever exited
15    from the ASL?                                         11:15
16         A    I don't think so.  No.  No.  No.  I was
17    pretty well behaved.
18         Q    So you started working at Warrior Golf, and
19    then you came down with pneumonia?
20         A    Yes.                                        11:15
21         Q    And lost your job or couldn't work anymore?
22         A    Yes.  Yeah.  I was told by the hospital
23    that it might be good to file permanent disability,
24    and I had been in and out of that hospital for --
25    for my (inaudible) and -- and for my emphysema,      11:15
```

70

1   mainly my emphysema.

2       Q    Which hospital?

3       A    Laguna Beach.

4       Q    In South Laguna?

5       A    Yeah.                                            11:15

6       Q    So once you stopped working at Warrior

7   Golf, did you continue to stay either at the ASL or

8   in the parking lot?

9       A    When it became winter, like, around -- I

10  think around Thanksgiving, people that know about     11:15

11  the armories usually gravitate up that way, or as I

12  call it, inland.  And the reason I like to stay at

13  the beach, either -- anywhere is because of my

14  emphysema.  The air is cleaner, and there's more

15  oxygen in your -- in your body.  But usually right    11:16

16  after Thanksgiving, the armory is open and believe

17  it or not, not a whole lot -- it's just, you know --

18  it's a far -- it's a long ways away.

19      Q    So starting in late November 2012?

20      A    Uh-huh.                                         11:16

21      Q    Were you still attempting to get into the

22  ASL through the lottery?

23      A    Not as much, no.  I went to -- I went to

24  the armories in Fullerton and Santa Ana.  Actually,

25  Fullerton.                                              11:16

                                                      71

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

1      Q   So you just go to the armories rather than
2   trying to get into the lottery?
3      A   Exactly.  Yeah.  Because it is -- it's --
4   there's no lottery.  Very rarely do they fill up to
5   capacity, but it's getting worse.  And they only        11:16
6   hold 200.
7      Q   And in the winter of 2012, 2013, in that
8   late November 2012 through April 2013 time period,
9   were you staying, on occasion, at both the Fullerton
10   and Anaheim armories or just one?                       11:17
11      A   Just Fullerton, in that year.  Yeah.  I
12   didn't go down to Santa Ana Armory until, like, two
13   years ago.
14      Q   So how does the Fullerton Armory compare to
15   the ASL?                                                11:17
16         MS. WANNER:  Objection.  Ambiguous.
17         THE WITNESS:  It -- there is no lottery.
18   It's a capacity of 200 people so the chances of
19   getting inside for the night are pretty -- pretty --
20   almost 95 percent until the end of the month.          11:17
21   BY MR. YODER:
22      Q   Okay.  In this time period, again, in late
23   November 2012 through April 2013, were you ever
24   turned away from the Fullerton Armory?
25      A   No.                                              11:17

72

**Exhibit 16**
**Page 200**

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

1    You can do -- the only thing they don't do there at
2    the armory is laundry.
3         Q    But people can do laundry at the ASL?
4         A    Yes.  There's -- there's washers and
5    dryers.  And -- yeah.                                   11:19
6         Q    Okay.  So starting in April 2013 when the
7    Fullerton Armory shut down, where did you start
8    sleeping?
9         A    I went back to the ASL because I figured
10   it's -- at least it's safer, and I know people.  By    11:19
11   then, I had known enough people.  I'm not a person
12   to go live in the Civic Center of Santa Ana.  It's
13   just very dangerous.  Or even Fullerton, it's -- you
14   know, they kind of relaxed their laws up there, but,
15   you know, it's -- the train depot is nowhere -- it's   11:19
16   a train -- it's a station.  And buses, I can handle,
17   but trains coming through there, that'll wake you
18   up.
19        Q    So let's talk about the next period of time
20   then, April 2013 when the Fullerton Armory shuts       11:20
21   down.
22        A    Uh-huh.
23        Q    And then November 2013 when the armories
24   open up again.  So during that April to November
25   2013 period of time, did you stay at the ASL on a      11:20

74

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

```
 1   regular basis?
 2        A    Yes.
 3        Q    Did you also, when weren't able to get into
 4   the ASL, stay in the parking lot?
 5        A    Yes.                                              11:20
 6        Q    And were there occasions where you chose to
 7   not even enter the lottery but to just go ahead and
 8   stay in the parking lot?
 9        A    Yes.  It -- sometimes it's a lot easier.
10   If you want to get a good night's sleep, you know,        11:20
11   you eat dinner and lay down and go to sleep --
12   because they show a movie.  And -- and the armory's
13   the same way.  It's usually about 10:00, 11 o'clock
14   at night when you're only going to get about a five
15   hours of sleep.  And believe me, it wears on you.         11:20
16            After a few months, people -- and of
17   course, at the armory, you develop what's called
18   "the armory cough," and the hospitals near the
19   armories know very well what it is.  It's just -- I
20   don't know what it is, but you -- almost -- I would       11:21
21   say about 70 percent of the people get it.  And I'm
22   not sure.  They just call it "the armory cough."
23        Q    Let me ask you a couple of questions --
24        A    Sure.
25        Q    -- that were prompted by what you just         11:21
```

75

**Exhibit 16**
**Page 202**

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

1   the fall 2014, I was banned from the ASL for a

2   two-week period.  Because I was banned, I was unable

3   to shower for several days, and as a result, I did

4   not go to work."

5        A    Correct.                                       11:33

6        Q    That's the instance during the time that

7   you were working for Auto Warranty?

8        A    Yes.

9        Q    And you think that occurred when?

10       A    My memory is bad.                              11:34

11       Q    Was it the fall 2013?

12       A    No.  It was 2014.  It was right.  That is

13  right.  That is right.

14       Q    Okay.

15       A    It is right.                                   11:34

16       Q    Okay.

17       A    It is.  It is.  Because in 2012, I just

18  remember I was working at Warrior Golf in the fall.

19  So it is 2014.  It was two years ago.  Yeah.

20       Q    So let me try to -- to break it down here.    11:34

21  So again, I'm trying to create some buckets of time

22  to kind of help us with the questions, and the first

23  period of time where you were staying on a regular

24  basis at the ASL or the parking lot was July 2012

25  until late November 2012?                               11:35

87

**Exhibit 16**
**Page 203**

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

```
 1        A    Correct.
 2        Q    And then you stayed at the Fullerton Armory
 3   through the spring of 2013 when it closed down, and
 4   then once again, you started staying on a regular
 5   basis either at the ASL or the ASL parking lot?          11:35
 6             MS. WANNER:  Objection.  Compound.
 7             THE WITNESS:  Correct.
 8   BY MR. YODER:
 9        Q    And then you continued to do that through
10   November 2013 when the armories opened up again?         11:35
11        A    Correct.
12        Q    So during that spring 2013 through late
13   November 2013 time period, just to be clear, you
14   were staying, on a regular basis, either at the ASL
15   or the ASL parking lot?                                  11:35
16        A    Correct.
17        Q    Did you have any employment during that
18   period of time?
19        A    What -- what year is that?
20        Q    2013, so three years ago?                      11:35
21        A    I believe I worked at -- when I stayed in
22   Huntington Beach, see, because of my injury, I
23   can't -- when you -- when you're -- when you're
24   stressed like I am over the years, I can't even
25   hardly remember.  I do know that I was working and       11:36
```

88

ADVANCED DEPOSITIONS
www.advanceddepositions.com | 855.811.3376

**Exhibit 16**
**Page 204**

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

```
 1   they fired people over the loudspeaker, and I just
 2   -- I didn't like working there anymore.  I said,
 3   "This is the strangest place I've ever worked."
 4   "Pick your stuff up and go.  Come to the office get
 5   your check."  Yeah.                                      11:50
 6       Q   So in this period of time, spring to late
 7   November 2013, for part of that time, you stayed at
 8   New Spirit Life?
 9       A   Yeah.  New Life Spirit, correct.
10       Q   New Life Spirit.  And part of the time, you   11:50
11   were either staying at the ASL or the ASL parking
12   lot?
13       A   Correct.
14       Q   Any other locations where you slept other
15   than those during that period?                          11:51
16       A   No.  Just what I mentioned maybe like less
17   than five days maybe at the Fullerton train depot.
18   Where else?  It's hard for me to remember.  I think
19   it was -- sometimes we would sleep at the Hunt
20   library at Fullerton which was across, right by the     11:51
21   armory.  I don't know if the library was still open,
22   but people would sleep there.  That's something I
23   counted on.
24       Q   On the occasions where you were in Laguna
25   Beach and attempting to stay at the ASL --              11:51
```

95

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

1    A    Uh-huh.

2    Q    -- how often were you successful in the

3  lottery?

4    A    About half the time.

5    Q    Same as the prior year?                    11:51

6    A    Yeah.

7    Q    And were there occasions as well where you

8  just decided to stay in the parking lot rather than

9  trying to go and win the lottery?

10   A    Yes.  Or I would give up my mat.  I don't    11:51

11  know.  Like, when I was with Lynn, if I got in and

12  she didn't, I would say, "You stay in, and I'll stay

13  outside because I'll be all right."  And she started

14  crying, and I said, "Don't worry I'll be fine.  It's

15  a little cold, but I'll be all right."  And I did     11:52

16  many times for other people, mainly for women

17  because I didn't want them sleeping out in the cold.

18   Q    During this period of time, March through

19  November 2013, on those occasions where you were

20  staying at the ASL, were you ever asked to leave?     11:52

21   A    No.  No.  No.  Like I said, I think one

22  time.

23   Q    When you were staying in the parking lot,

24  were you ever asked to leave?

25   A    Yes.                                          11:52

96

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

 1          A    Page three, paragraph 13.

 2          Q    It talks about an incident on July 25,

 3     2013.  Is that the incident you were just

 4     describing?

 5          A    Yes.                                        11:54

 6          Q    And so your best memory is that's the only

 7     time you were given a ticket or citation for

 8     sleeping in the ASL parking lot during 2013?

 9          A    Correct.

10          Q    And that was given to you by Officer Farris   11:54

11     when you had voluntarily left the ASL?

12          A    Correct.

13          Q    And did you have a discussion with him at

14     the time he gave you the ticket?

15          A    I think I explained to him why I was          11:54

16     outside, that I was inside and then he wrote the

17     ticket anyway.

18          Q    Did he say why?

19          A    Just said, "You're illegally lodging," and

20     then when I went down to the courthouse, they were    11:54

21     cool.  They said, "This never was filed," just you

22     know.

23          Q    Take a look at Exhibit 8 to your

24     Declaration on the last page.

25          A    This, Exhibit A?                             11:54

                                                      98

Exhibit 16
Page 207

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

```
 1        Q    Yeah.
 2        A    Yeah.  That is the ticket.
 3        Q    That's the citation Officer Farris gave
 4   you?
 5        A    Yes.                                        11:54
 6        Q    And you actually appeared in court?
 7        A    Yeah.  I believe I went, and my name wasn't
 8   on the docket.  But I always remember what Bruno
 9   said, "Don't count on that.  Go into the DA's office
10   and make sure."  And that's when I discovered that   11:55
11   it wasn't filed, but I think that's when the DA
12   said, "You have a drunk driving," and I said, "No.
13   I was a passenger in the car, and he was drunk
14   driving."  So we cleared that up.  She said, "It's
15   still under investigation."  I did see him a few     11:55
16   months ago.  "Hey, Sam.  What's going on?"
17        Q    So going back to this ticket that's
18   attached to your Declaration.
19        A    Uh-huh.
20        Q    Was any action taken on this ticket?       11:55
21             MS. WANNER:  Objection.  Ambiguous.
22             THE WITNESS:  As far as the courts, no.  So
23   it was just -- I don't know.  It's a paper ticket.
24   BY MR. YODER:
25        Q    Did you ever have to pay any fine for the  11:55
                                                      99
```

ADVANCED DEPOSITIONS
www.advanceddepositions.com | 855.811.3376

**Exhibit 16**
**Page 208**

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

```
 1   ticket?
 2        A    No.
 3        Q    Did you ever serve the time for the ticket?
 4        A    No.
 5        Q    Have you ever served any time?              11:55
 6        A    Yes.
 7        Q    On how many occasions?
 8        A    Too many.
 9        Q    Okay.  Hold off.  We'll come back to those.
10        A    Okay.                                       11:56
11        Q    So is this July 25, 2013, incident -- well,
12   strike that.  So when Officer Farris gave you the
13   ticket on July 25, 2013, did he ask you to leave the
14   parking lot?
15        A    No.  He didn't know.  In fact, I think I    11:56
16   witnessed him give tickets before, and people --
17   like a woman that had a broken leg and he wrote her
18   a ticket and laid it on the ground, and she couldn't
19   get up and leave because she had a broken leg and
20   she had nowhere to go.  I was not really happy that  11:56
21   night.  I remember that.  I said, "She's not doing
22   anything.  She's sleeping."  But I believe the
23   ticket was for intoxication.
24        Q    Public intoxication?
25        A    To me -- well, she's sleeping.  I don't     11:56
```

100

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

1   know how you determine that, but it's kind of

2   strange.

3        Q   So other than this ticket that you were

4   given in July of 2013, have you ever been given any

5   other tickets or citations for sleeping or camping          11:57

6   someplace in public?

7        A   No.

8        Q   That's the only one?

9        A   That's the only one.

10       Q   Has Officer Farris or any other Laguna          11:57

11  Beach police officer threatened to give you a ticket

12  or citation for sleeping or camping somewhere else

13  in public?

14       A   No.  Because I -- yeah.  No, they have not.

15       Q   Because you're not, right?                       11:57

16       A   Right.  Because I -- I -- I will -- well,

17  now I stay in Newport where they have -- they don't

18  mind it.  In fact, they bring people there, and we

19  watch over them.

20       Q   Okay.  So -- so during this March to            11:57

21  November 2013 period of time when you're staying at

22  least for a part of that time either at the ASL or

23  the ASL parking lot, were you ever asked to leave by

24  any ASL staff?

25       A   No, not until the next year when I had the      11:58

                                                        101

**Exhibit 16**
**Page 210**

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

```
 1    emphysema attack inside the building.  And then
 2    after being discharged from the hospital, I was told
 3    I was out for two weeks for waking people up, but in
 4    that time frame you're talking about, no.
 5         Q   So in November 2013, did you start staying        11:58
 6    at the Fullerton Armory again?
 7         A   Yes.
 8         Q   And did do you that through the spring of
 9    2014?
10         A   Yes.                                              11:58
11         Q   In that period of time, did you ever stay
12    at the ASL?
13         A   I don't think I went down there in the
14    winter.  It's just, you know, with the lottery, and
15    it's just not worth it.                                    11:58
16         Q   Okay.  During that period of time, did you
17    ever stay in the ASL parking lot?
18         A   No.  Once I'm in inland, I usually stay up
19    there.  Yeah.
20         Q   During that period of time, did you ever         11:58
21    stay overnight at any location in Laguna Beach?
22         A   No.
23         Q   So then in the spring 2014, did you then,
24    again, start staying, on a regular basis, either at
25    the ASL or the ASL parking lot?                            11:59
```

102

**Exhibit 16**
**Page 211**

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

1          A    Correct.

2          Q    And is that the period of time where, at

3     some point then starting in the spring then 2014,

4     you started working at the Auto Warranty in Irvine?

5          A    In -- in Garden Grove.                           11:59

6          Q    Okay.

7          A    And then -- and later on in that year, I

8     went to work for the other Warranty that was started

9     by some people from the other company, and that's

10    where I worked.                                           11:59

11         Q    Okay.  Look at your Declaration.  I think

12    we can help out a little bit.  Exhibit 28, Page 2,

13    paragraph 10 at line 22, and that refers to this

14    incident in the fall of 2014 where you were banned

15    from the ASL for a two-week period?                       12:00

16         A    Correct.

17         Q    Okay.  And was that -- other than maybe one

18    time when Mary asked you to leave for -- for a day,

19    was that the first time, to your memory, you were

20    exited from the ASL?                                      12:00

21         A    Correct.

22         Q    Okay.  So up until this time in the fall of

23    2014 when you were exited for two weeks, had you

24    ever had any difficulties staying overnight at the

25    ASL?                                                      12:00

                                                    103

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

```
 1   don't remember.  And that was her reason for kicking
 2   me out permanently was that I don't remember.
 3        Q    Okay.  So let me just kind of break down
 4   the chronology again before we go back to that.  So
 5   in November of 2014, did you start staying at the          12:08
 6   Fullerton Armory again?
 7        A    Yeah.
 8        Q    And you did that --
 9        A    At Fullerton or -- or at the Santa Ana, I
10   -- either one because they were the only ones open,        12:08
11   but I -- usually, it was Fullerton because I wasn't
12   really -- I think it's when I got hooked up with
13   mental health and could go to the walk-in center
14   because the Santa Ana Armory is around the corner.
15   And I would get up, and I didn't have to shower at         12:09
16   the armory.  I could go to the walk-in center around
17   the corner, which is -- you know, you have to wait
18   maybe 20 minutes for the 6:00 to open up.  Compared
19   to the other poor people, you know, because you kind
20   of have -- you have to be hooked up with the doctors       12:09
21   and stuff to use their facility, but it's, you know,
22   a lot better that sitting outside all day or getting
23   run out of a coffee shop or something.
24        Q    So in this third period of time that you
25   were staying regularly at the ASL or the ASL parking       12:09
```

110

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

1      A   I can't remember who it was, but he says,
2  "Just -- just walk down the canyon.  You're just --
3  you're hot under the collar, and" --
4      Q   So you stayed, as best you remember, both
5  at the Fullerton Armory and the Santa Ana Armory      12:12
6  starting in November 2014 through the spring of
7  2015?
8      A   Correct.  That's correct.
9      Q   And some nights you'd stay in -- in
10  Fullerton, some nights you stay in Santa Ana?         12:12
11     A   In Santa Ana, correct.  Yeah.
12     Q   In that period of time, November 2014,
13  spring 2015, did you ever stay at the ASL?
14     A   No.  Rarely did I -- I may come down for
15  coffee or use the library or something, but in the    12:13
16  winter, I rarely ever went.  I can't be positive,
17  but I just didn't want to risk being outside and --
18  and it's 30 degree out.  And having already caught
19  pneumonia, I said, I'm better off, you know, even
20  though it's not the greatest, but being indoors at    12:13
21  night.
22     Q   So you were staying in North County?
23     A   Yes.  Yes.  Basically, yeah.
24     Q   In that time period, November 2014 to the
25  spring of 2015, did you ever stay in the ASL parking  12:13

114

**Exhibit 16**
**Page 214**

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

1    lot?

2        A    I may have.  I can't tell you the exact

3    date, but -- no.  Not in the winter, I didn't.  No.

4    Only in the spring and summers and falls.  Yeah.  I

5    just would not -- you wouldn't see me.  I would come        12:13

6    down in the daytime.  "Hey, where you been?"  And I

7    would say, "I have friends.  I'm up -- up at the

8    armories.  The armories are open, and" --

9        Q    So starting in -- in March or April of 2015

10   when the armories closed --                                 12:14

11       A    Uh-huh.

12       Q    -- did you, again, start staying either at

13   the ASL or the ASL parking lot?

14       A    Correct.  Yes.

15       Q    Any incidents in 2015 when you started          12:14

16   staying at the ASL or the ASL parking lot?

17       A    Yes.  That was the incident with Giselle,

18   the woman that took my radio and got me kicked out

19   permanently.

20       Q    When did that happen?                           12:14

21       A    It was right after winter, maybe March,

22   2014 or '15.

23       Q    We're in 2015.

24       A    I think it's -- 2014 -- well, because I've

25   been exited for a year and a half now, so I'm trying     12:14

                                                        115

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

```
 1   said, "You're out for two weeks."  After a week, I
 2   said, "Well, I've got one more week to go," and she
 3   says, "You're out permanently," and I said.  "Why?
 4   I stopped myself from being robbed," and she said,
 5   "You don't remember," quote, unquote, and those were    12:16
 6   her exact words.
 7        Q   Have you made any efforts since Mia said
 8   you were out permanently to try to stay at the ASL?
 9        A   I've slept outside a couple nights, but I
10   just had a recent kind of a nightmare myself last       12:17
11   week.
12        Q   A nightmare, nightmare?
13        A   No.  No.  No.  Something bad happened.
14            THE WITNESS:  Is it okay to explain?
15            MS. WANNER:  If counsel asks you about --      12:17
16   BY MR. YODER:
17        Q   Where did the incident happen?
18        A   In the parking lot of the ASL.
19        Q   And this was just a couple of weeks ago?
20        A   It was last week.                              12:17
21        Q   So let me just break this down a little
22   bit.  At some point -- again, we can try to pin this
23   down through records, but I believe sometime in the
24   spring of 2015, Mia told you you were exited or
25   banned permanently from the ASL, correct?              12:17
```

118

**Exhibit 16**
**Page 216**

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

1        A    Correct.

2        Q    And after being told that by Mia, is that

3    when you started staying in Newport?

4        A    Yes.  Yeah.  Yeah.  Yeah.

5        Q    But there have been a handful of occasions          12:17

6    where you've gone back and stayed --

7        A    Once in a while, yeah, just in the parking

8    lot.

9        Q    -- and stayed in the parking lot?

10       A    Yeah.  Just -- because I -- I'm not sure to         12:18

11   clarify what she meant, but, you know, I know other

12   people that have been banned that sleep in the

13   parking lot.

14       Q    Have you ever made any efforts to try to

15   get back into the lottery to stay at the ASL since          12:18

16   Mia told you you were banned permanently?

17       A    No.

18       Q    On those occasions where you've stayed in

19   the parking lot at the ASL after Mia told you you

20   were banned permanently, were you ever given any            12:18

21   ticket or citation?

22       A    No.

23       Q    Were you ever given a warning by any police

24   officer that if you stayed in the parking lot you

25   would be given a ticket or citation?                        12:18

                                                    119

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

```
 1        Q    Who is Marie Van?
 2        A    She is the Homeless Court public defender
 3    person.
 4        Q    Okay.
 5        A    And I have a few tickets.  I am not proud          12:24
 6    of them, but when you live on the streets like I
 7    have and make people millions of dollars and I end
 8    up dying on the street like Lynn, I'm mad.  I don't
 9    deserve any of this.  I don't get anything out of
10    this by doing this.  It's for other people.             12:25
11    Unfortunately, I spent my whole life making other
12    people wealthy and doing what -- instead of for me.
13    But I have never been so humiliated in this last
14    year, but I -- being assaulted in a hospital and
15    being rounded up like a dog and being thrown into a      12:25
16    thing with no clothes.  And if that ain't setting
17    somebody up, I don't know what is because that's the
18    way I felt, that once I got in that parking lot, I
19    was a target.  And I know who's behind it.  I'm not
20    going to say, because I already know.  It's all on       12:25
21    record there.  I never was exited for more than a
22    day or two until Mia took over that position because
23    Mary would not do that to this day.
24        Q    So do you think you've been treated
25    unfairly by Mia or others at the ASL?                    12:25
```

126

**Exhibit 16
Page 218**

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

```
 1        A    Absolutely.
 2        Q    And do you think that -- well, strike that.
 3   Why do you think she treats you unfairly?
 4        A    I have no idea.  Maybe I'm outspoken.  I
 5   don't know.  I have no idea.                              12:26
 6        Q    So you think she discriminates against you?
 7        A    Absolutely.
 8        Q    You think she does that because of any
 9   physical disability you have?
10        A    It's -- she doesn't take that into -- she    12:26
11   obviously doesn't care.  She throws people out for
12   two weeks that are mentally and physically disabled.
13   She knows damn well.
14        Q    Well, do you think she treats you unfairly
15   because you have physical health problems?              12:26
16        A    I can't answer that.  I don't know her very
17   well.  All I know is her actions speak louder than
18   her words.
19        Q    Do you think she treats you unfairly
20   because you have mental health problems?                12:26
21        A    Possibly.  I have post-traumatic stress.
22   Sometimes I go off and say things I probably
23   shouldn't, but freedom of speech.  You know, I don't
24   know what country we're living in, but, you know,
25   she has the power to throw people out permanently.      12:26
```

127

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

 1   That's her business.

 2        Q    Have you had confrontations with Mia?

 3        A    No.

 4        Q    Have you had arguments with Mia?

 5        A    No.                                          12:27

 6        Q    Have you raised your voice with Mia?

 7        A    Sure.

 8        Q    For what purpose?

 9        A    What purpose?  I was angry because I'm

10   permanently exited and so was Lynn for fighting with    12:27

11   somebody.  Or here's -- here's -- here's why I'm

12   angry.  See this thing right here?  See this?  This

13   is all wrong.  That's why I'm angry, because they

14   falsify stuff.  I make honest mistakes on a date.

15   This is declaring this is what happened.  This         12:27

16   mentions no mention of going to the hospital.  Why?

17   See?  Right here.  That's why I'm angry.  Right

18   there.  Right there.  All bullshit.

19        Q    And that --

20        A    Pat Dahl isn't even alive, and he was a       12:27

21   friend of mine, and I recall many times where he

22   almost fell down on people staggering drunk where if

23   it was me, they would tell me, "Sleep outside, or

24   have enough sense."  If I had been drinking that

25   way, I would sleep outside.  I don't want to           12:27

                                                    128

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

```
 1        Q   So has any ASL staff ever told you that you
 2   could not stay at the ASL because of any physical
 3   disability or condition?
 4        A   I -- no.  I never recall anybody telling me
 5   that.  Other people, I'm not so sure.  I don't know.    01:29
 6        Q   Just talking about you.
 7        A   No.
 8        Q   Do any of your physical health conditions
 9   that you've described prevent you from getting
10   access to the ASL?                                       01:30
11        A   No.
12        Q   Do any of the physical health conditions
13   that you've described prevent you from staying
14   overnight at the ASL?
15        A   Well, since I've exited, I don't go             01:30
16   anywhere near there, and after last week, I am very
17   fearful of the police picking up paper warrants that
18   aren't even warrants and hauling me away to jail.
19        Q   Okay.  Stay with me now.
20        A   Okay.                                           01:30
21        Q   One step at a time.
22        A   Okay.
23        Q   Okay.  Do any of the physical health
24   conditions that you've described prevent you from
25   staying overnight at the ASL?                            01:30
```
                                                           137

**Exhibit 16**
**Page 221**

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

```
 1        A    No.  No, they don't.

 2        Q    Now, if you look at Paragraph 3 of your

 3   Declaration, Exhibit 28, it -- it describes how --

 4   what you indicate are some disabling mental health

 5   conditions, correct?                                    01:30

 6        A    Yes.

 7        Q    And I think you've mentioned most of these

 8   before?

 9        A    Uh-huh.

10        Q    Your bipolar disorder, right?                 01:31

11        A    Correct.

12        Q    Depression?

13        A    Correct.

14        Q    You also list anxiety.  Have you been

15   diagnosed with an anxiety disorder?                     01:31

16        A    You know, because -- I've had different

17   opinions of different doctors.  They fall under

18   manic depression.  Anxiety -- manic means you're

19   hyper.  That could be -- that could be seen as

20   anxiety, and then you're either -- so doctors try to    01:31

21   balance out -- someone who's bipolar means you're

22   either very depressed sometimes or you're very

23   hyper, and so they try with medicine to give you a

24   balanced moods -- so your moods aren't so swingy,

25   but --                                                  01:31
```

138

**Exhibit 16**
**Page 222**

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

```
 1        Q    In the --
 2        A    That's what they say.
 3        Q    I'm asking you.
 4        A    Yes.
 5        Q    And that is the August 2014 incident?      01:34
 6        A    This is true.
 7        Q    Okay.  Other than the August 2014 incident,
 8   were you ever excluded from the ASL because of
 9   yelling?
10        A    Then I guess not.  I don't recall any other   01:35
11   times except this one.
12        Q    Other than the incident in August 2014, did
13   any ASL staff ever tell you that you could not stay
14   at the ASL because of yelling?
15        A    No.                                          01:35
16        Q    Did any staff at the ASL ever tell you that
17   you could not stay at the ASL because you had a
18   mental disability or condition?
19        A    No, but they know I'm -- people are
20   disabled, so it's kind of a catch-22 answer.          01:35
21   They're aware of people's disabilities.
22        Q    And some people with disabilities stay at
23   the ASL, correct?
24        A    This is correct.
25        Q    You've stayed at the ASL, correct?          01:35
```

                                                    142

**Exhibit 16
Page 223**

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

1      A    Correct.

2      Q    What I'm asking if anyone at the ASL staff

3   ever told you you can't stay there because you have

4   some type of mental health condition?

5      A    No.                                                  01:36

6      Q    Do you consider yourself to be an

7   alcoholic?

8      A    That's a broad term.  I was told, "You

9   binge drink, David."  As far as a doctor told, me a

10  psychiatrist, he goes, "You don't even have          01:36

11  cirrhosis."  He said, "You go to the hospital

12  sometimes.  Your enzymes are way up out of whack,

13  but they all go back to normal."  He says, "You

14  don't -- as far as alcoholism, no."  He said -- the

15  psychiatrist said, "If I was homeless, you better     01:36

16  believe people drink and sedate themselves," because

17  the reality of -- of might -- I might not wake up.

18  I can lay down and sleep at night or outside, and

19  end up being killed.  It happens.

20     Q    Has any ASL staff told you you can't stay     01:36

21  at the ASL because you're an alcoholic?

22     A    No.

23     Q    Has any ASL staff ever told you you cannot

24  stay at the ASL if you drink alcohol onsite?

25     A    They haven't told me, but they do --          01:37

143

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

1   I'm, you know -- sometimes tap -- one of the workers

2   would say, "There's an empty mat.  Come on inside

3   tonight."

4       Q   Was it your choice to stay outside that

5   night?                                                    01:42

6       A   No.  I was not included in the lottery

7   because I got in there late, and I can't get in

8   there at 9:30.  So it's their choice, they said.

9   Well, I heard two conflicting stories.  One is, you

10  should be in the lottery.  You're just working, and   01:42

11  if you're in, we'll let you know.  If you're not,

12  we'll let you know.  Your name should be there.  And

13  the other said, well, you don't make it in time for

14  the lottery, so you're not in the lottery.  So I was

15  told two different things.                               01:43

16      Q   So you slept outside?

17      A   I just figured it's a lot easier.

18      Q   So have you ever been prevented from

19  staying overnight at the ASL because of any mental

20  health condition?                                        01:43

21      A   No.  If I did, it would be on my own term,

22  just say, "I don't feel like going there tonight,"

23  or like I mentioned, there would be a woman that

24  almost every night she would start yelling, and they

25  never told her to exit.  They never exited her, and     01:43

149

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

1  yet when I raise my voice, I feel I am targeted and

2  discriminated against because I've observed other

3  people with worse behaviors, and they didn't do

4  anything with them.

5       Q   So there were times you chose to stay in        01:43

6  the parking lot rather than going in the facility?

7       A   This is correct.

8       Q   And sometimes you did it because the

9  weather was nice?

10      A   Sometimes I did it because I didn't want to     01:43

11 hear that lady yelling and screaming all night --

12      Q   And on those occasions --

13      A   -- and the environment becomes too

14 aggravating to me.

15      Q   And on those occasions, you would then         01:44

16 sleep in the parking lot --

17      A   Correct.

18      Q   -- that you described before?

19      A   Yes.  I think one -- maybe a handful of

20 times I actually did get on the bus and go to Santa    01:44

21 Ana, but I'm not sure what year it was.  But

22 sometimes I'd just say, "You know what?  I'm just

23 going to go.  I'd rather just, you know --

24 especially once you -- around November, it starts to

25 get cold, and then pretty much for three months, I     01:44

                                    150

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

```
 1   heard Matt Mars had a heart attack and died.
 2        Q    Lynn was your girlfriend, right?
 3        A    Or less.
 4        Q    The statement here at the end of that
 5   paragraph, "He reports it is difficult for him to go      02:00
 6   back there," "there" being the ASL, right?
 7        A    Yes.
 8        Q    "Because he used to go there with his
 9   girlfriend who died."  Is that a true statement?
10        A    Yes.  It's hard for me to go back there.  I     02:00
11   go to the city and I use the library and coffee with
12   my friends, but when it goes up -- up there, I just
13   -- I get a weird -- what is the word?  It's just
14   kind of like bad Karma or something.  I just --
15        Q    Is it one of the reasons you're staying in      02:00
16   Newport right now?
17        A    Yeah.
18        Q    Let me hand you --
19        A    Obvious -- no.  And of course, I'm not
20   allowed into -- I'm frowned upon if someone gives me      02:01
21   a plate of food so, right?  I just decided I would
22   go I would rather go -- what does the Bible say?
23   I'd rather go eat in the attic with -- than to be --
24   I don't know.  I know that part of the Bible,
25   though.  When they frowned upon me, "Like I'm not        02:01
```

165

**Exhibit 16**
**Page 227**

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

```
 1   Officer Farris has treated you?
 2        A    No, not him, no, not him at all.  And --
 3        Q    Officer Farris ever been unfair to you?
 4        A    He hasn't, no.  He -- other officers may
 5   have, but --                                           02:20
 6        Q    Officer Farris ever harassed you?
 7        A    No.
 8        Q    Have you ever had a conversation with
 9   Officer Farris about the possibility of getting your
10   permanent ban at the ASL lifted?                       02:20
11        A    No, because as I was saying, it's like a
12   lot of water under the bridge, and I just don't feel
13   -- it brings back a lot of bad memories.  It's not
14   so much that -- it's just all my friends had died in
15   that short period of time.  It's just I just get       02:20
16   kind of a weird feeling up there.  You know, I don't
17   mind picking up my mail or anything, but it's just,
18   I had some fun times there, but the -- you know, the
19   deaths of those people really stick to my mind and
20   it's hard for me to go up there without kind of a      02:20
21   weird feeling, you know.
22        Q    Do you remember, though, Officer Farris
23   ever talking to you about approaching Mia to see if
24   you could get the ban lifted?
25        A    No, because he never really mentioned that.  02:21
```

169

**Exhibit 16**
**Page 228**

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

```
 1   permanently for being robbed.  I've never seen
 2   anybody get kicked -- permanently exited for being
 3   robbed and stopping a robbery or a theft.
 4       Q   So why do you think that they were treating
 5   you unfairly?                                          02:40
 6       A   Because I spoke my mind, and so did Lynn.
 7   And they kicked her out permanently too before me.
 8       Q   How did you speak your mind?
 9       A   I just said what I felt, what I observed.
10   I said, "You make rules.  Make them for everybody.    02:40
11   So if I'm kicked out for stopping someone from
12   stealing my property, the next time someone stops
13   somebody for stealing property, kick him out for
14   good too."
15       Q   And you feel you were treated unfairly        02:40
16   because of making those kinds of statements?
17       A   Correct.
18           MS. WANNER:  Objection.  Misstates
19   testimony.
20           THE WITNESS:  I do.  I truly do.              02:40
21   BY MR. YODER:
22       Q   Do you think you were treated unfairly for
23   any other reason?
24       A   I -- I -- I really can't answer that, but I
25   noticed that when Mia was put in charge, that a lot   02:40
```

186

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

1

2

3

4

5

6

7

8        I, DAVID SESTINI, do hereby declare under penalty

9   of perjury that I have read the foregoing transcript; that

10  I have made any corrections as appear noted, in ink,

11  initialed by me, or attached hereto; that my testimony as

12  contained herein, as corrected, is true and correct.

13        EXECUTED this 26ᵀᴴ day of OCTOBER ,

14  20 16 , at LAGUNA BEACH , CALIFORNIA .
                        (City)              (State)

15

16

17

18  _David Sestini_
       DAVID SESTINI

19

20

21

22

23

24

25

                                                    201

**Exhibit 16**
**Page 230**

David Sestini, 9/13/2016
Glover v. City of Laguna Beach

```
 1           I, the undersigned, a Certified Shorthand
 2   Reporter of the State of California, do hereby certify:
 3           That the foregoing proceedings were taken before
 4   me at the time and place herein set forth; that any
 5   witnesses in the foregoing proceedings, prior to
 6   testifying, were duly sworn; that a record of the
 7   proceedings was made by me using machine shorthand which
 8   was thereafter transcribed under my direction; further,
 9   that the foregoing transcript is a true record of the
10   testimony given.
11           Further, that if the foregoing pertains to the
12   original transcript of a deposition in a Federal Case,
13   before completion of the proceedings, review of the
14   transcript [  ] was [  ] was not requested.
15           I further certify I am neither financially
16   interested in the action nor a relative or employee of any
17   attorney of any of this action.
18           IN WITNESS WHEREOF, I have this date subscribed
19   my name.
20
21   Dated: _____
22
23
24           _____
25           ANGELA METZ
             CSR No. 12454
```

202

**EXHIBIT  17**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

Kenneth Glover, et al.,
individually, and on behalf of all
others similarly situated,

        Plaintiffs,

     vs.                  No. 8:15-CV-01332-AG-DFM

CITY OF LAGUNA BEACH;
THE LAGUNA BEACH POLICE
DEPARTMENT, a California
charter city,

        Defendants.
_____


DEPOSITION OF RICHARD OWENS

Costa Mesa, California

Thursday, September 15, 2016
Volume I


Reported by:
ANGELA METZ
CSR No. 12454

JOB No. 22150


PAGES 1 - 159

1

Exhibit 17
Page 232

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

```
 1            MS. GARROW:  Eve Garrow.
 2            MR. WHITTAKER:  Chris Whittaker on behalf
 3    of the defendant.
 4            MS. SALEM:  Nora Salem on behalf of the
 5    defendant.                                          10:29
 6            THE VIDEOGRAPHER:  Would the court reporter
 7    please administer the oath?
 8
 9                    RICHARD OWENS,
10    having been first duly sworn, was examined and
11    testified as follows:
12
13                    EXAMINATION
14    BY MR. WHITTAKER:
15        Q    Good morning, Mr. Owens.                   10:29
16        A    Morning.
17        Q    Could you please state and spell your full
18    name for the record?
19        A    Richard Owens, R-i-c-h-a-r-d, O-w-e-n-s.
20        Q    Thank you.  My name is Chris Whittaker.    10:29
21    I'm one of the attorneys representing City of Laguna
22    Beach in the lawsuit that you and several others
23    have filed against the City.  To my right is my
24    colleague Nora Salem, and as you may have noticed,
25    there's a court reporter here who is taking down     10:30
```

6

**Exhibit 17**
**Page 233**

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

1       A    Absolutely none that I can see at this

2   point in time, Mike.

3       Q    Mr. Owens, how old are you?

4       A    Forty-one years old.

5       Q    And where do you currently reside?          10:35

6       A    Currently, I'm in San Clemente, California,

7   my home town.

8       Q    And how long have you been living in San

9   Clemente?

10      A    About a month and a half now since I've     10:35

11  left the ASL.

12      Q    And do you have a specific location you're

13  staying there every night?

14      A    Yeah.  I'd rather leave that undisclosed,

15  though.                                              10:36

16      Q    Okay.  Do you have any plans to relocate

17  from San Clemente in the near future?

18      A    No.  I -- I'm kind of partial to San

19  Clemente.  I'd like to live my life out there.  It's

20  a beautiful place.                                   10:36

21      Q    Do you have a job out there currently?

22      A    No.  I am seeking a part-time job that I

23  can get with.

24      Q    Okay.  And when you say you're seeking a

25  job, have you submitted any applications for that?   10:36

                                                    12

**Exhibit 17**
**Page 234**

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

1    Q   So you were living with somebody out here

2   in California right after you got back from Iowa?

3    A   Uh-huh.

4    Q   And who was that?

5    A   Josh Rhodes.                                      10:51

6    Q   Just a friend of yours?

7    A   Just a young childhood friend of mine, you

8   know that I kept in contact with, one of the only

9   ones that I've even kept in contact with.  Like I

10  said, over the years, I've grown antisocial, and I  10:52

11  was lucky to even have, you know, that as a friend

12  out here still.  But I had that leeway to come out

13  here and -- and get here and stay and now, you know,

14  when I got here, I found out all of the troubles

15  that were, you know, brewing.  And what can I do?  I  10:52

16  mean, do you want me to pack up give up and leave?

17  No.  I'm going to live free, and hopefully I'm going

18  to die happy here in So. Cal.

19   Q   So you left -- you left -- stopped living

20  at that house because of the troubles that the owner  10:52

21  was having?

22   A   Yeah.  Yeah.  He needed to do his own

23  program like I did before, and then he hasn't seen

24  it yet, so --

25   Q   Now, you mentioned you were getting help    10:52

                                                    24

ADVANCED DEPOSITIONS
www.advanceddepositions.com | 855.811.3376

**Exhibit 17**
**Page 235**

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

```
 1        A   I had to disown my mom, and I don't speak
 2   to her.  I don't speak to my father.  I don't speak
 3   to the baby's mama.  I don't even speak to my kids.
 4   Quite honestly, my best friend down here don't speak
 5   to me now either.  I afforded that guy a chance to      10:56
 6   rip me off of $79.  I was going to give him $10 in
 7   gas money for it.  Funny, huh?  Thirty-one year
 8   friendship down the drain in ten minutes.  His time.
 9   His choice.  I'm -- I'm just not good with
10   deception.  He deceived me once, last time.            10:56
11        Q   So to the best you can place it in time,
12   when was it that you returned back to California
13   from Iowa?
14        A   Six and a half months ago, almost exactly.
15        Q   So January of this year, basically?           10:56
16        A   Yeah.  Like I said, it was winter when I
17   came here, so yeah, 30 degrees outside the box.  The
18   ASL is what we call "the box" just in case you ever
19   hear it referred to as that.
20        Q   How did you first hear about the ASL?         10:57
21        A   I believe it was that wonderful wide world
22   of the web.  I was looking up any and every option I
23   have.  Salvation Army, room shares, slavery,
24   anything and everything I could to have a place over
25   my head that I could, you know, continue my            10:57
```

27

**Exhibit 17**
**Page 236**

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

```
 1   treatment and live healthy and happy and free.
 2        Q   And did you learn about the ASL while you
 3   were still in Iowa, or was this after you were
 4   leaving your --
 5        A   It was, obviously, after I was leaving        10:58
 6   because I had a place when I came here right, Mike,
 7   with Josh, and, therefore, I figured out he was on
 8   so many substances for me to stay with him at that
 9   point in time.  I was afforded the option through
10   the ASL and did not like -- do not enjoy it, might    10:58
11   not go back.  I do not send nobody there.  I do not
12   refer them.  I want nothing to do with it.  I'm
13   ashamed that I was even there.
14        Q   And you stayed there for four and a half
15   months or so or something like that?                  10:58
16        A   Just about exactly, yeah.  That's just
17   about right.  You've done your homework, haven't
18   you?
19        Q   And then what?
20        A   You've done your homework, haven't you?      10:58
21        Q   I try.
22        A   That's pretty good.  That's a good number.
23   That's almost exact.
24        Q   So when you first got to the ASL, did you
25   think at that time, those first nights that you       10:59
```

28

ADVANCED DEPOSITIONS
www.advanceddepositions.com | 855.811.3376

**Exhibit 17**
**Page 237**

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

```
 1    stayed there, that it was a place that wasn't good
 2    for you to be staying?
 3        A   I -- I knew it was a madhouse.  I mean, you
 4    walk into the gates and you feel like you're in a
 5    Freeman encampment.  I mean, then they shut the gate    10:59
 6    behind me, and I knew I was in for a hell of a
 7    night.  It was --
 8        Q   Do you want to take a break?
 9        A   Yeah, please.  I have a problem breathing
10    for a minute.                                           11:00
11            THE VIDEOGRAPHER:  We are going off the
12    record.  The time is 11:01.
13            (Recess.)
14            THE VIDEOGRAPHER:  We're back on the
15    record.  The time is 11:12 a.m.                         11:11
16    BY MR. WHITTAKER:
17        Q   So Mr. Owens, you told me that you, when
18    you came back to Southern California, stayed with a
19    friend of yours.  And I can't remember his name if
20    you gave it to me.  Where in Southern California was    11:12
21    that?
22        A   San Clemente.
23        Q   And so when you began looking for places to
24    stay after that, you were looking kind of whatever
25    was available in the Southern California area?          11:12
```

29

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

```
 1        A    Yeah.  Absolutely.  I mean, what else can
 2   you do?  There's not a lot of places that are
 3   affordable out here on the little tiny check.  I get
 4   -- I was thankful that, you know, California has the
 5   ability to, you know, help us a little bit more than       11:12
 6   Iowa does.  Now that I've gotten ahold of social
 7   security and whatnot, that was a big -- big ordeal
 8   for me.  You know, mentally, I get -- I get stuck a
 9   lot because I don't have transportation or I'm
10   disgusted with, you know, what's going on around me        11:12
11   every day, and -- and sometimes I just get stuck.
12   And, you know, lately, I wouldn't have support or
13   help or anything like that, no therapist, no
14   friends, no family, no jack but me and myself and I.
15   But --                                                     11:13
16        Q    So you're currently getting --
17        A    It gets a little hard.
18        Q    Sorry about that.  So you're currently
19   getting income from social security disability
20   benefits then?                                             11:13
21        A    It's SSDI.  It's just supplemental.  It's
22   not the full amount.  It's just supplemental.
23        Q    And do you have any other source of income,
24   any other benefits you're receiving?
25        A    No.  That's why I'm currently looking into       11:13
```

30

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

1    a part-time thing.  What I'm living on right now, I

2    dare you to.

3         Q    What's that?

4         A    What I'm living on right now, I dare you

5    to.                                                        11:13

6         Q    I am -- I'm very sure that it's very

7    difficult.  So when you moved to Laguna Beach, it

8    was because of the availability of the ASL then?

9         A    It was the availability of the ASL.  It's

10   because of Laguna Beach is a very beautiful place.          11:14

11   I've been there before.  I know a lot of the people.

12   I grew up with them.  Again, So. Cal. kids, you

13   know, we all know each other from Huntington to

14   here, San Clemente to here.  Yeah.

15        Q    So you do have friends in the area?             11:14

16        A    I have acquaintances.  All of my friends

17   are dead or in prison or I don't talk to them no

18   more because of one reason or another.  That's

19   probably better for all of us.  You know how that

20   goes, the good, the bad and the ugly.                     11:14

21        Q    So you mentioned that you stayed at the ASL

22   for about four and a half months, and -- and we'll

23   talk a little more about that in a second.  When you

24   stopped staying at the ASL, where were you staying

25   after that?  Did you still stay in Laguna?                11:15

31

**Exhibit 17**
**Page 240**

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

```
 1            MS. MINOOFAR:  Objection.  Compound.
 2            THE WITNESS:  No.  I do not ever want to
 3     step foot in Laguna.  Really, honestly, I fear
 4     Laguna Beach now.  I fear the police in it.  I fear
 5     the conspiracy that was abounding all around me.  I      11:15
 6     personally don't care for Laguna Beach anymore.  My
 7     -- now that I've been through the ASL, they can have
 8     it.
 9         Q   And when was the last --
10         A   They can have Laguna Beach.  I don't need      11:15
11     to step foot in that city.  I've got Officer Drake,
12     Officer Collins, and Officer Farris that -- well,
13     all three of them have threatened me.  I told them,
14     basically, I had -- I told them take off your badge.
15     Take off your gun.  Quit talking to me like that.      11:16
16     They're disrespectful when they're, you know, not
17     around anybody else and it's just you and them.
18     It's a whole different person if you didn't know.
19         Q   So when was the last time you were in
20     Laguna Beach then?                                     11:16
21         A   Like I said, about a month and a half ago.
22         Q   And you have no intention to return there?
23         A   Nope.  Don't even want my mailing address
24     there.  So now the FAM, Family Assisted Ministries
25     in San Clemente California, amen.                      11:16
```

32

**Exhibit 17**
**Page 241**

1  doctor? Mental health doctor or doctor?" "Mental

2  health doctor." "Okay. Then I'm out." That is a

3  big friggin lie, and he told me -- Rashad told me it

4  was a actual doctor's appointment and trying to say

5  it was mental health and then when I got there, it          11:32

6  was all of a sudden two enrolled in one, and that

7  was deceptive, and it was time for me to leave.

8       Q   So you think the services that you're

9  getting connected with at Family -- Family Assisted

10  Ministries are the services that you're -- you're     11:32

11  looking for?

12       A   Hopefully. I always have hope. If I don't

13  try, then I'm done then, right? I don't want to be

14  like this for any period of my time that I don't

15  have to be. I'm trying to better myself. I've       11:33

16  already lost everything, Chris. I want to have

17  something again. I want to be able to see my kids.

18  Hopefully, they'll call me in the future, Facebook

19  me or something, if this president of ours doesn't

20  screw us.                                             11:33

21       Q   So getting back to your time at the ASL

22  then, were you ever asked to leave the ASL?

23       A   Twice, and they were both for a non

24  legitimate reason.

25       Q   What was the first time?                    11:33

                                                              43

Exhibit 17
Page 242

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

```
 1         A    First time was Mike Newman got up in my
 2   face, spilled some coffee on me, and I didn't even
 3   touch him, but I should have because I was kicked
 4   out for two days anyway, and then when I was kicked
 5   out for that two days, they rescinded it because I      11:34
 6   didn't touch him.  I didn't do anything to him.  He
 7   spilled coffee on me.  He got in my face in the
 8   morning.  I was just getting up and defending myself
 9   because you don't, you know, defend yourself, you
10   get beat up on.  It's just the way it happens.  You     11:34
11   don't let it happen.  You want to be a lot safer in
12   your life.  You've got to stand up for yourself, in
13   other words, or you get stomped on.  So I had to
14   stand up, you know, and not let him badger me and
15   yell at me in front of 60 people in the morning, and    11:34
16   then when I did, you know, they basically, the mean
17   look on my face, they seen me -- my whole face
18   change, and they knew there was about to be a
19   problem, and if he went any further, there would
20   have been.  But I didn't touch him, and one of the      11:34
21   workers, Raul, piped up, and "You're out of here,
22   two days."  He preemptively didn't know what he was
23   saying.  He didn't see the situation, just made a
24   snap judgment in front of all of the 60 individuals
25   there, I guess.  And it was the wrong judgment.  I      11:35
```

44

1    didn't touch the dude.  I didn't do what he said I

2    did, and they found that out and one day it was like

3    -- Mike was still kicked out because he started it,

4    and he had to stay out for the full two days outside

5    in the parking lot.  What a -- anyways, in a tent by          11:35

6    the way, with all of the amenities, food being

7    brought out to him and whatnot in the parking lot.

8    That's self-service after you've just been kicked

9    out, and meanwhile, I'm brand-new to the city.  So I

10   left the ASL, like you should when you're kicked out          11:35

11   and not stay in the parking lot and receive their

12   food and all their blessings that they have at that

13   wonderful place.  And therefore, I came back to get

14   my mail that one day, the one day after and they --

15   they told me, "Oh you can come back here."                    11:36

16        Q    And did you go back there?

17        A    "We rescinded that," and I was like, "What?

18   No.  I'll stay out for the night."  It's only one

19   more night, and that's fine.  I like to, you know,

20   do my time that I was given already preemptively,"           11:36

21   and I stayed outside.  I thought about it and sorted

22   it out in my head, went back and I talked to Mike,

23   and me and Mike, you know, we're friends now.  I can

24   sit next to the dude with no problem, not friends,

25   acquaintances.  I don't trust him as far as I can           11:36

45

**Exhibit 17**
**Page 244**

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

1    throw him.  I mean, I think he's an okay guy,
2    though.  I don't fight with him to this day.  He --
3    he and I don't have any need to get in each other's
4    face at any point in time, and we understand each
5    other more thoroughly.  And that's all that's                    11:37
6    needed.  Communication was the key.
7        Q   So after that incident, the ASL staff told
8    you that you were -- your exit had been rescinded.
9    You were welcome to come back, but you decided to
10   stay out one more night anyway?                                  11:37
11       A   Just I took my full one.  It was only two
12   days.  You know, I guess I'm -- what doesn't kill
13   you only makes you stronger, right?
14       Q   And so what about the second incident.  You
15   said you were exited a second time?                              11:37
16       A   Yeah.  That was, again, because of Raul.
17   Raul decided to say I was smoking in the front
18   tenement, front yard and smoking marijuana.  He
19   thought I was smoking when they allow everybody to
20   come in those doors those days.  And I swear,                    11:37
21   there's probably four people in that yard that night
22   smoking marijuana, because it is a medical legalized
23   -- legalized medically here in California now.  And
24   there are people that take advantage of it.  As a
25   matter of fact, for seizures, the CBDs are excellent             11:38

46

| | |
|---|---|
| 1  for stopping seizures.  That's why so many kids | |
| 2  around the USA are fighting here to get, you know, | |
| 3  the rights, fighting to get it legalized, even the | |
| 4  oil the CBD oil, which is not the THC, the important | |
| 5  part, the CBDs are the best part of that plant.  God | 11:38 |
| 6  gave it to us.  We should be able to use it.  But | |
| 7  anyway, there were four people out in the yard that | |
| 8  night smoking themselves.  He called me out because | |
| 9  I was standing on a chair talking to somebody over | |
| 10  the fence, and he didn't -- he didn't take a look at | 11:38 |
| 11  the situation or nothing, just picked me out.  "Hey, | |
| 12  you're out.  Smoking.  I see you smoking."  "What?" | |
| 13  Showed him my cigarette, and he didn't pay any | |
| 14  attention to it.  He goes, "You go.  Get out," and | |
| 15  that's just the way Raul is.  He's a very stern | 11:39 |
| 16  person when, you know, it comes down to what he | |
| 17  thinks is happening.  I've seen it with many other | |
| 18  people too, but it was the snap decision, wrong | |
| 19  decision, and I still got no apologies to today for | |
| 20  it.  As a matter of fact, I went out to the ASL when | 11:39 |
| 21  I came back and asked him if he had a personal | |
| 22  problem with me, and I said, you know, "Why would | |
| 23  you kick me out twice or you say anything twice? | |
| 24  You be the person.  Do you have a personal problem | |
| 25  with me?  What?"  And I still think to this day he | 11:39 |

47

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

1   has a personal problem with me.  He's cussed at me.

2   Called me a "little faggot" in Spanish in -- in

3   front of people, multiple people, and I don't get

4   down with that.

5        Q   And so after that incident, how long were          11:40

6   you exited for?

7        A   That time was supposed to be for four days.

8   No.  No.  A week, yeah, a week.  And I was out for

9   the whole week.  I came back, and it was never

10  talked about again.  The only problem -- I had one      11:40

11  more problem there, and it was a man, Shane.  And he

12  ripped my bike out from underneath my head.  But I

13  personally said the frames and forks and handle

14  bars, I put all the extras on it, you know, my -- my

15  rack, my lights, and, you know, rims, everything on     11:40

16  it.  And come to find out it was stolen, but I only

17  found that out when Shane ripped it out from under

18  my head when I was sleeping outside the ASL, and I

19  told Raul there's going to be a problem, and I

20  should probably be afforded the ability to at least     11:41

21  sleep on the inside of the gate if I'm going to stay

22  here at all.  You know, and that was not able to be

23  happening, so in the middle of, you know -- after

24  that, you know, happened, I hopped over the fence

25  after Woody took my bike and he was caught with the     11:41

                                                    48

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

```
 1       Q   And again, if you'll just let me finish my
 2  question --
 3       A   Sorry.
 4       Q   -- the court reporter can take it down
 5  better.  So you were exited the first time for an      11:43
 6  argument that you had with Mr. Newman and you were
 7  exited for two days, but that was ultimately
 8  rescinded; is that right?
 9       A   It was rescinded and they -- it was
10  supposed to -- you know, should have been out for      11:43
11  one night, but I stayed out myself.  Mike was out
12  for both two days in the parking lot with food and
13  amenities, all his bags, bed right there next to --
14  you know, in the thing, queen-sized blow up
15  mattress.                                              11:43
16       Q   And you didn't --
17       A   And I'm out on the street in a bush because
18  I -- I did wrong, supposedly.
19       Q   Did they ask you to leave the parking lot?
20       A   Well, they always do.  They don't say you    11:43
21  can kick it in the parking lot after you're --
22  you're kicked out.  They say, "Leave."  But they're
23  not going to enforce that, especially on Mike
24  Newman, the -- the grower of Laguna Beach that's all
25  over the news articles, really.                        11:44
```

50

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

1      Q   So the second time you were exited, then,
2   you were exited for what Raul thought was smoking
3   marijuana but you weren't actually smoking
4   marijuana?
5      A   It was a cigarette.   It was a straight        11:44
6   cigarette.
7      Q   And you were exited for a week that time?
8      A   It was a rolled cigarette, and he just --
9   he didn't see a butt on it, so he just, you know, he
10   came over.   He could have come over and smelled it    11:44
11   or bring it to him.   But none of that happened.   He
12   made his judgment and went with it, and that's what
13   he has to do.   I mean, if you think about it, he
14   can't watch over everybody.   He's not really paid
15   that well to do that that way, and you know, I       11:44
16   understand how and why he could do it, but you know,
17   to do it is still reprehensible the way it happened,
18   and I asked him nicely, you know, maybe you should
19   take a look at the situation a little better.   You
20   know, no.   I got it.   I know what you're calling me.  11:45
21   You're calling a liar.   Yeah.   I'm calling you
22   negligent, actually, for not knowing or checking out
23   the situation at all before you made your decisions
24   both times.
25      Q   And so that time you were exited for a        11:45

51

**Exhibit 17**
**Page 249**

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

```
 1   sights.  My heart is broken and my mind is
 2   untrusting, and I went backwards for every bit of
 3   treatment that I've ever done in the past nine
 4   years.  I've lost a therapist over the ASL.  I don't
 5   want to deal with anybody.  I don't want to talk to        11:50
 6   anybody.  I want nothing to do with people because I
 7   was sickened by the ASL, for the most part, and it
 8   kind of opened my eyes to protect myself a little
 9   more from this what I thought was bond on me, and,
10   you know, still today the morals keep going            11:51
11   downhill.  I worry about my children.  They aren't
12   raised like they are used to.  I'm sure you probably
13   understand that if you have children, you know,
14   growing up a lot quicker nowadays.  That's neither
15   here or there, but --                                 11:51
16        Q   So getting back to your time at the ASL
17   then, were you ever exited because of any of your
18   mental illnesses?
19        A   I was mentally in a horrible state the
20   morning of Newman and me, so yes.  Yeah.              11:51
21        Q   You were exited --
22        A   Newman came off on me.  I turned raw
23   because Newman came off on me that morning.  I was
24   only standing up for what, you know, I didn't do for
25   -- for what he was accusing me of doing.              11:52
```

55

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

1      Q    So you were just defending yourself?

2      A    I was just defending myself, and

3  definitely, yes.  He knew I was mentally ill.  He

4  knew that I had, you know, a seizure problem, and as

5  a matter of fact, I had a seizure because of him          11:52

6  because, you know, it was all unresolved problem,

7  you know.  Me and him could have went outside or

8  talked it out right then and there.  And no.  We

9  couldn't do either one.  We were broken apart.  He

10  was -- he stayed inside and coddled.  I left because   11:52

11  I was really mad, and I don't believe staying

12  somewhere where I'm not wanted, and I wasn't wanted

13  because I was obviously kicked out for two days.

14  Okay.  I'll leave.  And I left and then I came back

15  to the next night and found out I shouldn't have     11:52

16  been exited in the first place because they finally

17  realized they made a mistake, which was too late.

18      Q    So on that occasion you were --

19      A    Yeah.  I was a accosted for my mental

20  inabilities and that was part of Mike and Raul and   11:53

21  everybody here.  Everybody knew I had seizures

22  problems at that point in time when I came in.

23      Q    So did you have a seizure that night then

24  or that morning, I guess?

25      A    It was overnight, yep, while I was        11:53

56

**Exhibit 17**
**Page 251**

1   sleeping.  I went into seizures.  It happens a lot

2   while I sleep.  It's better that it happens when I

3   sleep than when I'm awake because when I'm awake,

4   I'm, for some reason, head heavy.  I go straight

5   down on my head if I'm standing up.  First thing        11:53

6   that hits the ground is my head.

7        Q   On the day that you were exited because of

8   your argument with Michael Newman, did you have a

9   seizure during that argument?

10       A   No.  I didn't have a seizure during an         11:54

11   argument, normally.

12       Q   Did you have a seizure after the

13   argumentative?

14       A   Yes.  Once I -- I calm down, my adrenalin

15   goes away, unless if it's a severe problem and my       11:54

16   brain says, "Shut down now."  You know, no, my

17   adrenalin has to go away before my brain will say --

18       Q   So on that day, you had a seizure after

19   your argument with Michael Newman?

20       A   Yes.                                            11:54

21       Q   Was that before or after you left ASL?

22       A   That was when I -- after I left ASL and I

23   went to lay down.  You know, before I was getting

24   ready to lay down, I had that seizure, and it wasn't

25   -- you know, it wasn't a huge one, but it was still     11:54

                                                    57

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

1    a seizure.  I shouldn't have had it because of Mike,

2    and it's not the first time, and it wasn't the last.

3    I still have to go to that same bank on a daily

4    basis with -- with different people.  Even though I

5    don't have to deal with them, I can't walk away from          11:55

6    them now because I don't have a gate that I have to

7    stay in or a yard that they lock me in and let other

8    people out and not me.

9        Q   So on the day that you had the argument

10   with Michael Newman, you were you -- you had the              11:55

11   argument.  Then you were exited by Raul because you

12   had defended yourself or started speaking your mind

13   to Michael Newman, and then after you were exited

14   you had a seizure out in the parking lot; is that

15   right?                                                        11:55

16       A   Not in the parking lot, no.  I wasn't

17   sleeping in the parking lot when I left.

18       Q   So it was somewhere other than the ASL?

19       A   It was down on the beach when I had the

20   seizure.  Nobody can really tell that I'm having a            11:56

21   seizure on the beach, you know, and they're not

22   paying attention and whatnot.  And it's not like I

23   was hurting myself, you know, so maybe they thought

24   I was tripping out or something on -- on some

25   serious drugs or something maybe.  But nobody said           11:56

58

```
 1   anything about the seizure.  Nobody usually does.
 2   And if they do know I'm having a seizure, they most
 3   likely rifle my pockets if I do.  That's all I've
 4   seen.  I've only been helped by two people that
 5   actually knew that helped.  "Oh, that's Owen."  You        11:56
 6   know, that would be a good idea to teach them at the
 7   ASL about seizures and strokes and get some medical
 8   training in there because they're uneducated, the
 9   poor workers that have to deal with all these
10   disabled and sick people that have multiple               11:56
11   different problems and they don't know how to deal
12   with it.
13        Q   So other than that day with Michael Newman,
14   is there any other occasion where you believe you
15   were exited because of your mental illnesses?             11:57
16          MS. MINOOFAR:  Objection.  Vague as to
17   "because of."
18          THE WITNESS:  The -- the false accusations.
19   I don't think they can be mental.  That would be a
20   judgment.                                                 11:57
21   BY MR. WHITTAKER:
22        Q   So the time when Raul accused you of --
23        A   That would be just a straight wrong
24   judgment on that one, and the other time was --
25   well, yeah, basically.  Basically, Shane was taking       11:57
```

59

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

1    advantage of me and my mental health because he knew

2    that if he did that and got away, you know, I would

3    have a seizure immediately, and I wouldn't be able

4    to follow him.

5         Q    Is Shane an ASL staff member?                    11:57

6         A    Shane's a drug addict.  He's been kicked

7    out of the ASL multiple times.  As a matter of fact,

8    been let back in just recently, and that's when I

9    was there and afforded the ability to get -- what do

10   you call it?  The -- the -- the progressive health,    11:58

11   what is the word I'm looking for when they're

12   aggressive and you're angry?  Anger management.

13   Anger management, and he had the ability to have a

14   free night.  He didn't have to go through lottery or

15   anything as long as he went to that class, anger       11:58

16   abuse, and was anybody else really afforded that

17   without something later?  No.  I wasn't.  Nobody

18   else was.  It was only him and a couple other people

19   that had their own issues, and it's -- I don't know.

20   Again, it's another conspiracy to keep the people      11:59

21   they wanted in and there, although, I mean, at that

22   point in time, you know, there's always got to be

23   somebody that -- there's always going to be somebody

24   like that, you know.  It wouldn't be a group of

25   people without regular people.                          11:59

                                                        60

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

1      Q   So focusing back on your experience,

2  though, you've been exited twice from the ASL,

3  right?

4      A   Twice through -- yeah.

5      Q   And one time was related to an accusation      11:59

6  that you were smoking marijuana, right?

7      A   Yes, sir, false accusations.

8      Q   And you don't think that had anything to do

9  with your disabilities, correct?

10     A   Well, I mean, I have to smoke marijuana       11:59

11  because I'm -- I'm unmedicated by mental health.

12  And actually, let me change that.  Yeah.  It was

13  because of -- if I had mental health or if I was on

14  medications, I, you know, wouldn't have to have that

15  at all, and he shouldn't have thought I was doing it   12:00

16  inside the gates because that's obviously the rules,

17  and I followed the rules.  If I did do that, I did

18  it outside the gates, and it is -- I mean, it is a

19  medicine, so it's not a, you know, illegal drug no

20  more.  Yeah.  So that was also part of the mental     12:00

21  health.  That wouldn't just be a snap judgment,

22  right?

23     Q   So you think that you were exited by

24  Raul --

25     A   What if it was my medication?  I should be   12:00

61

**Exhibit 17**
**Page 256**

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

```
 1  able to smoke it inside the gates.
 2      Q   But you weren't, right?
 3      A   But no, you're not allowed to at all, even
 4  if it is, and that wasn't the thing.  His was just a
 5  straight accusation, but it was nor here nor there.     12:00
 6  Maybe I should have been.
 7      Q   So you use marijuana to medicate your
 8  mental health conditions?
 9          MS. MINOOFAR:  Objection.  Assumes facts
10  not in evidence.                                         12:01
11  BY MR. WHITTAKER:
12      Q   Is that right?
13      A   That would be a -- the CBDs in marijuana.
14  I've used the oil a lot.  It doesn't have THC in it.
15  That way, I can still pass the drug test and do my      12:01
16  daily activities without being high or euphoria of
17  my own.  I need to be able to perceive my situations
18  correctly, and I already have a problem with being
19  stuck mentally.  I ain't trying to be sitting around
20  and getting high and having an addiction nowadays to    12:01
21  THC, one, but THC -- so every once in a while I will
22  use that as a -- a fallback, you know, but for the
23  most part the CBDs in that are the medicine for me,
24  not the THC.
25      Q   So you use CBD oils to medicate your mental      12:02
```

62

1   health conditions?

2        A    Yes.

3        Q    Do you ever smoke marijuana to medicate

4   your mental health conditions?

5        A    When I don't have vaporizers, like, yeah.          12:02

6   I have to now.  The sheriff broke my vaporizer when

7   I was at my storage unit.

8        Q    Do you have a prescription for either of

9   those to medicate your mental health condition?

10       A    The recs, yes.                                     12:02

11       Q    I'm sorry.  What?

12       A    The recs from the doctor.  Yeah.

13       Q    A recommendation?

14       A    Yeah.

15       Q    Did he prescribe it?                               12:02

16       A    Yeah.  I think it was recommended

17   thoroughly along with my medical card, thanks to the

18   -- one of the police, they took all of my cards out

19   of my wallet and spread them around my stuff one

20   day, and I haven't been able to get to my stuff for   12:03

21   three weeks, but I've been paying the storage bill.

22       Q    And did you tell the ASL staff that you

23   used marijuana or CBD oils to medicate your mental

24   health condition?

25       A    Yeah, I did.                                       12:03

                                                           63

**Exhibit 17**
**Page 258**

1      Q    Who did you tell?

2      A    Mia, Raul.  After the fact, you know, when

3  he did that, that was -- you know, that was out of

4  line, and I told him what was happening after that,

5  and I walked in there the next time I talked to him.          12:03

6      Q    This was after you were exited when he

7  thought you were smoking marijuana?

8      A    Yeah.  And I talked to him after that, and

9  I asked him if he had a problem with me and why he's

10  picking on me and what -- you know, what's the deal,          12:03

11  and he never said anything.  He just put it off like

12  he was just doing his job.  Yeah.  I mean, they all

13  know that I smoke -- I smoked for medicinal

14  purposes.  Yeah.

15      Q    So you've told Mia, and you've told Raul?          12:04

16      A    And she's told her staff and then -- then

17  --

18      Q    How do you know that she's told her staff?

19      A    There's a billion people that smoke it

20  inside the gates.  Like I said, when he accused me,          12:04

21  there were four other people inside those gates that

22  were smoking that weren't told jack.

23      Q    I understand, but I'm trying to focus on

24  your experience here.  So you've told Mia and you've

25  told Raul that you smoke marijuana to medicate your          12:04

64

Exhibit 17
Page 259

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

```
 1   mental health conditions; is that right?
 2         A    For my seizures, yes.
 3         Q    And did they say anything in response?
 4         A    "Don't do it inside the gates."  "I know.
 5   I already found that out the hard way.  Thank you."     12:04
 6         Q    So you told them that after this time that
 7   you were exited for being accused of smoking
 8   marijuana?
 9         A    Mia knew before.
10         Q    I'm sorry.  What?                             12:05
11         A    Mia did the intake with me.  I told her on
12   the intake, but it was nobody else's business after
13   that, I mean, until Raul decided to pipe up for what
14   he did.
15         Q    And how often do you use either the oils or  12:05
16   marijuana to medicate your condition?
17         A    I have to use it, you know, whenever I'm
18   most likely going to have a seizure.  It's best to
19   be concurrently medicate with it, but, you know,
20   again, I don't have the finances or whatnot to        12:05
21   constantly medicate myself with CBD oil, but I might
22   be able to do it with marijuana, but then I'd never
23   get nothing done.
24         Q    So how often do you take it then now?
25         A    As needed, actually maybe three -- three to  12:05
                                                         65
```

**Exhibit 17**
**Page 260**

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

1       A    Yeah.  So I did even get on transfers from

2    whatnot.  They don't have much -- have me on

3    paperwork.  Corporal Farris and -- said fine.  He

4    needed the name of the landlord.  My mom don't know

5    it.  I couldn't get that information to him, so          01:26

6    therefore, I'm not resident status.  However, if

7    you're being a pain in their ass, you can be a

8    resident just so they can keep you off of Laguna

9    Beach streets.

10       Q    So you -- but in your situation, you tried     01:26

11    to get local status and you weren't able to get

12    local status?

13       A    Yeah.  I'm too nice.

14       Q    And so you then had to go through the

15    lottery, I guess?                                       01:26

16       A    Yeah.  Lottery or parking lot or walk up on

17    the hill.

18       Q    And so for that about four and a half

19    months that you were in Laguna, how often did you

20    try to get in the lottery at the ASL?                   01:27

21       A    For about four and a half months minus the

22    times that I was asked or told that I should, you

23    know, vacate the premises for whatever reasons that

24    -- that they say, four and a half months every

25    night.                                                  01:27

70

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

```
 1        Q    So you had the two exits, the one time for
 2   two days and the one time for seven days.  Other
 3   than those two periods, you applied every night to
 4   get in the ASL?
 5        A    Every night.  Everybody there knows me.      01:27
 6   They still know me to this day.  They all know me as
 7   one of the best people they're going to know and one
 8   of the worst people they're going to know.
 9        Q    How often did you get in when you applied?
10        A    Seeing that I was a nice guy and never did   01:27
11   anybody, you know, wrong, I always helped out
12   everybody and as a matter of fact, Mia used me as
13   her little vending machine or whatnot when people
14   came in there that didn't have stuff that needed it
15   only, I usually look out for people like that,        01:28
16   people that want stuff and ask for stuff, we usually
17   tell them to go away and get their own.
18        Q    So again, of the times that you --
19        A    So that's why they kept me there, they -- I
20   got in a lot -- a lot for those reasons right there,  01:28
21   but most of the time I was -- I was stuck in a
22   parking lot either way because I didn't feel good
23   about taking an older lady's bed in there if she's
24   severely crippled or, you know, whatnot.  I gave up
25   my bed a lot of times for people.  It's not a new     01:28
```

71

1    thing for me, but it's just the way it goes.  Again,

2    that's how I got my blessings.  I was too nice of a

3    character, apparently.  So --

4        Q    So -- so you applied to be in the lottery

5    every night that you thought you were able to?          01:29

6        A    Yes, sir.

7        Q    Would you say you got a spot through the

8    lottery more than half the time?

9        A    No, I wouldn't say half the time.  I'd say

10   a little less than half the time, which was a good      01:29

11   thing because it -- you know, it's constantly

12   changing and lottery, you know.

13       Q    What do you mean?

14       A    Well, you get picked for a lottery or you

15   don't, you know, and there's constantly new people      01:29

16   walking in there every day.  The place is on the

17   Internet.  There's only one place in, you know, So.

18   Cal, for the most part, that is a shelter, a bona

19   fide shelter, you can just walk into and put your

20   name down and not have to be searched, you know, or     01:29

21   -- and seized and, you know, whatnot, give up all

22   your information to.

23       Q    Uh-huh.

24       A    And so there's a lot of people coming

25   there.                                                  01:30

                                                          72

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

```
 1       Q    A lot of new people from outside the area?
 2       A    Yeah.  There's always new people that we
 3   have to tell the new rules to.  You know, if you see
 4   something laying around, don't touch it.  If it's
 5   not yours, don't touch it.  You know, with your          01:30
 6   stuff, be responsible and be cool, calm, collected,
 7   and don't mess with the staff.  You know, they're
 8   not here to take care of us that much.  They don't
 9   get paid that much.  They keep us happy, and we keep
10   them happy, honestly.  It's more like a jail, you        01:30
11   know, cell.  The inmates kind of run it, but the
12   CEOs make the rules, you know, and change -- change
13   whatever they want to change around, you know, to
14   fit their needs and their growing needs.
15       Q    So you apply every night that you're           01:30
16   available -- that's available to you?
17       A    You either get in or you don't.
18       Q    You get in maybe less than half the time?
19       A    Yep.
20       Q    You noticed a lot more people coming to the    01:30
21   shelter from outside the area?
22       A    Uh-huh.
23       Q    Is that a "yes"?
24       A    Yes.
25       Q    And so the times that you didn't get into      01:31
```

73

**Exhibit 17**
**Page 264**

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

```
 1   the lottery, you stayed in the parking lot?
 2       A    I would stay in the parking lot or most of
 3   the time I stayed in the parking lot because it was
 4   winter, number 1, and I needed to be able to stay,
 5   you know, kind of -- kind of warm, and, you know,        01:31
 6   body heat around there was ambient because there's
 7   everybody outside that didn't get in.  Then minus
 8   that, if you're down on the beach by yourself,
 9   you're going to be kind of cold, normally,
10   especially if you don't have a sleeping bag and all       01:31
11   that stuff, which, you know, I have my bag and
12   whatnot so I usually was able to have a sleeping
13   bag, thank God.  And I had absolutely needed one for
14   my COPD and my -- my mental attributes.  I wouldn't
15   be such a good guy in the morning when I woke up and      01:31
16   I was freezing cold and wet from the dew in the
17   morning on the beach.  You wouldn't know about that,
18   would you?
19       Q    I would not.  So the vast majority that you
20   didn't stay at the ASL, you stayed in the parking         01:32
21   lot then?
22       A    Yeah.  Yeah.
23       Q    Anywhere else that you stayed if you didn't
24   get into the ASL?
25       A    I felt like I was dependent on the ASL           01:32
```

74

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

 1    my health and that because I was having a problem
 2    breathing and I needed that inhaler at that specific
 3    moment.  And he didn't care.  And that was Drake,
 4    Officer Drake.  I don't care for the cop myself.  He
 5    gives cops a bad name.  They work hard, and the ones        01:35
 6    that are good deserve their name and that job.  As
 7    long as they're bad, they might as well ship them
 8    back to the prison and do training again.
 9        Q   So when you didn't get into the ASL, then,
10    and you weren't staying in the parking lot, you            01:35
11    listed you stayed at the park bench out in front,
12    the beach.
13        A   The bus stops, in -- the bus don't care if
14    we stay on the stops.  They don't call on us or
15    whatever.                                                  01:35
16        Q   And you mentioned the beach?
17        A   Yeah.  You still get tickets on the beach
18    thought, so I didn't like to stay down there too
19    often.  I didn't want to deal with the police.
20        Q   So how often did you stay on bus benches or      01:36
21    bus stops while you were living there?
22        A   Only when I was sick of being around
23    morons, I mean, people that couldn't use common
24    sense or -- or that didn't value respecting other
25    people like, you know, respect your own kind and          01:36

                                                          77

```
 1    treat people the way wanted to be treated anyways.
 2         Q   So would you say, how many times?
 3         A   Yeah.  I'd say five.  Yeah.  Five times I
 4    was on the bench.  Three times and I threw up my
 5    hammock in the beach on the cliff once and then up    01:36
 6    in the canyon across the way from the box, directly
 7    across the street from the box in a tree.  I'm a
 8    tree dweller.  I love my hammocks.  I don't know how
 9    I would be homeless without it.
10         Q   So as I understand it then, while you were   01:37
11    in Laguna, you were either in the ASL, in the ASL
12    parking lot, at bus stops, on the beach or in the
13    canyon or up on the hill in the canyon; is that
14    right?
15         A   As I said, anywhere I can lay my head.       01:37
16         Q   And -- and while you were at the -- the
17    times that you stayed in the ASL parking lot, were
18    you ever ticketed for sleeping there?
19         A   I was threatened a lot, four times, as a
20    matter of fact, I was threatened for I'm going to    01:37
21    get a ticket, I'm going to get that, or I'm going to
22    get this, but they're too lazy to arrest or, you
23    know, ticket anything.  They don't want to do the
24    paperwork, much less, you know, paperwork on
25    everything I carry.  I mean I have a roll-around      01:37
```

78

**Exhibit 17**
**Page 267**

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

```
 1    you were a gentle -- gentleman with them and then
 2    they complied.  You mean they just -- they left you
 3    alone after that?
 4        A   Well, they never let me alone.  They would
 5    back off a little bit and find somebody else to go      01:43
 6    harass.  That made it -- Drake did it the night that
 7    he called me a tweaker and told me to get out of
 8    town.  Do not pass go.  Do not collect $200.  Just
 9    leave.  He went on to the next guy, which was a guy
10    named Cowboy, and Cowboy didn't deal with police at    01:43
11    all.  It was actually hilarious.  I think I have a
12    video of it on one of my phones that I can shoot to
13    my lawyer and she can post up.  It's not very good
14    and clear of the whole thing, but it's got Cowboy
15    saying his peace to Drake.  It was quite comedic.      01:44
16        Q   So how often would you say that you stayed
17    in the ASL parking lot then, I guess how many times
18    during the four and a half months or so that that
19    you were in Laguna?
20        A   I'd probably have to say two and a half        01:44
21    months, about half the time.
22        Q   And of those times, you never received a
23    ticket but you did get threatened four times you
24    said with a ticket?
25        A   Well, they weren't out there every morning.    01:44
```

83

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

```
 1    that compassion.  Only if you're me can you possibly

 2    do that because, I mean, they're looking through you

 3    or looking at you, and they all know that.  They

 4    have my records.  They know who I am.

 5         Q   So when you did talk to them in that --        01:47

 6    that way though, they left you alone and went to go

 7    speak with somebody else?

 8              MS. MINOOFAR:  Objection.  Asked and

 9    answered.

10              THE WITNESS:  Yes.  They didn't want to       01:47

11    deal with me for a non problem at that point in

12    time, and they were done harassing me at point in

13    time.

14    BY MR. WHITTAKER:

15         Q   So I'm going to have the -- the same types     01:47

16    of questions with respect to the other places you

17    stayed, and hopefully we can go through these a

18    little bit quicker.  When you were -- the handful of

19    times that you stayed at bus pass -- excuse me --

20    bus stops or bus benches, did you ever get a ticket     01:47

21    while staying in those locations?

22         A   Never on the bus stop.  The OCTA is so

23    blessed when we were sleeping on their bus benches.

24    We can sleep on any bus bench we want, and they will

25    not call a cop because it's their property.  And       01:48
```

86

1   41-year-old man.  Either give me a ticket or go

2   away.  Don't you have better things to do?"  That's

3   what I tell them, and they normally do.  They either

4   get a call or they get sick of, you know, dealing

5   with a thoughtful, respectful human being.                    01:49

6       Q   So to get back to my question then, when

7   you were staying at the A -- the OCTA bus benches,

8   you never got threatened with a ticket?

9       A   I believe I just said that.  Never.  OCTA

10  was very kind.                                                 01:50

11      Q   And then you also mentioned that you

12  occasionally either one time or -- or maybe a

13  handful of times slept on the beach; is that right,

14  in Laguna Beach?

15      A   One time I was up on the ridge -- the --     01:50

16  outside the back side of the canyon on the -- on the

17  beach, you know.  I didn't sleep on the beach

18  because I'm -- I'm not dingy.  They come down in --

19  in trucks.  You know they -- they drive around down

20  there on the beach, and I have a problem with, you   01:50

21  know, being ran over.  So, you know, I don't usually

22  sleep places that are vulnerable like that.

23      Q   And so when you were up on the ridge, did

24  you get a ticket that night?

25      A   No.  They didn't see me.  They -- I seen     01:50

                                                             88

**Exhibit 17**
**Page 270**

```
 1   them giving crap to about six people that were
 2   sleeping in a, you know, circle in their bags.
 3        Q    And they --
 4        A    And they came down there and harassed every
 5   one of them, searched every one of them.  It took        01:51
 6   about two hours.  And then all those people --
 7   people watchers, so I sat there and watched it and
 8   tried to figure out what was going on with the
 9   people and the cops and --
10        Q    But the officers never came to talk to you?    01:51
11        A    No.  They didn't even know I was there.
12        Q    Didn't give you -- didn't give you a
13   ticket?
14        A    Didn't even know I was on the canyon.
15   Didn't see me.  I was there, though.  I was on the       01:51
16   canyon side because I'm smart enough to stay out of
17   their way.
18        Q    So am I correct, then, that for the four
19   and a half months that you were in Laguna Beach,
20   some of which you were at the ASL and some of which      01:51
21   you slept outside, you were only threatened with a
22   ticket those four times, and those were all in the
23   parking lot of the ASL?
24             MS. MINOOFAR:  Objection.  Misstates
25   testimony.                                               01:51
```

89

**Exhibit 17**
**Page 271**

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

1    themselves.  And at that point in time, you won't

2    get nothing from me, but the ones that need,

3    absolutely need that have severe crippling problems

4    and pain or throwing up and need a toilet ASAP all

5    night long, yes, I do give them my spot, and God      01:57

6    bless me for that.

7         Q   So am I correct, then, that if you did get

8    a spot, you either took it.  A few times you gave it

9    to somebody you thought was more needy, and this one

10   time --                                               01:58

11        A   Four times.

12        Q   -- you went to the emergency room?

13        A   Four times I gave it to people that were

14   needy of it.

15        Q   One time you went to the hospital?          01:58

16        A   One time I went to the hospital and lost my

17   spot.

18        Q   And the rest of the time you got a spot,

19   you stayed at the ASL?

20        A   The rest of the time I stayed in my spot,    01:58

21   slept, got up, did some chores, even helped them

22   clean their places.  I live there too.  And if I

23   don't respect my place, then nobody will, and I felt

24   good about myself when I left that place until I was

25   released on the streets and was harassed again by     01:58

94

```
 1   record.  The time is 3:14 p.m.
 2           (Recess.)
 3           THE VIDEOGRAPHER:  We are on the record.
 4   This is Disk Number 3 in the deposition of Richard
 5   Owens.  The time is 3:38 p.m.                        03:37
 6   BY MR. WHITTAKER:
 7       Q   So I think you mentioned earlier in the day
 8   that you feel like you're treated unfairly at the
 9   ASL.  Is that how you feel?
10       A   Very unfairly, yeah.                         03:38
11       Q   Why do you think that is?
12       A   I get different attention than other
13   people.
14       Q   Why is that?
15       A   They take my kindness for weakness.  I'm     03:38
16   trying to be a different man than I was.  If I was
17   the -- the man that I previously, you know, was with
18   was as a child or youngster, they wouldn't want to
19   deal with me.  I'd be Scott free.  I'd be fine, but
20   I'm trying to be better and a little bit nicer, and  03:38
21   I've been taught a word.  It's called couth and
22   being responsible and respectful in everything you
23   do in your life no matter if it's good or bad.  They
24   just look better as a person and you feel better as
25   a person and honestly I do, no matter if I'm dealing 03:39
```

138

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

I, RICHARD OWENS, do hereby declare under penalty
of perjury that I have read the foregoing transcript; that
I have made any corrections as appear noted, in ink,
initialed by me, or attached hereto; that my testimony as
contained herein, as corrected, is true and correct.

EXECUTED this ___ day of _____,

20__, at _____.
                (City)                    (State)


_____
RICHARD OWENS

158

**Exhibit 17**
**Page 274**

DEPOSITION ERRATA SHEET

1

2  Page No. 7 Line No. 15 Change to: It was

3  over -- in family matters, family

4  Reason for change: _____

5  Page No. 19 Line No. 12 Change to: A: I am a

6  jack-of-all, automotive, sales,

7  Reason for change: _____

8  Page No. 19 Line No. 13 Change to: retail sales.

9  I've done construction. I survive,

10  Reason for change: _____

11  Page No. 25 Line No. 8 Change to: can't work

12  with Glen Bowman no more. I mean, he's

13  Reason for change: _____

14  Page No. 29 Line No. 5 Change to: FEMA

15  encampment. I mean, then they shut the gate

16  Reason for change: _____

17  Page No. 36 Line No. 7 Change to: of it. It was

18  a snap judgment on his part, but they have

19  Reason for change: _____

20  Page No. 37 Line No. 11 Change to: bus system that

21  sucks. OCTA is not a great transit

22  Reason for change: _____

23

24  SIGNATURE: _____ DATE: 10/27/16

25

**Exhibit 17**
**Page 275**

Page No 59 Line no 5 Change To:
actually Knew That helped. "Oh, That's ovens."
You

Page No 81 Line No 1 change to:
don't give Them nothing). No scavengers get
nothing)

Page No 100 Line No 3 change to:
fiend, with "Dunk dope" written above his
eyelids,

Page No 123 Line No 2 change to:
was Dr. Laurie Clair.



SIGNATURE                                    DATE 10/27/16

Exhibit 17
Page 276

Richard Owens, 9/15/2016
Glover v. City of Laguna Beach

```
 1           I, the undersigned, a Certified Shorthand
 2   Reporter of the State of California, do hereby certify:
 3           That the foregoing proceedings were taken before
 4   me at the time and place herein set forth; that any
 5   witnesses in the foregoing proceedings, prior to
 6   testifying, were duly sworn; that a record of the
 7   proceedings was made by me using machine shorthand which
 8   was thereafter transcribed under my direction; further,
 9   that the foregoing transcript is a true record of the
10   testimony given.
11           Further, that if the foregoing pertains to the
12   original transcript of a deposition in a Federal Case,
13   before completion of the proceedings, review of the
14   transcript [  ] was [  ] was not requested.
15           I further certify I am neither financially
16   interested in the action nor a relative or employee of any
17   attorney of any of this action.
18           IN WITNESS WHEREOF, I have this date subscribed
19   my name.
20
21   Dated: _____
22
23
24           _____
25           ANGELA METZ
             CSR No. 12454
```

                                                    159

ADVANCED DEPOSITIONS
www.advanceddepositions.com | 855.811.3376

**Exhibit 17**
**Page 277**